ETHAN G. OSTROFF
757.687.7641 telephone
757.687.1541 facsimile
ethan.ostroff@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
757.687.7500 telephone
troutmansanders.com

June 3, 2011

Len Bennett, Esq.
12515 Warwick Boulevard, Suite 100
Newport News, VA 23606

Re: **Alisha Wilkes v. GMAC Mortgage, LLC et al.**

Dear Mr. Bennett:

Enclosed please find Defendant, GMAC Mortgage, LLC's Rebuttal Expert Report with regard to the above referenced action.

Very truly yours,

Ethan G. Ostroff

Enclosures

cc: Matt Erasquin, Esq.
John Bazaz, Esq.
Brian Casey, Esq.

ATLANTA   CHICAGO   HONG KONG   LONDON   NEW YORK   NEWARK   NORFOLK   ORANGE COUNTY   PORTLAND
RALEIGH   RICHMOND   SAN DIEGO   SHANGHAI   TYSONS CORNER   VIRGINIA BEACH   WASHINGTON, DC

# Law Offices
of
# Oscar Marquis & Associates
*Experts in Privacy & Consumer Reporting*
(847) 477-4986
omarquis@omarquislaw.com
www.omarquislaw.com

Alisha W. Wilkes
v.
Experian Information Solutions, Inc. et. al.

REBUTTAL REPORT
TO PLAINTIFF'S EXPERT REPORT
OF EVAN HENDRICKS
By
Oscar Marquis

---

I have been asked by counsel for GMAC Mortgage, LLC (GMAC) to provide a rebuttal to the expert report filed by Plaintiff's expert, Evan Hendricks, in the above proceeding. I also reserve the right to supplement this report based on additional information.

I have reviewed the expert report of Evan Hendricks ("Mr. Hendricks") submitted in this case. The report of Mr. Hendricks includes a number of overarching themes that do not address the particulars of this case. He first discusses his views of the underlying incentives for furnishers proving their account information to consumer reporting agencies and then he discusses the accuracy of consumer reports in the context of consumer reporting in general. I will discuss these issues below.

a. **The Consumer Reporting Industry**

Mr. Hendricks believes that this case "is the result of (GMAC) abusing the credit reporting system by using it to collect debts from Plaintiff (that she) did not in fact owe."[1] Mr. Hendricks believes that "creditors view credit reporting as an arm of debt

---

[1] Hendricks Expert Report, P. 1

collections";[2] that creditors report debts "that they know...are not the responsibility of the consumer" and quotes himself to prove the point.[3]

In fact, there is no evidence that any creditors or loan servicers, let alone national financial institutions such as GMAC, use the credit reporting system to collect debts from consumers that the institution knows do now owe the debt. I have never encountered even one such incident in my over 25 years working in the consumer reporting industry. There is no evidence that I could find in this case indicating that GMAC tried to collect the debt from Plaintiff knowing she did not owe it.

Furnishers of information to consumer reporting agencies, whether they are creditors or loan servicers such as GMAC, can use a segment or field for reporting the status of mortgages as being in collection. GMAC did not report Plaintiff's mortgage as being in collection. The account was reported by GMAC as being in foreclosures and does not indicate that any collection activities had been initiated prior to or after the foreclosure. In the case of mortgages as in the case of all accounts, there is a code by which to report an account in collections. That was not done by GMAC in this case indicating that GMAC was not collecting the amount owing on the defaulted mortgage and was not using the credit reporting system to collect a debt from Plaintiff.

In this respect, Mr. Hendricks appears to misunderstand the purpose of the consumer reporting industry. Lenders and loan servicers participate in the consumer reporting process for reasons having to do with lending, not collections. Rather than reporting information in order to make consumers pay off debts they do not owe, creditors and loan servicers, such as GMAC, report information to the consumer reporting agencies so that they can get credit information on new applicants. They need to contribute data in order to get data. I am aware of situations where lenders did not contribute information and were not given access to consumer reports or were threatened with not getting access and started reporting.

Creditors are in the business of lending money and they make money be lending to persons that pay back their credit obligations, and lose money when they lend to persons that do not pay them back. Consumer reports are used to help lenders distinguish between consumers who pay their bills, from those that do not pay or pay after collection activities are initiated. Lenders report their account information in a cooperative manner to consumer reporting agencies so that they can get information about new credit applicant's credit experiences with other lenders. That helps them find individuals that are credit worthy so they can make them their customers and as a result, make money. That is the way the consumer reporting industry began and continues to be its major focus today.

The exchange of credit information has existed in the United States for over 100 years and developed to facilitate lending. The almost universal reporting of credit experience information by lenders in the United States to centralized credit bureaus is the

---

[2] Hendricks Expert Report, P. 3
[3] Id.

2

foundation of US consumer credit and a critical ingredient of the US economy. It reduces the risk in lending and also permits consumers that are credit worthy to make purchases, obtain credit cards or obtain mortgages in places where they are not known and from lenders that do not know them.[4] The US credit reporting system also permits nationwide competition among credit card issuers and makes more choices available to consumers. In other words, the credit reporting system plays a positive role in the economy and is used for positive purposes and is not as nefarious as Mr. Hendricks envisions.

### b. Accuracy

Mr. Hendricks states that the "context" of this type of case is important and that "inaccuracies stemming from identity theft is a long-standing and well-known problem" and that there is "a long-standing problem of significant inaccuracy rates in credit reporting data."[5]

However, to bolster his case, he cites biased and old "inaccuracy studies" conducted by consumer advocacy groups. None of these so-called studies used any independent third party to conduct them nor used any randomly selected sample groups or any rigorous analysis.[6] In addition, there have been substantial changes to the Fair Credit Reporting Act ("FCRA") since those "studies" that in part addressed issues of accuracy and in fact resulted in improvements.

The most recent accuracy study was peer reviewed and much more rigorous than the earlier studies. It was conducted by the Policy and Economic Research Council (PERC) and release on May 5, 2011, and found that less than 1% of consumers had errors in their credit reports that could negatively affect their credit reports.[7]

In addition, it is important to note the context in which credit reporting operates. Mr. Hendricks addresses a context of inaccuracy claims but fails to address the relevant context. The three nationwide consumer reporting agencies each maintain approximately 1.5 <u>billion</u> credit accounts held by 210 Million individuals.[8] They update approximately 4 <u>billion</u> accounts <u>per month</u> with information received from 30,000 data contributors and issue over 1 <u>billion</u> reports per year.[9] GMAC currently services over 3,000,000 mortgage accounts.

---

[4] The recent credit crisis is the result of credit decisions being made without proper risk evaluation based on credit history information.
[5] Hendricks Report, P. 4
[6] For example, the most recent study he cites, by US PRIG in 2004, was based on the following: "In the spring of 2004, we sent emails to thousands of PIRG citizen members across the country requesting their voluntary participation in a survey about the accuracy of credit reports. In addition, we asked PIRG staff, coalition partners, friends and family to complete the survey as well. Overall, we collected 197 surveys from 154 adults in 30 states, the vast majority of surveys coming from PIRG citizen members." P. 16
[7] http://perc.net/files/DQreport.pdf
[8] Federal Trade Commission and Federal Reserve Board Report to Congress on the Fair Credit Reporting Act Dispute Process, August 2006, P. 3.
[9] Id

3

Consumer reporting agencies issue approximately 54 million reports per year to consumers and approximately 22% of those consumers dispute information.[10] In other words, of the 1 billion credit reports issued per year for the purpose of making credit or other risk decisions about individuals, only approximately 1.2% of the consumers dispute information in their consumer reports. The rest are presumably satisfied with the results.

Given these numbers, some errors are inevitable. But, FCRA contemplates errors and does not require error free reports. It only requires furnishers and consumer reporting agencies to follow "reasonable procedures" to assure accuracy.

The Federal Trade Commission and the Federal Reserve Board conducted a study of the dispute process in the consumer reporting industry in 2006. After conducting the study, the federal agencies made no recommendation that any change in the operation or the process, including the use of ACDV's, was necessary at this time.[11]

In December, 2008, the Federal Trade Commission (FTC) issued its third interim report to Congress regarding credit reporting accuracy and completeness. The purpose of the report was to help develop methodology for conducting a rigorous accuracy study:

> The previous interim report to Congress (December 2006) reviewed the results of an initial pilot study designed for testing a potential methodology for a nationwide survey, and it proposed a second pilot study to address certain problems uncovered in the first study. In both pilot studies, randomly selected consumers reviewed their credit reports with an expert to identify potential errors, and then disputed potential errors that the expert believed could have a material effect on their credit standing. The current report explains the methodological improvements tested in this second pilot study. As a next step, in 2009 FTC staff plans to submit a proposal, subject to approval by the Office of Management and Budget, for a nationwide study assessing credit report accuracy.[12]

Again, no recommendation to change the process was made by the FTC.

In an accuracy study that occurs every day, lenders make lending decisions based on their belief in the accuracy of the consumer reports they use. They sell automobiles, homes, wide screen televisions and give consumers that they have never met credit cards worth thousands of dollars based only on the consumer report. Giving money to people about whom they know nothing other than what is in a consumer report is a profound belief in the accuracy of those reports.

    **c. The ACDV Exchange**

---

[10] Id at P. 12
[11] Id. at P. 34
[12] http://www.ftc.gov/opa/2008/12/factareport.shtm

Mr. Hendricks appears to disapprove of the ACDV process for investigating disputed information. The ACDV process to automate dispute investigations in order to respond to consumers more quickly and to make the same changes in the consumer reports maintained by all nationwide consumer reporting agencies was implemented while I was General Counsel of Trans Union. The process was created to respond to the FCRA amendments of 1996. Section 611(a)(5)(D)[13] required the nationwide consumer reporting agencies to implement an automated system through which furnisher of information can report the results of reinvestigations to all other agencies. The system is designed to enhance consumer protections and is required by law.

The FTC and other regulators are fully aware of the ACDV process and how it works and have never recommended or suggested that it be changed.

### d. Plaintiff's Credit Report and Credit Scoring

Mr. Hendricks discusses credit scoring, but does not relate it to Plaintiff's consumer report other than to say that the GMAC foreclosure is more recent and therefore will have a more negative impact on the credit score. That is true, but is only part of the story. Credit scores also necessarily consider positive information.

Plaintiff's consumer reports reflected four recent adverse accounts: the GMAC mortgage account, an American Express account that was in collection in 2008, another American Express account that was charged off and Plaintiff settled for less than the amount owing in 2008, and a Bank of America account that was settled for less than the amount owing in 2009. The most current other credit account was one from 2008 with Banana Republic, but that card was reported as stolen or lost.

Plaintiff appeared to have no other current credit accounts. Her credit report reflected a number of older and closed installment and charge accounts, but they had not been active for five or more years except for a prior GMAC mortgage that was transferred to another lender in June of 2005.

As discussed above, creditors use credit reports to make risk decisions about credit applications. Those risk decisions have been largely automated as well and creditors use sophisticated scoring systems that evaluate credit reports as summarized in credit scores. As a result, personal bias has been taken out of the credit approval process and it is based entirely on an objective evaluation of a consumer's credit performance.

The scores are intended to predict whether and how a consumer will repay a new loan based on how consumers with similar credit characteristics behaved in the past. A credit score is based on the risk of, e.g., non-payment or bankruptcy by an individual by comparing his or her credit characteristics with those of other consumers who had the same characteristics whose performance is known. In other words, the scoring systems compare consumer reports at different time periods to determine which characteristics predicted the ultimate performance. Creditors make credit decisions by deciding what

---

[13] 15 U.S.C. 1681i(a)(5)(D)

5

level of risk they wish to take with a loan compared with their cost of funds and other factors, and determine the accept/reject and the pricing based on a credit score that corresponds with their risk tolerance.

To create credit scores, statisticians considered all the characteristics in a consumer report, which are in the hundreds, and selected a smaller, manageable number of characteristics that are also most predictive of future credit performance—both *positive and negative* performance—usually less than 20, to score. The Federal Reserve Board (the "Fed") analyzed credit scoring and presented a report to Congress as required by the Fair and Accurate Credit Transactions Act of 2003, which explains in great detail how scores are developed and what characteristics are considered.[14] In preparing its analysis, the Fed created a credit scoring system that closely paralleled the results achieved by the commercially available scoring systems, such as that developed by Fair Isaac Company (FICO) or the Vantage Score.[15] The Fed considered over three hundred characteristics[16] and selected 19.[17]

The characteristics used in the FICO and other commercial credit scoring systems are proprietary. However, based on my experience and on the Federal Reserve Board analysis, the characteristics and methodology used by the Fed is very similar to the commercial systems. The characteristics used by the Fed are essentially the same as those used by FICO.

The characteristics considered include positive and negative information, inquiries, the relationship between credit limits and outstanding credit, the type of credit accounts, their age, missed payments, late payments, timely payments and public records. No one factor alone determines the score. The weight of a factor is dependent on its relationship to other factors and is not always the same.[18]

Specifically, the Fed selected the following characteristics:[19]

1. Total number of accounts in good standing, opened 18 or more months ago
2. Total maximum credit issued on open accounts reported in the past 12 months
3. Total number of months since the most recent account delinquency

---

[14] The report can be found at:
http://www.federalreserve.gov/boarddocs/RptCongress/creditscore/creditscore.pdf
[15] Id. P. 78
[16] Id. Appendix B
[17] Id. Appendix C
[18] Fair Isaac publication, "Understanding your FICO Score,"
http://www.myfico.com/Downloads/Files/myFICO_UYFS_Booklet.pdf
[19] The characteristics used in credit scoring systems commercially and weights given to the characteristics are proprietary. However, based on my experience working with Fair Isaac and Trans Union's scoring program, the characteristics used by the Fed scoring program are typical of those used commercially.

6

4. Percentage of total remaining balance to total maximum credit for all open revolving accounts reported in the past 12 months
5. Percentage of total remaining balance to total maximum credit for all open installment accounts reported in the past 12 months
6. Percentage of total remaining balance to total maximum credit for all open bankcard accounts reported in the past 12 months
7. Percentage of accounts with no late payments reported
8. Number accounts that have payments that are currently or previously 30 or more days past due within the past 24 months
9. Total number of accounts currently less than 120 days past due in the past 2 months
10. Greatest amount of time a payment was late ever on an account
11. Total number of months since the most recent occurrence of a derogatory public record
12. Total number of inquiries for credit
13. Total number of months since the most recent update on an account
14. Average age of accounts on credit report
15. Total number of open personal finance installment accounts reported in the past 12 months
16. Total number of open non-installment accounts with a remaining balance to maximum credit issued ratio greater than 50% reported in the past 12 months
17. Percentage of accounts that are open and active with a remaining balance greater than $0 reported in the past 12 months
18. Total number of different credit issuers
19. Total number of public records and derogatory accounts with an amount owed greater than $100[20]

As can be seen from this listing, the emphasis in the scoring systems is positive and negative credit performance and the recentness of such performance. Plaintiff's credit report had no current information. There were no open accounts on which to base a credit decision. But, she had four recent negative accounts.

It should also be noted that none of the factors consider whether an account is disputed or not. An obvious reason for ignoring dispute statements is that if accounts marked as "disputed" were not considered by the scoring systems, the accuracy of consumer reports would be adversely impacted as consumers would dispute accurate, but negative information.[21] If such accounts were not included in calculating credit scores, credit risk decisions by lenders would be negatively impacted.

---

[20] Id. Appendix C
[21] Congress enacted the Credit Repair Organizations Act to address the problem of consumers circumventing the system through frivolous disputes.

7

It is therefore likely that Plaintiff's credit score would be low because there is nothing positive to score. Her application for most credit would denied for lack of current credit activity.

### e. Damages

Plaintiff applied to refinance her home with Precision Funding Group, LLC and Quicken Loans, Inc. in or about April 2010. Plaintiff requested a loan that would result in a mortgage payment of over 40% of her gross monthly income.

She applied to refinance her home more than one year after moving to another state, after she had rented the home, after she had decided that she did not want to move back to Virginia, and after she had already listed the home for sale in April 2010. Plaintiff ultimately closed on the sale of her home in June 2010.

Her application for the loan to Precision Funding Group, LLC did not indicate any information about the existing property. The application did not provide any information about an employer. It listed no source of her base income, though she identified monthly base income. The application had no information about current assets, although it interestingly listed the GMAC mortgage as a current liability.

The adverse action notice from Precision Funding Group, LLC denied the loan because of a foreclosure and unacceptable payment record on a pervious mortgage and because Precision Funding Group, LLC does not "grant credit to any applicant on the terms and conditions" requested.

The adverse action notice from Quicken Loans, Inc. denied the refinance loan because of credit history (i.e., current/previous slow payments, judgments, liens or bankruptcy). Neither Plaintiff nor Quicken Loans, Inc. have produced Plaintiff's application for the requested refinance from Quicken Loans, Inc. I believe it is reasonable to assume that, since both applications were done by Plaintiff in April, 2011, the same information that was provided to Precision Funding Group, LLC was also provided to Quicken Loans, Inc.

I believe that it is likely that the applications would have been denied even if the GMAC account had not appeared on her consumer report. The lack of credit history and the dearth of information on her application would have made credit approval difficult.

Mr. Hendricks discussed Plaintiff's damages beginning on Page 15 of his report. However, he does not appear to have analyzed any specific damages that might have been incurred by Plaintiff but discusses only general damages that others might incur.

He discusses non-economic damages, and states that "the damage on one's well-being and lifestyle are often much more profound. For starters, the vast majority of Americans are very concerned about maintaining their good names, a fact that is

8

reflected in FTC complaint statistics." This may be true, but the expert report does not relate this to Plaintiff or how she was damaged.

He states, "But the inaccuracies caused by GMAC severely stained her credit, and directly and persistently interfered with any hopes she had to resume a normal life. This assuredly impacted how Mrs. Wilkes felt about herself in particular and about life in general, as well as her interpersonal relationships. Like other victims of chronic inaccuracy, Mrs. Wilkes' plight symbolizes the nature of, and interrelationship between, 'economic' and 'non-economic' damage." However, we do not know from his report whether she did not lead a normal life or whether she was like "other victims of chronic inaccuracy" or had different damages that were more specific. It may very well be that Plaintiffs damages and personal harm resulted from her husband forging her name and other personal factors, not from GMAC.

Accordingly, it is unlikely that the reporting of the GMAC mortgage account resulted in any credit denials, lost credit opportunities, or credit related damages to Plaintiff.

### f. Willfulness

Finally, Mr. Hendricks sates that "because GMAC knew that Mrs. Wilkes was not responsible for the fraudulent accounts generated by her ex-husband, GMAC's continued reporting of them was intentional, reckless and defamed Mrs. Wilkes. The order from the state court action was entered by the state court on February 26, 2010 and GMAC responded to all of the ACDVs less than 30 days after this order.

I was responsible for a law department in a large corporation. I know that even when many systems are automated, instantaneous communication among all the areas of a company is not possible. Any lack of immediate communication between departments within GMAC regarding the outcome of the state court case was not unreasonable, much less intentional or reckless. It is unfortunate, but not planned or intended.

### g. Specific Points made by Mr. Hendricks

Mr. Hendricks expresses a number of additional opinions in summary form on the first two pages of his report. I address some of those below.

- Defendants GMAC and American Funding knew or should have known that impermissible access can lead to identity theft, and identity theft can result in credit report inaccuracies that are highly damaging to an innocent victim like Mrs. Wilkes. **Response**: There is no allegation in the complaint that GMAC obtained Plaintiff's report impermissibly. I fail to understand this opinion by Mr. Hendricks as it relates to GMAC or this case.

- From 1996 to the present, GMAC was put on notice by a variety of events of the importance of credit report accuracy and its duty to conduct reasonable investigations. It also was put on notice of serious deficiencies in widespread

9

industry practices and procedures for responding to consumer disputes that GMAC followed. Yet despite this notice, GMAC failed to make changes that would have prevented the predictable recurrence of inadequate reinvestigations that permit inaccurate data stemming from identity theft to remain in consumer files, and therefore failed to prevent the foreseeable damage that it inflicted upon Mrs. Wilkes. **Response**: It is very difficult for furnishers of information to consumer reporting agencies to investigate cases of identity theft because the criminal will have applied for credit using the victim's identity. The furnisher will not know if the borrower is a victim of identity theft or a borrower trying to avoid liability for a legitimate loan. I worked with the consumer relations experts at Trans Union while I was General Counsel to try to solve the problem. I do know that furnishers and consumer reporting agencies are focused on producing accurate reports and protecting consumers from identity theft. Congress, in enacting the FACT Act, recognized that the most effective steps to take are available when accounts are opened. The FACT Act required the regulatory agencies to develop "red flag rules" at account opening to protect applicants and those rules are now in place. But, no solution to an effective investigation of identity theft has been found and Mr. Hendricks offers none.

- A primary reason that GMAC's investigations were inadequate was because they sometimes over-relied on the "hurried, one-dimensional ACDV- Exchange." ... **Response**: As discussed above, the ACDV process was implemented to help consumers and respond more quickly. It has, in fact, achieved that result. But, GMAC is not responsible because that is the process used by the credit and consumer reporting industry and the process required by FCRA.

Fundamentally, it appears that Mr. Hendricks wants all doubts about the content of consumer reports and disputes to be resolved in favor of consumers. Unfortunately, the economy cannot function that way. FCRA does not require perfection by consumer reporting agencies or by furnishers. Errors in consumer reports unfortunately occur. But Congress in enacting FCRA recognized the importance of credit reporting to the banking system and therefore requires "reasonable procedures," not perfection. FCRA contemplates that consumers will not always agree with the results of the reinvestigation and accordingly permits them to place a dispute statement in their files rather than requiring creditors or consumer reporting agencies to agree with the dispute. In this case, Plaintiff did have a dispute statement regarding her allegation of identity theft and a security alert for FCRA fraud in her files with the national credit bureaus. But all that that furnishers of information, like GMAC, are required to do is follow reasonable procedures, which in this case, GMAC did.

| _/s/ Oscar Marquis_ | _June 3, 2011_ |
|---|---|
| Oscar Marquis | Date |

10

## DOCUMENTS REVIEWED

In preparing this rebuttal report, in addition to the materials listed in my original report and listed in the in footnotes to my original report, as well as the documents identified in my original report that were provided to me by counsel for GMAC, I considered the materials listed in this rebuttal report and in the footnotes of this rebuttal report and I relied on personal experience working in the consumer reporting industry. In addition, I reviewed the following documents provided to me by counsel for GMAC:

1. Plaintiff's deposition transcript dated May 11, 2011;
2. The documents produced in this case by Quicken Loans Inc. in response to a subpoena;
3. The documents produced in this case by Precision Funding Group LLC in response to a subpoena;
4. Documents Bates numbered GMAC/AW 2449-2470.

418842v1