# CONSUMER LITIGATION ASSOCIATES

ATTORNEYS AND COUNSELORS AT LAW

A PROFESSIONAL CORPORATION

**HAMPTON ROADS OFFICE:**
12515 Warwick Blvd.  Suite 100
Newport News, Virginia 23606

**NORTHERN VIRGINIA OFFICE:**
1800 Diagonal Road
Suite 600
Alexandria, Virginia 22314

Leonard A Bennett, Esquire
lenbennett@clalegal.com
(757) 930-3660 Phone
(757) 930-3662 Facsimile

**REPLY TO: HAMPTON ROADS OFFICE**

April 1, 2011

John C. Lynch
Troutman Sanders LLP
P. O. Box 61185
222 Central Park Ave
Suite 2000
Virginia Beach, VA 23462
john.lynch@troutmansanders.com

Elizabeth Spain Flowers
Troutman Sanders LLP
P. O. Box 61185
222 Central Park Ave
Suite 2000
Virginia Beach, VA 23462
liz.flowers@troutmansanders.com

Brian Nelson Casey
Taylor & Walker, PC
555 Main Street
P.O. Box 3490
Norfolk, VA  23514-3490
bcasey@taylorwalkerlaw.com

Jason Hamlin
Glasser & Glasser PLC
580 E Main St
Suite 600
Norfolk, VA 23510
jhamlin@glasserlaw.com

RE:   Alisha Wilkes v. Experian Information Solutions, Inc., et al
Civil No: 1:10cv1160

Exhibit N

Dear Gentlemen and Ms. Flowers:

Enclosed please find Plaintiff's 26(a)(2) Expert Witness Disclosure and Designation with regard to the above referenced action.

Thank you for your cooperation and assistance herein, I remain

Very truly yours,

Leonard A. Bennett

LAB:vlw

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

ALISHA W. WILKES,                                    :
                                                     :
        **Plaintiff**                            :
                                                     :
v.                                                   :          **CIVIL NO. 1:10cv1160**
                                                     :
EXPERIAN INFORMATION SOLUTIONS, INC.,                :
            **et al.**            :
      **Defendants.**                             :

### PLAINTIFF'S 26(A)(2) EXPERT WITNESS DISCLOSURE AND DESIGNATION

COMES NOW the Plaintiff, **ALISHA W. WILKES**, by counsel, and

discloses the following Expert Witness to testify at trial:

Evan D. Hendricks
P.O. Box 302
Cabin John, MD 20818
(301) 229 7002 - Telephone

The opinions, qualifications, basis for the opinions and other disclosures required by

F.R.C.P. 26(a)(2) are contained in the Plaintiff's Rule 26(a)(2) Expert Witness Report attached to

this Designation.

Respectfully submitted, .

ALISHA W. WILKES

Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
lenbennett@cox.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April, 2011, a true and correct copy of the foregoing pleading was mailed postage prepaid, to:

John C. Lynch
Troutman Sanders LLP
P. O. Box 61185
222 Central Park Ave
Suite 2000
Virginia Beach, VA 23462
john.lynch@troutmansanders.com

Elizabeth Spain Flowers
Troutman Sanders LLP
P. O. Box 61185
222 Central Park Ave
Suite 2000
Virginia Beach, VA 23462
liz.flowers@troutmansanders.com

     *Counsel for GMAC Mortgage, LLC*

Brian Nelson Casey
Taylor & Walker, PC
555 Main Street
P.O. Box 3490
Norfolk, VA  23514-3490
bcasey@taylorwalkerlaw.com

     *Counsel for America Funding, Inc.*

Jason Hamlin
Glasser & Glasser PLC
580 E Main St
Suite 600
Norfolk, VA 23510
jhamlin@glasserlaw.com

     *Counsel for Nationstar Mortgage, LLC.*

Leonard A. Bennett, Esq.

## PLAINTIFFS' RULE 26(a)(2) EXPERT WITNESS REPORT OF
## EVAN HENDRICKS

I, Evan Hendricks, provide the following Expert Report in connection with the action entitled <u>Alisha Wilkes v. Experian Information Solutions, et al.</u>: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ). **Part 1** of this report addresses issues that are specific to this case, including a context and history that robustly put Defendants on notice of the problems in this case and why Defendants should have prevented them. **Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages. It is likely that Defendants will disclose additional evidence after I have completed this expert report. If appropriate, and if justified by the production of additional evidence in discovery, I reserve the right to supplement this report at a future date.

### Summary of Opinions

- This case is the result of Defendant GMAC abusing the credit reporting system by using it to collect debts from Plaintiff Alisha Wilkes that Mrs. Wilkes did not in fact owe. GMAC's conduct was particularly reckless and egregious because it was party to a lawsuit in which the court declared that Mrs. Wilkes did not owe the debt.

- This case is also the result of Defendant American Funding allowing and enabling the theft of Mrs. Wilkes' identity by her husband by way of American Funding's impermissible access to her credit reports on the basis of highly questionable data provided and representations made by the thief -- Mrs. Wilkes' ex-husband. Given that identity theft is a well-known, long-standing phenomenon, American Funding's impermissible access to Mrs. Wilkes' credit report was reckless.

- A well-known and long-standing cause of credit report inaccuracy is identity theft. One well-known aspect of identity theft is family identity theft. Family identity theft includes the theft of the innocent victim's identity by an ex-spouse.

- Defendants GMAC and American Funding knew or should have known that impermissible access can lead to identity theft, and identity theft can result in credit report inaccuracies that are highly damaging to an innocent victim like Mrs. Wilkes.

- From 1996 to the present, GMAC was put on notice by a variety of events of the importance of credit report accuracy and its duty to conduct reasonable investigations. It also was put on notice of serious deficiencies in widespread industry practices and procedures for responding to consumer disputes that GMAC followed. Yet despite this notice, GMAC failed to make changes that would have prevented the predictable recurrence of inadequate reinvestigations that permit inaccurate data stemming from identity theft to remain in consumers'

1

files, and therefore failed to prevent the foreseeable damage that it inflicted upon Mrs. Wilkes.

- The inaccurate data stemming from the ex-husband's fraudulent accounts remained on plaintiff's credit report because GMAC did not exercise enough care in considering plaintiff's disputes and because its "investigations" of the disputes were inadequate to determine the underlying truth. This greatly compounded the damage to Mrs. Wilkes.

- A primary reason that GMAC's investigations were inadequate was because they sometimes over-relied on the hurried, one-dimensional "ACDV-Exchange." Still another reason is that GMAC viewed credit reporting as an effective means of collecting delinquent debts. While this is appropriate when a consumer actually owes the debt in question, it is utterly unreasonable and even reckless when the consumer does not owe the debt, particularly when the consumer is a victim of identity theft and so informed the furnisher and/or CRA, as did Mrs. Wilkes.

- The accounts generated by Mrs. Wilkes's ex-husband were the predominant reasons for the damage to her creditworthiness. This is because some of the fraudulent accounts fell within the FICO scoring model's definition of a "recent, major derogatory," and therefore had a significant negative impact on Mrs. Wilkes's FICO scores. Some of these accounts were also damaging because they were showing as past due or had derogatory terms associated with them, such as "foreclosure."

- Mrs. Wilkes' dispute was very genuine and was prompted by identity theft, a very serious and damaging activity that GMAC knew caused inaccuracy in credit reporting. Given the nature of Mrs. Wilkes' disputes, and given the fact that identity theft was a well-known, long-standing and prevalent problem, and given the fact that GMAC was party to a lawsuit in which the court declared that Mrs. Wilkes did not owe the debt, GMAC's repeated failure to correct inaccuracies disputed by Mrs. Wilkes was reckless.

- Because GMAC knew that Mrs. Wilkes was not responsible for the fraudulent accounts generated by her ex-husband, GMAC's continued reporting of them was intentional, reckless and defamed Mrs. Wilkes.

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms. The damages suffered by plaintiff were consistent with those experienced by other victims. In addition, Mrs. Wilkes suffered damages that were peculiar to her situation.

- One of the many damages that Mrs. Wilkes endured was invasion of privacy. The Defendants were responsible for this, as they accessed her confidential credit

report data without a permissible purpose, as Mrs. Wilkes had no legitimate relationship with the Defendants.

**Underlying Incentive For Furnishing**

Many people do not realize that creditors' furnishing of their customers' data to credit reporting agencies (CRAs) is entirely voluntary. A fundamental incentive for large creditors such as GMAC in this case is that credit reporting is a cost-effective means of enhancing debt collection.

GMAC is keenly aware that credit reporting is a "powerful tool designed, in part, to wrench compliance with payment terms." (Rivera v. Bank One, 145 F.R.D. 64, 623 (D.P.R. 1993)). Creditors' collection letters and debt-collecting operators often advise customer-debtors that if they don't pay their debt it will result in highly derogatory data being entered on that customer's credit report which may remain for up to seven years. Creditors' collection letters often advise customer-debtors that, "Any potential employer, mortgage company, car dealership or creditor is likely to see this remark. Such a condition is far more damaging than the delinquent status you now maintain."

When a consumer applies for a mortgage, or other major form of credit, the mortgage or credit often is not granted until all outstanding unpaid debts listed on the credit report are resolved. Thus, a creditor that is owed money, or that still hopes to collect money whether or not it is actually owed by the consumer, enhances its ability to garner payment by reporting the debt to that consumer's credit report. This practice is highly problematic and damaging to the consumer when the consumer in fact does not actually owe the amount being reported to her credit report. However, it is conceivable that such practices would cause consumers, particularly those who did not know their rights, to consider paying off debts that they did owe in order to remove serious derogatory data from their credit reports.

As I wrote in my book, "Credit Scores and Credit Reports,"

... Creditors view credit reporting as an arm of debt collection – a sort of last resort that will catch up with non-paying consumers sooner or later. This practice "crosses the line" when creditors and collectors threaten to report debts – or actually report debts – that they know or should know are not the responsibility of the consumer. [Page 31 – Second Edition]

GMAC crossed that line in the case of Mrs. Wilkes, in my opinion. Despite numerous notices directly from Mrs. Wilkes, as well as the disputes forwarded to GMAC by the CRAs, GMAC repeatedly reported to her credit reports the fraudulent debts generated by her ex-husband, and repeatedly failed to adequately investigate her disputes and facilitate the removal of the fraudulent data from her files. GMAC also failed to notate Mrs. Wilkes' disputed accounts as "disputed by consumer," or to advise the CRAs of their disputed status in the course of the ACDV-Exchange.

3

## Context

Context is extremely important in this type of case, in part because credit reporting, along with inaccuracies stemming from identity theft, is a long-standing and well-known problem. An important role of experts in FCRA cases is to help the trier of fact understand the relevant context.[1] Accordingly, I provide a brief history. An important theme emerging from this history is that a furnisher like GMAC was consistently provided notice in one form or another of the importance of ensuring the accuracy of information it reports and promptly restoring accuracy when the consumer disputes inaccuracies. This history also notified GMAC of the potential damage to consumers of both reporting erroneous information and then failing to correct it.

## History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[2] This history is covered in Chapter 10 of my book, "Credit Scores and

---

[1] Kirkpatrick v. Equifax, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO; In rejecting Defendant Equifax's motion to exclude Mr. Hendricks' testimony, Judge Michael W. Mosman, ruling from the bench, stated: "As a general statement, what I'm allowing and the reason I'm allowing it is testimony that puts the particular actions of the defendant in particular here in context, in the context of the nationwide problem of identity theft, in the context of the congressional reaction to that and other issues in the credit-reporting industry, when he can by virtue of his study and his prior testimony, both in court and to Congress, make comparisons, then that's something that's helpful to the jury." (January 18, 2005; Transcript available upon request.)

[2] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me?  The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

Credit Reports." As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC.

Of particular note was the 1993 study done by the U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC." Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions. These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

In 1991, Experian's predecessor TRW signed a consent agreement with 18 State Attorneys General (AGs).

The first problem identified by the State AG Agreement was the need to avoid the occurrence or reoccurrence of mixed files. The Agreement defined "Mixed File" as a *"Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."* The 1994 FTC Consent Order's definition of Mixed File was identical. The Agreement also emphasized the importance of using "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

One reason that the consent agreements are relevant is that identity theft-related inaccuracies are a sub-component of a mixed file, as information generated by the fraudster, in this case, Mrs. Wilkes' ex-husband, are mixed into the file of Mrs. Wilkes, the innocent victim.

---

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org,* July 2000.

Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers,* December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin,* February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

### History: Increased Attention on Role of Furnisher

This Consent Agreements are also relevant because (1) they created widespread publicity about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and more specific standard of care to ensure accuracy and fairness, and (3) they formed the foundation for the 1996 Amendments to the FCRA. However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time. Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. *Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors."* [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA. Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher. Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform him or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away. Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations. This resulted in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for many years, a furnisher like GMAC has been on notice from Congress, the FTC, State AGs, the media and the public that it is important to ensure accuracy, and to reasonably investigate consumer disputes, and that it can be highly damaging when inaccurate information is not removed.

### 'Reinsertion' Evidences Known Lack of Care by Furnishers

A major cause of inaccuracy identified in the FTC and State AG consent agreements was "reinsertion," which occurs when information that is deleted from a CRA file following a consumer dispute is later reinserted in the consumer's file.

A fundamental reason for this is that following the initial dispute and removal of the inaccurate information, the credit grantor continues to furnish the inaccurate data in the course of its routine monthly reporting.  In other words, *it is not uncommon for the furnisher to fail to delete the inaccurate information from its system that routinely reports it to the CRAs*.

Thus, the phenomenon of reinsertion, and all of the enforcement, legislation, litigation, and discussion surrounding it, provided notice to creditors like GMAC that its lack of care was an important and systematic cause of accuracy.

The CRAs recognized that because this problem was so prevalent, and because they could not rely on creditors to stop reporting inaccurate data, that they needed to develop their own solution.  Thus, they developed a mechanism for preventing previously deleted data from being wrongly reinserted into credit reports.  It is my understanding that Experian refers to this mechanism as a "soft delete;" Equifax refers to it as "suppression;" and Trans Union refers to it as "cloaking."  Trans Union's "cloaking" mechanism was discussed in Cousin v. Trans Union 246 F.3d 359, 5th Circ. 2001).  The Fifth Circuit concluded that one aspect of Trans Union's cloaking procedure – its decision to cloak accounts for only one year – was "not reasonable as a matter of law and the issue of reasonableness was properly before the jury to consider."

Under the CRAs' suppression function, a disputed-and-deleted account is marked or flagged, so that when the creditor furnishes it the following month, it is blocked, or suppressed, from re-entering the consumer's file.  Thus, if a CRA actually "deletes" disputed, inaccurate information from its database, it is unable to prevent it from reinserting when the creditor predictably provides it the next month.

### Standardized Industry Forms

The need to heighten furnishers' standard of care in credit reporting is also reflected in the standardized form that the furnishers use to unilaterally instruct CRAs to make changes in consumers' files.  The forms, known as Universal Data Forms (UDFs), were created by the credit reporting industry as part of its system for exchanging communications between CRAs and furnishers.  (UDFs sent electronically are referred to as Automated Universal Data forms, or AUDs).  The bottom of the UDF it reminds the furnisher, "When you sign this form, you certify that your computer and/or manual records have been adjusted to reflect any changes made."

The same is true on the Consumer Dispute Verification (CDV or ACDV) that furnishers like GMAC receive from CRAs when a consumer disputes data in their credit file.  These forms are used by furnishers to report to the CRAs the results of their "investigation."  In case the furnisher instructs the CRA to make changes, this standardized language appears at the bottom of the form: "When you sign this form you certify that you have verified the accuracy of the entire item and that you [sic] company's records will be adjusted to reflect the changes noted above."

Thus, furnishers like GMAC have been specifically notified by statute, by legislative history, by industry enforcement actions, by court opinions and by standardized industry forms and manuals that they need to ensure that inaccurate data are removed from their routine systems to ensure that they are not wrongly reported to CRAs.  Despite this extensive notice, however,

many of them still predictably fail to remove inaccurate information from their routine systems, and therefore, continue reporting it.

### (1) Parade of Notice – 4th Circuit's Opinion in <u>Johnson v. MBNA</u>

Both before and after my letter, two federal courts – U.S. District Court for the Eastern District of Virginia, in Richmond where Cap One had its headquarters, and the U.S. Court of Appeals for the Fourth Circuit – issued opinions that held unequivocally that the type of ACDV-Exchange-and-ID-data-comparison conducted by Cap One and other furnishers did not amount to a reasonable investigation under the FCRA. I quote at length from these two opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to Cap One regarding the need to change its investigation procedures.

By way of background, the FCRA lawsuit, filed by Leonard Bennett, stemmed from an MBNA MasterCard opened by Plaintiff Linda Johnson's ex-husband, Edward Slater, in 1987 – four years before he married her. They had since divorced. Johnson said she was only an authorized user, which meant she was not responsible for paying the account. In December 2000, Slater filed for bankruptcy, and MBNA promptly removed his name from the account. That same month, MBNA contacted Johnson and informed her that she was responsible for the approximately $17,000 balance on the account. After obtaining copies of her credit report from Experian, Equifax, and Trans Union, Johnson disputed the MBNA account with each of them. Experian and Trans Union sent automated consumer dispute verifications (ACDVs) to MBNA specifically indicating Johnson's claim that she was not a co-obligor on the account.

MBNA agents responded by conducting the ACDV-Exchange, comparing the disputed data with the account information contained in MBNA's computerized Customer Information System (CIS). Since the two were identical, MBNA "verified" that the disputed information was correct. In other words, MBNA did nothing more than confirm that it indeed reported the original (inaccurate) data. The CRAs continued to report it on Johnson's credit report.

Tricia Furr, an MBNA credit reporting specialist, confirmed that MBNA's "Desktop Procedure" manual directs specialists to confirm a match of two out of three identifiers – name, address and/or SSN. Once a two-out-of-three match is established, MBNA can inform the CRA that the disputed information is "verified as reported." Ms. Furr said that MBNA's "reinvestigations" did not go beyond the information contained in its own CIS.[3]

Reading from MBNA's internal records, MBNA Vice President Edward Hughes quoted an MBNA employee's communication to a customer's attorney: "It would be up to (c)ard holder to prove MBNA was reporting wrong, not MBNA proving right."

The jury disagreed with MBNA's argument that its actions did not violate the FCRA, and awarded Johnson $90,300 in damages.

---

[3] The depositions of MBNA personnel were taken in the case, <u>Linda Johnson v. MBNA America Bank. N.A.</u>, Slip Op. No. 3:02 cv 523, U.S. District Court For The Eastern District of Virginia (Richmond Division).

Judge Richard Williams affirmed the jury verdict. "According to [MBNA], the duty to investigate means that any investigation is sufficient, no matter how cursory. Such a construction is illogical. There would be no point in having the statute, and the requirement of an investigation, if there was no qualitative component to the investigation. The statute itself does impose a qualitative component to the [MBNA's] negligence," Judge Williams said.[4]

MBNA appealed Judge Williams' decision. But on February 11, 2004, a three-member panel of the U.S. Court of Appeals for the Fourth Circuit affirmed, finding that MBNA's standard response to consumer disputes did not amount to a true "reinvestigation" under the FCRA.

"MBNA argues that the language of § 1681s-2(b)(1)(A), requiring furnishers of credit information to 'conduct an investigation' regarding disputed information, imposes only a minimal duty on creditors to briefly review their records to determine whether the disputed information is correct," the panel wrote, in an opinion authored by Chief Judge William W. Wilkens. "Stated differently, MBNA contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable."[5]

"The key term at issue here, 'investigation,' is defined [by the dictionary] as 'a detailed inquiry or systematic examination.' Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," he wrote.

Further, he said, the statute "uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, unreasonable inquiries by creditors. We therefore hold that § 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."

MBNA also tried to argue that its investigation in Johnson's case was reasonable. But the court pointed to the specific nature of Johnson's dispute, and the testimony of MBNA agents that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the Customer Information System, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account.

"The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably

---

[4] Johnson v. MBNA, op. cit., bench ruling February 24, 2003
[5] Johnson v. MBNA America Bank: 357 F.3d 426 (4th Cir. 2004).

conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS," Judge Wilkens wrote.

### (2) Parade of Notice – My Book

The first edition of my book, "Credit Scores and Credit Reports," was released in June 2004. The book had an entire chapter, "Reinvestigations (or not)," describing inadequacies in the system for responding to consumer disputes about credit report inaccuracies. The chapter devoted considerable coverage to Cap One's system and quoted at length from the same deposition of Pam Tuskey excerpted above. It also contained a discussion of the court opinions in Johnson v. MBNA, which included the following passage:

> Richard Rubin, a Santa Fe, New Mexico attorney who argued the case for Johnson before the Fourth Circuit, noted that the panel adopted his position that had MBNA simply told the truth and stated that its investigation was inconclusive, the CRAs would have deleted the tradeline as required by the FCRA, and the litigation never would have occurred.

Also relevant to the issue of notice was the fact that Michelle Singletary, whose weekly *Washington Post* personal finance column, entitled, "The Color of Money," which is syndicated in over 100 newspapers nationwide, named by book, "The Book of the Month" for July 2004.

In Singletary's laudatory review of my book, she noted:

> In "Credit Scores & Credit Reports," you get information based on advice from top consumer attorneys on how to dispute errors, *and you learn what happens when credit bureaus investigate consumer claims of inaccuracies (actual court testimony from officials in the credit industry will make you shudder).* ["Unlocking the Mysteries Of Your Credit Score," by Michelle Singletary, *Washington Post*, Sunday, July 11, 2004; Page F01 (Front Page of Business Section, emphasis added.)

### (3) Parade of Notice – Alabran v. Cap One

Another poignant court opinion came in December 2005 in the case of Alabran v. Cap One. Again, I quote at length from this opinion not to express any legal opinions or conclusions, but because, in my expert opinion, this court ruling provided important notice to Cap One regarding the need to change its investigation procedures.

Here are few facts cited by the court in Alabran:

> 14. Capital One also received three automated customer dispute verification (ACDV) requests on each account from the three credit reporting agencies (Equifax, Experian, and TransUnion) (CRAs) from May through

September 2003 describing the dispute as "Not his/hers" and asking the Defendant to "Provide complete ID."

15. In each instance, Capital One reviewed its account records, noted that payments had been made on the accounts from checking accounts with the Plaintiff's name and the same billing address on the payment checks, and verified the account information back to the CRAs.

16. When reviewing an ACDV notice, Capital One did not review any other records it may have maintained on the consumer, even though it had to know that the dispute was based on account information it had forwarded.

Here are some excerpts from the opinion:

As to the merits of Plaintiff's FCRA claims, Capital One argues that it cannot be held liable for any violation, as a matter of law, because it was only obliged to respond in a reasonable way to any inquiry from a CRA and that it did so. Specifically, Capital One asserts that it received multiple ACDV notices from the CRAs and that all of them reported only an identity dispute ("Not his/hers. Provide complete ID."), not an identity theft or fraud alert. As such, Capital One asserts it was only required to confirm personal identifiers in the account, that is, "whether the Larry Alabran who owned these accounts was the same Larry Alabran who was now disputing them." (Id. at 8).

Accordingly, Capital One reviewed such personal identifiers as name, social security number, address, and mother's maiden name and confirmed:

... to a sufficient degree of confidence that permitted Capital One Bank to conclude that the Larry Alabran who had used and enjoyed these credit card accounts for more than six years during the course of his marriage to Mersine, was the same Larry Alabran who was now disputing these credit card accounts for the first time, shortly after he filed for divorce.

In support of its position, the Defendant urges the court to adopt the holdings from other circuits involving the same CRA notification, "Not his/hers. Provide complete ID.," in which those courts (district and appellate levels) found that such notice was too "scant" or otherwise insufficient to require the furnisher to do anything more than Capital One did in the present case. Specifically, the Defendant relies on Westra v. Credit Control of Pinellas, 409 F.3d 825 (7th Cir. 2005), and Malm v. Household Bank, N.A., supra, in which both courts held that the scope of "reasonableness" for the required investigation by a furnisher in response to a notice of a consumer's dispute from a CRA is defined and confined by the information provided in the notification, and that the simple indication that the consumer was disputing a charge, without any indication of

possible fraud or identity theft, did not require the furnisher to do more than confirm the identity of the protesting consumer.

At the same time, the Plaintiff asserts that the Fourth Circuit opinion in <u>Johnson v. MBNA America Bank</u>, N.A., 357 F.3d 426, 431 (4th Cir. 2004), controls whereby the court held "that §1681 s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified," and that the factfinder (jury) had a basis to find that the furnisher's efforts, which the Plaintiff asserts mirror those of Capital One here, were unreasonable. The multiple notifications from different CRAs in Johnson were "CONSUMER STATES BELONGS TO HUSBAND ONLY" and "WAS NEVER A SIGNER ON ACCOUNT. WAS AN AUTHORIZED USER." The court in Johnson interpreted such information as indicating the consumer was disputing that she was a co-obligor on the account so that mere confirmation of the identity of the consumer without reference to additional information available to the furnisher in its own records would – and did – form a sufficient basis for the jury to have found the furnisher's investigation to be unreasonable.

In the present case, Capital One argues that Johnson is not controlling because the information provided by the CRA notification in Johnson was quantitatively different where the furnisher was clearly put on notice that the dispute involved more than the consumer claiming that he/she was not the same person who was obligated on the account. However, aside from the fact that Westra and Malm are not controlling for being from other circuits, they are distinguishable from Johnson and this case for a different reason, and with a different result, than urged by Capital One. *Specifically, in Johnson and here, the Plaintiff had lodged the dispute directly with the furnisher involved as well as the CRAs, and although the furnishers did not have the obligation under § 1681 s-2(b)(1) to conduct a "reasonable" investigation until they received notice from a CRA, they maintained the specifics of the dispute in their records that would have detailed the problem if the investigation reached beyond simply confirming identity.* The issue in both <u>Westra</u> and <u>Malm</u> was that of identification, that is, whether the person making the dispute was the same person who was obligated on the account, *i.e.*, ID fraud.[9] In both Johnson and the present case, however, the dispute concerned whether the person making the dispute was an authorized user and, if so, whether they were obligated for the indebtedness. In addition, and particular to this case of whether dispositive relief is available to Capital One, its own Rule 30(b)(6) witness testified in deposition that Capital One had received the same dispute code over time in regard to consumer disputes in which Capital One understood that the consumer, like the Plaintiff here, denied the obligation because they were only an authorized user versus not being the person who had used the card.

*Nevertheless, a Capital One employee responding to an ACDV notice of consumer dispute would not conduct any investigation under any circumstance of even Capital One's own internal files beyond confirming identity which allows for the reasonable inference that no further investigation would be undertaken even if there was an indication of fraud.*

12

In both Westra and Malm, the consumer lodged his/her dispute with only the CRA (or, as in Malm, with a successor creditor/furnisher) such that the furnisher involved did not have any additional information at its disposal to at least clarify what those courts concluded to be insufficient notification. Here, Capital One's own witness has confirmed in discovery that the notification of "Not his/hers" indicated that the consumer disputed that he/she was a co-obligor on the account, the same significance attached by the court to the arguably more specific notice in Johnson. As such, dispositive relief is precluded where there exists a genuine issue of disputed material fact as to whether, under the particular facts and circumstances of this case, *Capital One usurped any obligation to conduct a reasonable investigation upon receipt of the CRA notices because it had at least clarifying information available.*

[End of Excerpts From Opinion in Alabran—emphasis added]

I emphasized the above passages to underscore direct and robust notice to Cap One regarding the importance of considering all of the relevant information available to it after receiving a consumer's dispute from the CRA.

### GMAC Disregards Notice

As we can see, there was nothing in GMAC's actions in Mrs. Wilkes' case that indicated GMAC heeded the important notice arising from these cases.

However, Plaintiff's experiences and GMAC's actions confirm that they have no intention of making the changes necessary to cure the gross inadequacies in their systems for handling consumer disputes.

Thus, in my opinion, it appears that a sufficiently forceful enforcement action is necessary to prompt GMAC make the necessary changes.

### GMAC Did Not Adequately Investigate Mrs. Wilkes's Disputes

In my opinion, GMAC did not adequately evaluate or investigate Mrs. Wilkes' disputes that it received from the credit reporting agencies. Instead, GMAC conducted its traditional, two-dimension exchange of CDVs with the credit reporting agencies, which has been shown not to be effective in resolving identity theft disputes, in my opinion. As mentioned above, this resulted in GMAC "verifying" false information about Mrs. Wilkes. Moreover, in important instances, GMAC did not adequately evaluate or investigate disputes that it received directly from Mrs. Wilkes and also failed to adhere to its duty to notate them as disputed by consumer.

### Mrs. Wilkes' Problems With GMAC Would Have Persisted Absent A Lawsuit

Like other victims of chronic inaccuracy, the Mrs. Wilkes's problems would have persisted until litigation or the threat of litigation forced a more thoughtful review of her case.

13

### The ACDV-Exchange

It is essential that the trier of fact gain an understanding of Defendant's principal method of responding to consumer disputes investigation, and the shortcomings of that method that are relevant to this case. The history of CRAs' and furnishers' inadequate reinvestigations, and the response to that history by Congress, federal and state enforcement officials, consumer groups and the media, effectively put the financial services industry on notice several years ago that their routine method of reinvestigation would not facilitate correction of certain types of inaccuracies. Of particular relevance to this case is the failure on the part of GMAC to conduct reasonable reinvestigations after receiving Mrs. Wilkes' disputes concerning fraudulently-generated data appearing on her credit reports, in my opinion.

The principle "reinvestigation" procedure followed by CRAs and by furnishers such as GMAC who receive notice of a consumer dispute from a CRA, essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs). When the consumer sends her dispute to the CRA, the CRA populates the ACDV form with her identifying information (name, address, city-state-zip, SSN, sometimes previous address),[6] and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not mine" or "fraud"). In a "not mine" dispute, the ACDV instructs the furnisher to provide "complete ID."

Upon receipt of the ACDV form, the furnisher will advise the CRA if a sufficient number of identifiers (i.e., name, Social Security number) match up and then "instruct" the CRA to either delete, modify, or "verify" the information so that it remains.

Thus, this process is better described as a *comparison* of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute.

As this case illustrates, there can be several problems with the CDV-exchange serving as the principal means of responding to consumer disputes. First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word. The Webster's New Collegiate Dictionary defines "investigate" as, "v. To observe or study by close examination and systematic inquiry. Systematic—adj. Marked by thoroughness and regularity." An exchange of messages is neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

Second, in cases like this, where the misuse of the victim's identifiers as maintained by the furnisher's *is the cause* of the inaccuracy in the victim's credit report, the ACDV-exchange has at times not been proven to be reasonably calculated to successfully determine whether a consumer's dispute should be honored. Thus, when GMAC in this case received the ACDV from the CRAs, there was a strong possibility that it would merely confirm or "verify" the inaccurate information it had previously reported. Again, this is because in the ACDV-exchange process, the CRAs merely direct GMAC to focus on and compare identifiers. Accordingly, I am aware of several cases in which CRAs and furnishers told consumers they had "verified" information that was in fact false.

---

[6] The CRAs often refer to identifiers as "indicative data"

Third, the ACDV-exchange is vulnerable to mistakes, in part because of the conveyer-belt environment, and the utter absence of careful consideration or true investigation.

Fourth, because the GMAC in this case rely principally on the CDV-Exchange, they did not consider taking other reasonable investigative steps that could have been more effective for dealing with Mrs. Wilkes' fraud-related disputes. For example, in her disputes, plaintiff provided contact information to GMAC , but it did not use the contact information to resolve the problem effectively. In fact, in the hurried, conveyor-belt atmosphere of the ACDV-Exchange, furnishers like GMAC  rarely, if ever, call a consumer to discuss his or her dispute.

### Damaging Nature of Inaccuracies

The inaccuracies on plaintiff's credit reports were damaging in several ways.  First, the inaccurate fraudulent accounts on Mrs. Wilkes's credit reports qualified as major derogatories that ensured significant damage to her credit score.  The more recent a derogatory tradeline, the more damaging it is to a consumer's credit score.  Under the FICO scoring model, a major derogatory, like a collection or charge-off, which is fewer than 12 months old, has a 92% negative impact on the FICO score, while one that is between 12-23 months old as a 64% negative impact.  (See below, "Nature and Purpose of Credit Scores.")

Second, at times inaccurate data furnished by GMAC portrayed Mrs. Wilkes as having outstanding or charged-off obligations that were still owed.  When this happens, it usually means that a creditor will not extend credit to applicants until they "resolve" the outstanding debt.  A consumer can "resolve" it by disputing it and removing it from her credit report.  However, given the difficulty that this can entail, it is often easier and faster to resolve it by paying it.  But Mrs. Wilkes justly refused to do this.

The damage to Mrs. Wilkes caused by Defendant's erroneous furnishings, and which remained because of Defendant's inadequate investigations, were the predominant reasons for the damage to the Mrs. Wilkes's creditworthiness, and consequently, for her inability to obtain credit on the favorable terms to which she would have been entitled but for Defendant's failures.

### 'Non-Economic' Damages

The above cited "economic" damages are easier to identify and quantify, and therefore easier for some people to understand.

In my experience, however, in the cases of victims of chronic credit report inaccuracy, the damage on one's well-being and lifestyle are often much more profound.  For starters, the vast majority of Americans are very concerned about maintaining their good names, a fact that is reflected in FTC complaint statistics.  People like Mrs. Wilkes who have worked hard for years to maintain their good name in the credit world describe it as extremely hurtful to be portrayed by supposedly reputable, nationwide organizations as irresponsible deadbeats.  But that is only the beginning of the harm.

To fully understand the nature of the damage, it is necessary to recognize the interrelationship between the "economic" and "non-economic" damage. The inaccurate tradelines, particular those that were reinserted, set off a chain reaction that ultimately cast a dark shadow over her life. As their credit reputations were besmirched, victims of chronic inaccuracy find that opportunities once taken for granted are vanishing. Mrs. Wilkes was a case in point. She had an excellent credit history and was entitled to obtaining credit on the most favorable terms.

But the inaccuracies caused by GMAC severely stained her credit, and directly and persistently interfered with any hopes she had to resume a normal life.

This assuredly impacted how Mrs. Wilkes felt about herself in particular and about life in general, as well as her interpersonal relationships. Like other victims of chronic inaccuracy, Mrs. Wilkes' plight symbolizes the nature of, and interrelationship between, "economic" and "non-economic" damage.

Now consider the impact that such an environment would have on a reasonable person's psyche, inter-personal relationships, ability to concentrate, organize and perform at work, and ability to enjoy life. Clearly, any reasonable person would be negatively impacted.

Greatly compounding the harm is the frustration, stress, and trepidation that victims such Mrs. Wilkes' endure as they are unsuccessful in their reasonable attempts to restore accuracy to her credit life. The truth was that Mrs. Wilkes' account should not have been depicted as seriously delinquent. However, supposedly reputable institutions like GMAC was effectively telling the financial services industry through the credit reporting system that Mrs. Wilkes was an irresponsible deadbeat. Mrs. Wilkes truthfully told GMAC she was being unfairly and inaccurately associated with fraudulent, derogatory data. Yet GMAC disregarded the essence of her disputes, or their duty to reasonably investigate them and restore accuracy.

**Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy/Identity Theft**

It is important that the trier of fact understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts.

**Some Categories of Typical Negative Impacts of ID Theft & Chronic Inaccuracy**

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms

(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Mrs. Wilkes's Damages Were Consistent with Other Victims of Credit Report Inaccuracy

Mrs. Wilkes' damages were consistent with other victims of chronic credit report inaccuracy. Their experiences touched on many of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[7] It can be difficult to perform adequately at one's job.

### Defendant Knew or Should Have Known It Actions Would Have Negative Impact

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to GMAC that failing to prevent Mrs. Wilkes from becoming a victim of chronic inaccuracy would have a highly negative impact on her.

### Part 2

### Potential Areas of Testimony: General Issues, Context

A.   The Nature and Purpose of Credit Scores
B.   The Nature and Purpose of Credit Reports

### Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems. If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of

---

[7] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time. The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others. The scoring range for the FICO "classic" model is 300-850. The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union,[8] are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[9] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
| --- | --- | --- |
| 760 - 850 | 6.148% | $1,827 |
| 700 - 759 | 6.370% | $1,871 |
| 680 - 699 | 6.654% | $1,927 |
| 660 - 679 | 7.464% | $2,090 |
| 640 - 659 | 8.816% | $2,374 |
| 620 - 639 | 9.782% | $2,584 |

A similar chart exists for auto loans. Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.[10]

1.  The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[11]

---

[6] In previous years, the Trans Union FICO Score was called "Empirica"
[7] Visited September 21, 2005
[8] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports," op. cit.
[11] These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.** The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.** This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?** The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.     It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months. The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a 93% negative impact, while a major delinquency between 1-2 years-old has about a 60% negative impact; a major delinquency between 2-3 years-old has a 44% negative impact; a 3-4 year old delinquency has a 33% impact; any delinquency older than 4 years has only a 22% negative impact.



There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates.
> http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores. While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[12]

### Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports. Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems. The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports. However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[13]

---

[12] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf
[13] *Ibid.*

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports. Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN). There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian. The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others. The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history. It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)     A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.
(2)     A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.
(3)     If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.
(4)     A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format. A fundamental purpose of the credit report is to describe a consumer's creditworthiness. For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan). The code for someone who always paid her credit card on time would be "R1." Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due

- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 : On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

### Background & Qualifications (Curriculum Vitae Attached)

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u>, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights. I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and

practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information. (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[14]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[15]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[16]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[17]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

---

[14] http://banking.senate.gov/03_07hrg/071003/index.htm
[15] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[16] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[17] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

25

### Testimony & Expert Reports

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies. Expert report, deposition, trial testimony. Judge Lourdes Baird presiding. The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures. (see 225 F.3d 1063 (2000)).

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida. Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony. Judge George A. Sprinkel IV presiding.

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No. CV 07-00726-SI. Expert report, deposition. Trial testimony. Judge Susan Illston presiding.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.: 07-9322 CA 09. Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri (No. 07-2514). FCRA. Expert report, deposition. Trial Testimony. Judge Nanette K. Laughrey presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO). FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc..: U.S. District Court for the District of Connecticut. 3:07-cv-01035-JCH. FCRA. Expert report, deposition. Trial Testimony. Judge Warren W. Eginton presiding.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.). FCRA. Expert report. Deposition. Trial Testimony. Chief District Judge Todd J. Campbell presiding.

Rebecca L. Valentine, v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony. Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272. Expert reports. Deposition. Trial Testimony   Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.   Expert reports. Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC, U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.   FCRA   Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.   FCRA.   Expert Report. Daubert Hearing. Trial Testimony.  Senior Judge John P. Fullam qualified me to testify at trial.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony.  Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE.   FCRA. Expert report, deposition, trial testimony.   Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition.  Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr.  v. Trans Union. L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition.  On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me.  The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony.  Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Alana Valerie Sheldon v. Trans Union. LLC., LVNV Funding. LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.

In Re: Cellphone Termination Fee Cases, Superior Court of the State of California, Alameda County, JCCP No. 4332.  Deposition.

Karl Benedikt v. ChoicePoint, Inc.: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC. and Afni, Inc.: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA.  Expert report, deposition.

Erin Ayles v. Experian Information Solutions, Inc.: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662. Expert report, deposition.

Maria D. v. Comcast Corp., Sacramento Superior Court, Case No. 03AS05745. Deposition.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

Ford Motor Credit Co. v. Sudesh Agrawal, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

Larry Alabran v. Capital One Services, Inc..: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE. Expert report, deposition.

Robert Gordon Peoples v. Experian Services Corp., et al.: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions: U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div.  FCRA. Expert report.  Deposition.

Earle E. Ausherman. et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433. FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

## FEE

My fee is $250 per hour for consulting and for the expert report; $300 per hour, or a minimum of $1,200 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

### Professional Activities

**1981- Present**      **Editor/Publisher** of *Privacy Times*

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present**      **Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present**      **Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004**      **Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002**      **Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks**      **P.O. Box 302**      **Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com**

---

**Recent Testimony Before Congress & The FTC**

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[18]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[19]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[20]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[21]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[22] Senate Banking Committee, March 15, 2005
"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[23]
"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[24]
"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[25]
"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[26]
"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

---

[18] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[19] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[20] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[21] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[22] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[23] http://banking.senate.gov/03_07hrg/071003/index.htm
[24] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[25] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[26] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).
In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in the Information Society," Presenter, "Credit Report Cases – Effective Remedies?" Center on Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[27]
"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed?  The George Washington University Law School, Washington, DC, June 12-13, 2008.[28]
"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)
"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005
"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005
"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute, February 28- March 1, 2005 (New York City)
"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004
"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004
"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004
**Professional Societies**
Past President & Board Member, American Society of Access Professionals www.accesspro.org
**Industry Certification**
FCRA Certification, National Credit Reporting Association (www.ncrainc.org).
**Media**
In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.
**Education**
Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

---

[27] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[28] http://privacyscholars.com

## MATERIALS CONSIDERED

In specific preparation for this case, I have reviewed the following:

Plaintiffs' Complaint & Attached Exhibits
Plaintiffs' credit reports
Various correspondences by Plaintiff & Defendants
Internal documents produced by Defendants
Defendants' and Plaintiffs' Answers and Responses to Interrogatories

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
<u>Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,</u>
National Consumer Law Center, 1998 (Boston)
<u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007),

My opinions in this case are also based on my 31-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 1st Day of April 2011 in Bethesda, Maryland**

/s/ **Evan D. Hendricks**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002