

ETHAN G. OSTROFF
757.687.7541 telephone
757.687.1541 facsimile
ethan.ostroff@troutmansanders.com

TROUTMAN SANDERS LLP
Attorneys at Law
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
757.687.7500 telephone
troutmansanders.com

May 6, 2011

Len Bennett, Esq.
12515 Warwick Boulevard, Suite 100
Newport News, VA 23606

Re: Alisha Wilkes v. GMAC Mortgage, LLC et al.

Dear Mr. Bennett:

Enclosed please find Defendant, GMAC Mortgage, LLC's 26(a)(2) Expert Witness Disclosures and Designation with regard to the above referenced action.

Very truly yours,

Ethan G. Ostroff

Enclosures

cc: Matt Erasquin, Esq.
John Bazaz, Esq.
Brian Casey, Esq.

Exhibit O

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ALISHA W. WILKES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil No. 1:10-cv-01160 (CMH-TRJ) |
| | ) |
| GMAC MORTGAGE, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT GMAC MORTGAGE, LLC'S
RULE 26(a)(2) EXPERT WITNESS DISCLOSURE AND DESIGNATION**

COMES NOW the Defendant, GMAC Mortgage, LLC ("GMAC"), by counsel, and discloses the following Expert Witness to testify at trial:

Oscar Marquis
120 N. Dee Road
Park Ridge, IL 60068
(847) 698-1077

The opinions, qualifications, basis for the opinions and other disclosures required by F.R.C.P. 26(a)(2) are contained in GMAC's Rule 26(a)(2) Expert Witness Report attached to this Designation.

Dated this 6th of May, 2011.

GMAC MORTGAGE, LLC

By: _____
Of Counsel

417665v1

John C. Lynch (VSB No. 39267)
Ethan G. Ostroff (VSB No. 71610)
Counsel for GMAC Mortgage, LLC
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7765
Facsimile: (757) 687-1504
E-mail: john.lynch@troutmansanders.com
E-mail: ethan.ostroff@troutmansanders.com

417665v1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ALISHA W. WILKES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 1:10-cv-01160 (CMH-TRJ) |
| ) | |
| GMAC MORTGAGE, LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of May, 2011, I sent a true and correct copy of the foregoing Rule 26(a)(2) Disclosures, via email to the following counsel of record:

**Counsel for Plaintiff**
John C. Bazaz, Esq.
Surovell Isaacs Petersen & Levy PLC
4010 University Drive, 2nd Floor
Fairfax, Virginia 22030
E-mail: jbazaz@siplfirm.com

Leonard Anthony Bennett
Consumer Litigation Assoc PC
12515 Warwick Blvd., Suite 1000
Newport News, Virginia 23606
E-mail: lenbennett@cox.net

Matthew James Erausquin
Consumer Litigation Assoc PC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
E-mail: matt@clalegal.com

**Counsel for America Funding, Inc.**
Brian Nelson Casey, Esq.
Taylor & Walker PC
555 Main St , PO Box 3490
Norfolk, VA 23514-3490
(757) 625-7300
Email: bcasey@taylorwalkerlaw.com

417665v1

/s/ Ethan G. Ostroff
Ethan G. Ostroff (VSB No. 71610)
Counsel for GMAC Mortgage, LLC
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Telephone: (757) 687-7541
Facsimile: (757) 687-1541
E-mail: ethan.ostroff@troutmansanders.com

417665v1

**Law Offices**
of
**Oscar Marquis & Associates**
*Experts in Privacy & Consumer Reporting*
(847) 477-4986
omarquis@omarquislaw.com
www.omarquislaw.com


**Alesha W. Wilkes**
v.
**Experian Information Solutions, Inc. et. al.**

**EXPERT REPORT**
By
**Oscar Marquis**

---

I have been asked by counsel for GMAC Mortgage, LLC (GMAC) to provide an expert report in the above proceeding, filed in the United States District Court for the Eastern District of Virginia, regarding GMAC's compliance with the Fair Credit Reporting Act. Specifically, I have been asked to provide an opinion as to whether GMAC's policies and investigation of disputed account information that GMAC furnished to consumer reporting agencies pertaining to Plaintiff was in accordance with industry practiced and reasonable under the Fair Credit Reporting Act (FCRA). My credentials are stated at the end of this report. I also reserve the right to supplement this report based on additional information.

### I. Conclusion

Based on the facts and the policies that I reviewed and for the reasons stated below, it is my opinion that GMAC conducted a reasonable reinvestigation of Plaintiff's dispute, reviewed all relevant information provided by the consumer reporting agencies and reported the results of the investigation to the consumer reporting agencies on the automated consumer dispute verification form (ACDV), all as required by 15 U.S.C. § 1681s-2(b) of FCRA and in accordance with industry practice.

### II. Facts

Plaintiff purchased certain real estate with her husband and held title as tenants by the entirely in 2005. Plaintiff appeared to enter into a promissory note and deed of trust securing the note with GMAC on April 25, 2008. Plaintiff alleges that, subsequently in or around October, 2008, she received collection calls regarding that account and learned for the first time that she was a party to the April 25, 2008 mortgage transaction. She continued to live at the property, however, and pursuant to a divorce decree dated

November, 18, 2008, she was given title to the marital residence, with her ex-husband assuming all liens.

Plaintiff alleges that, as a result of the collection calls, Plaintiff obtained her consumer report from the nationwide consumer reporting agencies, Equifax, Experian and Trans Union, and learned that her reports indicated that she was obligated on the GMAC account. Plaintiff engaged an attorney, who sent a letter on behalf of Plaintiff to GMAC in which her attorney claimed that this account was not Plaintiff's and that she was the victim of identity theft in the origination of the loan. GMAC sent correspondence to Plaintiff's attorney asking for a notarized affidavit from Plaintiff, a copy of a police report evidencing the allegation of identity theft, and proof of identification that includes a photo, signature and address. Rather than responding to GMAC and providing gthe request information, or availing herself of her rights under FCRA and disputing the accounts and the accuracy of her consumer reports with the consumer reporting agencies, Plaintiff initiated legal proceedings against her ex-husband on November 25, 2008, seven days after the divorce and after the decree under which he assumed the obligations under the GMAC account. In the fourth amended complaint in that litigation, GMAC was added as a defendant. The court issued an opinion on February 4, 2010 indicating that her signature on the promissory note and deed of trust were forged by her ex-husband. The court entered a final order on February 26, 2010 that the note and deed of trust were void. The period of appeal on that order ended on March 28, 2010.

On or about March 8, 2010, prior to the expiration of the appeal period, Plaintiff finally availed herself of her rights under FCRA and sent a dispute letter to the three consumer reporting agencies. The consumer reporting agencies sent ACDVs to GMAC indicating a claim of identity fraud, and/or that her ex-husband forged her signature on the promissory note. GMAC confirmed the account as accurate in March 2010 before the period to appeal the state court case expired.

Plaintiff disputed the account two more times with two of the three nationwide consumer reporting agencies in May and June 2010, but the consumer reporting agencies did not forward either of these disputes to GMAC. Finally, Plaintiff sent a dispute letter, dated June 16, 2010, directly to GMAC, as permitted by FCRA, and included documentation regarding the forgery of her signature on the note. GMAC received this dispute letter from Plaintiff on July 13, 2010. GMAC thereupon asked the consumer reporting agencies to remove the account from her consumer reports.

### III. Analysis

#### a. The Fair Credit Reporting Act

Consumer reporting agencies have existed in the United States for over 100 years. Creditors and loan servicers furnish their credit account information to consumer reporting agencies, and the consumer reporting agencies incorporate the information into their databases. The consumer reporting agencies in turn furnish the information in the form of reports that compile additional information from other creditors, loan

2

servicers, and public records sources to inquirers that have a permissible purpose to receive the reports.

The information exchange began and continues for the purpose of helping creditors make careful and accurate credit risk decisions on credit applications. Since creditors make money by lending money, they seek to lend it in a way that reduces losses by approving applications of credit worthy individuals and denying applications of those that are less likely to pay their obligations. The way to assure reliable risk decisions is through the voluntary exchange of information through the credit bureaus.

FCRA was enacted in 1970 to regulate the system and afford consumers added protections. But, in enacting FCRA, Congress recognized the needs of the banking system and its dependence "upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." The need for the efficiency of the banking system in 1970 when FCRA was enacted remain the same and may even be more important today: To make reliable credit risk decisions, consumer reporting agencies must provide accurate consumer reporting information. Lenders and consumers and consumer reporting agencies all want accurate information since inaccurate information serves no one.

Accordingly, Congress stated that the purpose of FCRA is to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce...in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information..."

But, in order to achieve the objective of accuracy, Congress recognized that there were real world and practical obstacles to achieving complete and perfect accuracy, and that standard is not required.[1] Rather, FCRA requires that consumer reporting agencies establish *reasonable procedures* to assure maximum possible accuracy of the information in reports, and brings consumers into the process by assuring greater transparency. Consumers must be told when they are denied an application for credit or another benefit based on a consumer report; they may request copies of their reports; they are given the right to dispute inaccuracies and have their reports corrected and unverifiable information deleted.

When a consumer disputes information with a consumer reporting agency, the consumer reporting agency must convey the dispute along with all relevant information pertaining to the dispute to the furnisher of the information. The furnisher is then required to investigate the dispute and report the results of the investigation to the consumer reporting agency.

---

[1] In the Guidelines regarding accuracy issued by federal regulators on July 1, 2009, this principle was reasserted, when the agency declined to define "accuracy" as being information "without error", because such as standard is unreasonable and unworkable.

3

An electronic mechanism has been developed by the credit and the consumer reporting industries to assure accuracy of consumer reporting and compliance with FCRA legal requirements. The dispute communication process has become largely automated, as required by FCRA, through the use of the ACDV process which assures more timely and efficient reinvestigations of disputed information. This ACDV process does not require or involve a consumer reporting agency forwarding documents received from a consumer to the furnisher along with the ACDV.

### b.   Reinvestigations

In order to understand how the reinvestigation process works when there is a dispute that the information is incorrect because of identity theft or other reasons, we need to consider how information about a consumer is compiled into a report and how and what types of identity errors can occur.

Lenders and loan servicers, such as GMAC, furnish information about borrowers on a periodic, usually monthly, basis to consumer reporting agencies. The information furnished includes an account number created by the creditor or loan servicer, which typically matches the creditor's or loan servicer's numbering scheme and is used to track performance on the account, all identifying information obtained from the consumer's application, such as name and address, social security number, date of birth when available, and former addresses.

In addition, information is furnished to the consumer reporting agency about account ownership which is designated as individual, joint or contractually liable as required by the Equal Credit Opportunity Act (ECOA). In addition to the identifiers and account description, account activity related to each account is furnished to the consumer reporting agency. The account activity consists of all the information relating to the consumer's performance on a credit account, such as outstanding balance, payments, high credit, date opened, date of payment, collateral if any, and additional detail.

When a consumer reporting agency receives account information from a furnisher of information, such as GMAC, its task is to place the account into the correct consumer's file. In order to do that, the consumer reporting agency's system first looks for the matching account number in its database. If a match on account number is found, the system compares names. If a match on names is also found, the account is updated in the consumer reporting agency's database with the new performance and activity information, such as payments made, new balance, credit availability, and so on. If the address has changed on the account, the consumer reporting agency has a complex system to determine whether the consumer has moved, or merely changed the place at which to receive a particular creditor's invoices. If the consumer reporting agency determines the consumer has moved, the current and former addresses are updated.

If a match on account number is found, but the name connected with the account number does not match, or if there is no match on account number or name, the consumer reporting agency's system looks for matching identifiers in its database. If

matching identifiers are found, the account is added to the file of the matching consumer as a new account.[2] If no match on name or account number is found, a new file is created which contains the account and the identifiers furnished with the account. This becomes a new credit file.

Accounts can get into the wrong consumer's file because errors can occur in the matching process used by consumer reporting agencies. The consumer reporting agencies do not require an exact match on the identifiers that are furnished by the creditor.[3] There are allowances for typographical errors, transpositions, nick names and a number of other variations. In addition, in some situations consumers may not wish to furnish their social security numbers because of concerns about privacy. Or the social security numbers on a hand written application may not be legible or the clerk entering it into the creditor's system my transpose some digits of the number. On occasion, consumers use nick names or first initials on some applications whereas they use full names on other applications. Or, consumers may not furnish their date of birth, or may not furnish the correct date of birth.

The result is that errors can occur in the consumer reporting system and the report on a consumer may contain accounts that do not belong to him or her. An account may be placed into the file of a consumer to whom the account does not belong because the name and address and other identifiers matched closely enough to satisfy the consumer reporting agency's matching logic. When an account is placed into a file of a consumer to whom it does not belong, the result is called a "mixed file." On other occasions, the identifiers furnished by the creditor do not match an existing file closely enough and the account is used to create a new file and not placed into the file of the consumer to whom the account belongs. The result is called a "fragmented file" because it may forever be a consumer file with only one account. The other file of the consumer containing his or her other accounts is located elsewhere in the consumer reporting agency's system.

There are complex processes and the rules are continually reviewed to minimize the incidence of mixed files or fragmented files. The objective of the consumer reporting system is that consumers should get the benefit (or drawback) of all their credit accounts when a creditor reviews their credit report, which mitigates toward adding information, and not the benefit (or drawback) of accounts belonging to another consumer, which mitigates toward keeping information out. Perfection is not possible and there are tradeoffs between increasing mixed files or increasing fragmented files when either problem is addressed.[4]

Given the logic of the file building process discussed above, it is the Federal Trade Commission's analysis and my experience that consumer reporting errors relating to account ownership, if they occur, result in mixed files—an account is in the file of

---

[2] An account can be in the files of multiple consumers if they are listed on the account as joint or authorized users.
[3] See FTC Report to Congress, p. 36-46 for a description of the process.
[4] Id. at p. 54

5

someone whose identifiers closely matches those of the correct owner of the account, but not exactly. The account ownership errors rarely result in an account winding up in the file of a consumer with totally different identifiers than the actual account owner.

The above described process determines how file ownership errors may occur which determines how investigations should be conducted when a consumer claims the account is not hers. When a consumer claims an account in her consumer report is not hers, a reasonable investigation is to compare the identifiers in the particular consumer's file at the consumer reporting agency with the identifiers in the creditor's system. As discussed above, an account can only get into a consumer's credit file if the identifiers in the furnisher's file matched so closely that the logic of the consumer reporting agency's system decided to merge the information rather than create a new file. A manual inspection of the identifiers will reveal whether or not the matching algorithm used by the consumer reporting agencies with their allowances for slight variations made a mistake in adding the account to a consumer's file despite their bias against adding the account when in doubt.[5]

For example, if the first name on the furnisher's account was Roberta (other things being equal), and the account was in the credit report of someone named Robert, the computer logic likely made an error even though the name varies by only one letter. On the other hand, if the first name on the account is Bob, and the account is in the credit report of someone named Robert, it is likely correctly matched even though few letters match.[6] The FTC Report to Congress contains several more examples that are more complex.[7]

Accordingly, when a consumer claims an account in her file does not belong to her, a reasonable reinvestigation process is for the furnisher of information to compare the identifiers in its system related to that account to the identifiers in the ACDV form furnished by the consumer reporting agency to determine whether the matching algorithm used by the consumer reporting agency made a mistake.[8]

### c. GMAC's Reinvestigation

Based on the above analysis of how mixed files occur, GMAC compared the identifiers in its system with the identifiers Plaintiff provided to the consumer reporting agencies as reflected on the ACDV. Such a comparison will show whether the consumer reporting agency's merging logic made an error. The completed ACDV reflected that the identifiers were basically the same.

---

[5] "... the CRAs are more tolerant of fragmented files than mixed files." Id. at P. 44
[6] The consumer reporting agencies use nick-name tables that recognize these variations.
[7] Id. at P. 44-48
[8] It would be a different investigation if the consumer claimed the amount owing is wrong. Then ownership of the account can be assumed and the investigation should be of the payment status.

6

In addition, Plaintiff claimed fraud or identity theft as shown by the dispute code on the ACDV. The Fair and Accurate Credit Transactions Act of 2003 ("FACT Act"), which amended the FCRA, added identity theft and fraud prevention provisions. However, those provisions placed the obligations regarding fraud investigations on the consumer reporting agencies which are in the best position to determine whether fraud is actually occurring since they have access to all of a consumer's accounts. They can see if there are anomalies among various accounts indicating that one account may be fraudulent and not belong to the consumer. In this case, this may be the reason for Equifax changing its report and not waiting for or relying on the ACDV response from GMAC. A furnisher, on the other hand, only has access to its own account with the consumer and if the consumer claims to be the victim of identity theft, the identifiers in the furnisher's system are likely to match the consumer's.[9] That information is not helpful in investigating fraud.

The investigation by GMAC of its records in fact did not find anything that could confirm whether or not identity theft occurred. The ACDVs all came through e-OSCAR. GMAC verified personal identifiers and account information through the FiServ System. GMAC checked the account information on the FiServ System to determine whether there was any indication that GMAC had received three or more ACDVs alleging identity theft from credit reporting agencies within the prior three months and each at least one week apart prior to the particular ACDV under investigation regarding Plaintiff. GMAC also checked the I.S.S. application to verify the personal and account information contained on the ACDVs matches the information on the original loan documents. The only information GMAC received from the credit reporting agencies is the information actually contained on the ACDVs; it did not receive any other documents or information from the consumer reporting agencies. Investigating additional matters outside the GMAC system is unlikely to be fruitful with this type of dispute, and, in fact, there is little that GMAC can investigate.

It is very difficult for a furnisher of information to investigate identity theft involving friends or relatives or, as in this case, a spouse. The friend or relative has access to the personal information of the other party and uses it to obtain credit in the name of the friend or relative. In identity theft involving a friend or relative, the difficulty for the furnisher is to determine whether two parties are collaborating to defraud the creditor. Therefore, any steps GMAC takes to reinvestigate the dispute are likely to confirm ownership of the account. There is no efficient way for GMAC to confirm identity theft.

The investigation is further complicated by the fact that the credit and consumer reporting industries have found that the incidence of fraud in the dispute process has been increasing. In other words, consumers have learned that disputing correct information may result in its being deleted from a consumer report. Based on industry experience, over 50% of the disputes communicated to a furnisher of information by a consumer reporting agency do not result in a change of the manner in which the information is reported. In a small percentage of those, consumers add dispute

---

[9] The FACT Act imposed on the creditor "red flags" rules to consider when opening accounts to prevent fraud.

7

statements telling their version of the account, as contemplated by FCRA. But the overwhelming majority of the 50% do not result in a change to the information or a dispute statement.

This implies that often and perhaps close to 50% of consumers dispute information in the hopes that the investigation will not be completed within the FCRA time limits and will therefore be deleted, or there will be an error in the investigation process resulting in the deletion of information. An entire industry, credit clinics or consumer repair organizations, sprang up to attempt to achieve this result—the deletion of accurate but derogatory information from consumer reports—by disputing and re-disputing the same information. The Credit Repair Organizations Act has been enacted to protect consumers from these unscrupulous companies, and the Federal Trade Commission (FTC) warns about their activities and has taken numerous actions against them.

Reinvestigating disputed information is made even more difficult by the fact that recent estimates indicate that up to 25% of consumer disputes claiming identity theft involve altered or fraudulent police reports, which harms real identity theft victims, but makes it perilous for furnishers and consumer reporting agencies to accept the word of consumers disputing information. The reality of credit repair makes it more important to thoroughly investigate disputes, even when the claim is fraud and even when a police report if furnished.

This is particularly true in the case of allegations of fraud involving a friend or relative, or "familiar fraud," as in this situation where a person living in a home claims she is not obligated on the note and that her "ex-husband forged my signature." (It should be noted that he forged her signature at a time when she was still married and living in the home.)

Accordingly, the GMAC procedures require that before a dispute alleging identity theft be given to the special department for investigating such disputes, there be some evidence that the claim is legitimate. But given that identity theft claims have increased as a result of consumer repair organizations, and that GMAC verifies the authenticity of an identity theft claim by referring the dispute to the Identity Theft mailbox only after having received such a dispute alleging identity theft and/or fraud from the three consumer reporting agencies at least one week apart and in a specific 3 month period. GMAC assumes that consumers that go to the effort to dispute with all three nationwide consumer reporting agencies and more than one week apart are more likely to be making a legitimate dispute. That did not occur in this case. But, the requirement is not an unreasonable standard given the reality that many disputes are not legitimate and cannot be taken at face value, and the desire of all parties to maintain accuracy and not permit the gaming of the system.

Finally, GMAC's law department had information about the court judgment voiding the note. However, the timing of the events makes the result of the reinvestigation not unreasonable. The court issued an opinion on February 4, 2010 indicating that Plaintiff's signature on the promissory note and deed of trust were forged by her ex-husband. The

8

court entered a final order on February 26, 2010 that the note and deed of trust were void and specifically stated in its order that the order would not be filed in the land records until the 30 day period to appeal had expired. The period of appeal on that order ended on March 28, 2010. The ACDV's were received by GMAC and completed prior to the end of the appeal period. It cannot be expected that all departments of a company such as GMAC are linked instantaneously or that the law department notify the ACDV department that quickly and even before the matter is completely settled. Having been responsible for a law department at one of the three nationwide consumer reporting agencies, I understand that such an expectation is operationally impossible to fulfill. Therefore, confirming the account as GMAC did in the ACDV is a reasonable result given the circumstances.

In any event, once GMAC finally received the documentation directly from Plaintiff, the account was deleted from her consumer report. The FACT Act added a provision permitting direct disputes by consumer to provide for this result. Direct disputes with appropriate documentation to the finisher of the information is most likely to resolve disputes as it did in this case.

Accordingly, given all the facts and circumstances of this case, GMAC's investigation of Plaintiff's dispute is not unreasonable and conforms to industry practice.


_____/s/ Oscar Marquis_____     _____May 6, 2011_____
Oscar Marquis                                              Date

## QUALIFICATIONS
### Oscar Marquis

### EXPERIENCE

- I am a partner in the Washington, D.C. law firm of Oldaker, Belair and Wittie. My clients consist of consumer reporting agencies and other companies engaged in the consumer information business.
- I provide advice regarding credit and credit reporting compliance issues to organizations engaged in the consumer information business.
- I assist organizations with their privacy compliance issues.
- I provide expert reports in litigation matters regarding the Fair Credit Reporting Act.
- I was an attorney at Trans Union, one of the three nationwide consumer reporting agencies, for over 24 years and General Counsel of Trans Union from 1984 to 2000 when I left to go into the private practice of law.
- I was involved in all legal, executive, legislative and compliance matters involving the company.
- I worked frequently with creditors and other financial institutions regarding their use of consumer reports and their furnishing of information.
- While at Trans Union, I established a compliance department and a government affairs department.
- I was responsible for and oversaw Fair Credit Reporting Act (FCRA) and other litigation involving Trans Union.
- I helped develop forms and policies and procedures for the Trans Union consumer relations process.
- I drafted the subscriber and other agreements in use by Trans Union many of which were models for the industry.
- While at Trans Union, I participated in the development of credit scoring policy and legal compliance.
- I consulted with the Federal Trade Commission and expert attorneys throughout the country in preparing FCRA interpretations.
- I negotiated four agreements with the Federal Trade Commission and two with groups of state Attorneys General involving various FCRA compliance issues.
- I testified in Congress and many state legislatures about FCRA issues.
- I have appeared on Nightline, CNN and numerous radio programs discussing consumer reporting issues.
- I have participated in the development of consumer reporting agencies in Canada, Mexico, South Africa, Italy and numerous other international locations.
- I prepared and participated in a credit reporting training session for the Central Bank of Nigeria.
- I participated in a legal and operational review of the consumer reporting framework in Kenya.

- I prepared a legal and operational analysis of the credit reporting system in Egypt and prepared and participated in a credit reporting training session for the Central Bank of Egypt.
- I frequently speak at credit industry and trade association meetings about FCRA and legislative issues affecting the consumer reporting and credit industries.
- I presented seminars to Congressional staffers about credit reporting issues.
- I frequently meet with attorneys from the consumer reporting agencies and the national trade association, Consumer Data Industry Association, to discuss compliance issues, legislative strategy, and FCRA interpretations.
- I have written numerous articles for industry publications about consumer reporting issues.

## EDUCATION

Northwestern University, Evanston, Illinois: BA, Economics

University of Illinois, School of Law, Champaign, Illinois: JD
    Harno Memorial Scholarship

## MEMBERSHIPS

Member of the Federal Reserve Board Consumer Advisory Council, 2001-2003
    Chair of the Depository & Delivery Systems Committee

Board of Directors of MicroBilt Corporation

Board of Directors of the Consumer Information Research Council 2001-2007

Board of directors of Hand of Peace

## ARTICLES

- Are Subpoenas court Orders under FCRA? CDIA Communicator, 2001
- Clear the Air on Information Sharing, American Banker, March 30, 2001
- Credit Bureaus Responsible for Errors Made by Others, CDIA Communicator, 2001
- PRIVACY NOTICES UNDER THE FAIR CREDIT REPORTING ACT, American Banker, 2001
- Privacy and the New Economy, Trans Union Newsletter, 2001
- ID Theft Should Be Addressed By the Industry, Not Congress, American Banker, September 13, 2002
- FCRA DEVELOPMENTS AND FINANCIAL INSTITUTIONS, Privacy and American Business, 2002
- The Fair Credit Reporting Act Debate: A proxy for the debate about privacy, International Association of Privacy Professionals publication, 2002

11

- The Amy Boyer Case, New rules for information companies, CDIA Communicator, March, 2003
- FCRA – Should Your Personnel be Trained? CDIA Communicator, April, 2003
- Privacy, Ethics and Customer Relationship Management, In Summary, What the Future Holds, Chicago Association of Direct Marketing Educational Foundation June 6, 2003
- Who Can Be Held Liable for Identity Theft? – American Banker, November 18, 2004
- Screening Companies, Resellers and the Fair Credit Reporting Act, CDIA Communicator, September 4, 2003
- ID Theft and Creditor Liability, American Banker, 2003
- BACKGROUND SCREENING AND CONSUMER REPORTS, Privacy and American Business, April, 2004
- Furnisher Obligations under FCRA: Reinvestigations, CDIA Communicator, 2004
- The FACT Act Studies: Understanding the Interpretive Rules, Privacy and American business, December, 2004
- The FACT Act—What's New? Privacy and American Business, January, 2006
- The Evolution of Identity Theft, Credit Card Fraud to Today, CDIA Communicator, 2002
- THE GAO IDENTITY THEFT REPORT, Is that all there is? CDIA Communicator, 2002
- Don't Gild the Lilly: Keep FCRA Out of Privacy Debate, American Banker, March 14, 2003

## SPEECHES

- I have made numerous presentations at the annual meetings of the Consumer Data Industry Association, formerly known as the Associated Credit Bureaus, from 1980 through the meeting in January, 2006.
- I have testified on consumer reporting issues in Congress and numerous state legislatures.
- I made numerous presentations at Trans Union annual meetings.
- I have appeared on Nightline, CNN and numerous radio programs.

  ➢ I have made presentations at programs sponsored by the following organizations:

- Pre-Employment Screeners Conference
- On-Line Lenders Alliance
- ACA International
- University of Dayton, School of Law
- National Association of Professional Background Screeners
- American Conference Institute
- Privacy and American Business
- Practicing Law Institute

12

- Internet Legal Council
- Direct Marketing Association
- Merchants Research Council
- Credit Industry Research Council
- Collection and Recover Solutions
- ID Analytics
- MarketerNet
- Thompson Financial
- Lorhman Education Services
- Background Investigator
- The Federalist Society
- Experian Law Conference
- First Advantage
- Debt Buyers
- MicroBilt Corporation

## DOCUMENTS REVIEWED

In preparing this report, I considered the materials listed in the report and in the footnotes and relied on personal experience working in the consumer reporting industry. In addition, I reviewed the following documents provided to me by counsel for GMAC:

1. Plaintiff's Complaint;
2. GMAC's Amended Answer to Complaint;
3. GMAC's Answers to Plaintiff's Interrogatories and Requests for Production, including GMAC's documents;
4. GMAC's Supplemental Answers to Plaintiff's Interrogatories and Requests for Production, including GMAC's documents;
5. GMAC's Second Supplemental Answers to Plaintiff's Interrogatories and Requests for Production, including GMAC's documents;
6. Plaintiff's Expert Witness Disclosure;
7. Plaintiff's Answers to Co-Defendant, First America Funding's, Interrogatories and Requests for Production, including Plaintiff's documents;
9. Plaintiff's Answers to GMAC's Interrogatories and Requests for Production of Documents, including Plaintiff's documents.

## COMPENSATION

My compensation in this matter is $490 per hour.

## LIST OF OTHER CASES IN WHICH, DURING THE PREVIOUS FOUR YEARS, OSCAR MARQUIS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION

| Case: | Retained by: | Firm: | Adverse firm: |
|---|---|---|---|
| Clansey v. GMAC Mortgage Corporation 2007 | GMAC | C. Ed Harrell<br>Three Allen Center<br>333 Clay, 29th Floor<br>Housont, TX 77002<br>713-759-0818 | Stuart Wilson<br>2100 West Loop South<br>Houston, TX 77027<br>713-479-9700 |
| CSI Investment Partners v. Cendant 2007 | CSI | Michael Petrella<br>O'Shea Partners LLP<br>90 Park Avenue / 20th Floor<br>New York, New York 10016<br>212-682-4437 | Skadden, Arps, slate, Meagher & Flom<br>Johathan J. Lerner<br>Four Times Square<br>New York, NY 10036<br>212-735-3000 |
| Federal Trade Commission v. Dennis Connelly 2007 | Federal Trade Commission | Eric Edmondson<br>Federal Trade Commission<br>Western Region-San Francisco<br>901 Market Street, Suite 570<br>San Francisco, CA 94103<br>415-848-5179 | David W. Wiechert<br>107 Avenida Miramar<br>San Clemente, California 92672<br>(949) 361-2822 |
| Anna Elizabeth Pires v. ChoicePoint Services, Inc. et. al. 2008 | ChoicePoint | Corey N. Cutter<br>TAYLOR BUSCH SLIPAKOFF & DUMA, LLP<br>1600 Parkwood Circle<br>Suite 200<br>Atlanta, Georgia 30339<br>(770) 434-6881 | John Soumilas<br>Francis & Mailman<br>100 South Broad Street<br>Philadelphia, PA 19910<br>215-735-8600 |
| Mathew Sizemore v. OwnerGUARD Corporatio7 2008 | OwnerGuard | Catherine Sabers<br>Lynn, Jackson, Shultz,& Lebrun<br>909 Joseph Street<br>Eight Floor<br>Rapid City, SD 57709-8250<br>(605) 342-2592 | Robin Zephier<br>Abourezk Law Firm<br>117 Knollwood Drive<br>Rapid City, SD 57709<br>605-342-0097 |
| Mary Ann Whiteker and Jerry Whiteker v. Chase Bank USA, NA et. Al 2007 | Chase | Brian A. Kilpatrick<br>Jackson Walker L.L.P<br>901 Main Street, Suite 6000<br>Dallas, Texas 75202<br>(214) 953-5933 | Eugene Wilshire<br>Wilshire Scott & Dyer<br>1221 McKinney<br>3000 One Houston Center<br>Houston, TX77010 |
| Jeffrey A. and Sarah D. Wilkerson v. Allstate Property and Casualty | Allstate | Marilee C. Erickson<br>Reed McClure<br>601 Union Street<br>Suite 1500<br>Seattle WA 98101<br>(206) 386-7047 | Scott P. Carness<br>Donchez Law Firm<br>8318 -196th Street S.W.<br>1st Floor<br>Edmonds WA 98026<br>425-744-1184 |

| | | | |
|---|---|---|---|
| Insurance Company 2009 | | | |
| Lisa B. Williams. v. LexisNexis Risk Management 2007 | Lexis | Ronald I. Raether, Jr.<br>FARUKI IRELAND & COX P.L.L.<br>500 Courthouse Plaza, S.W.<br>10 North Ludlow Street<br>Dayton, Ohio  45402<br>(937) 227-3704 | Michael A. Caddell<br>Richard D. Daly<br>CADDELL & CHAPMAN<br>1331 Lamar, Suite 1070<br>Houston, TX  77010 |