**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **ALISHA W. WILKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil No. 1:10-cv-01160 (CMH-TRJ)** |
| | ) | |
| **GMAC MORTGAGE, LLC,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT GMAC MORTGAGE LLC'S MEMORANDUM**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, GMAC Mortgage LLC ("GMAC" or "Defendant"), by counsel, pursuant to

Fed. R. Civ. P. 56, submits this Memorandum in Support of its Motion for Summary Judgment.

For the reasons set forth below, this Court should grant the Motion for Summary Judgment and

enter judgment for GMAC on the claims brought by the Plaintiff, Alisha Wilkes ("Plaintiff").

### INTRODUCTION

Notwithstanding Plaintiff's desire to turn this case into an indictment of GMAC's

actions since the inception of the forgery perpetrated by her ex-husband, this matter involves

only the actions GMAC took in response to notification it received in mid-March 2010 that

Plaintiff disputed an account that was created as a result of her ex-husband's fraud.  It is

undisputed that (1) Experian deleted the account immediately, (2) by July 14, 2010, TransUnion

had deleted the account, (3) on August 12, 2010, GMAC corrected the tradeline it reported to all

credit reporting agencies the account and, (4) by September 13, 2010, none of the credit

reporting agencies reported the fraudulently opened account on Plaintiff's credit report. Despite

this fact, and in spite of the fact that Plaintiff suffered no actual damages as a result of the delay

in correcting her credit report, Plaintiff filed her Complaint on October 14, 2010, alleging violations of the Fair Credit Reporting Act ("FCRA") and common law defamation.

Plaintiff discovered in October 2008 that her then husband, Daniel Wilkes, had forged her name on a Note and Deed of Trust secured by their home in Northern Virginia and had incurred other debt in her name without her knowledge. Admittedly, Plaintiff knew in October 2008 when she obtained a copy of her credit report, that GMAC was reporting that she was obligated on a delinquent GMAC mortgage account. Indeed, it was this account and its delinquent status that caused her to file suit in Prince William County Circuit Court against her ex-husband, GMAC and numerous other defendants seeking to have the Note and Deed of Trust declared void. Plaintiff claims to have made fruitless efforts in 2008 and 2009 to correct the reporting issue, both prior to filing her Fourth Amended Complaint. Nevertheless, Plaintiff failed to bring any claim against GMAC related to the allegedly incorrect reporting, including claims for defamation and/or to have the State Court order GMAC to correct its credit reporting. Accordingly, any claim that Plaintiff was harmed by actions or inactions of GMAC that occurred prior to the date that Judgment Order in the State Court case became final and non-appealable in March 2010 is barred by the doctrine of *res judicata*.

At its core, this case is about GMAC's response to a dispute letter crafted by Plaintiff's attorneys dated March 8, 2010 – mere days after entry of the Judgment Order in the State Court and without any effort to contact GMAC's State Court counsel. The facts demonstrate that GMAC followed its procedures in responding to the notices of dispute received from the credit reporting agencies in late March 2010 and, after being contacted by Plaintiff in mid-July 2010, promptly corrected Plaintiff's credit report in August 2010. Based on these facts, no reasonable jury could find that GMAC acted willfully in responding Plaintiff's dispute to the credit

reporting agencies.  Instead, the undisputed facts demonstrate that GMAC, at best, was negligent in failing to expeditiously correct its credit reporting.

Moreover, despite her attorneys' best efforts to create some form of damages by having Plaintiff apply for loans secured by the Northern Virginia property – while she was actually listing the property for sale and had it under contract – she suffered no damages as a result of GMAC's delay in removing the incorrect account from her credit file.  Finally, Plaintiff's claims of emotional distress are unsupported by anything other than her own conclusory testimony, which falls far short of the standard of proof that would enable a reasonable jury to find that she suffered any non-economic injuries.  Accordingly, this Court should grant GMAC's Motion for Summary Judgment and dismiss Plaintiff's claims.

### STATEMENT OF UNDISPUTED FACTS

### Background

1.      On or about January 27, 2005, Plaintiff and her then husband, Daniel Wilkes ("Mr. Wilkes") purchased a home located at 18018 Densworth Mews, Gainesville, Virginia (the "Property"), as tenants by the entirety.  (Compl. ¶ 15.)

2.      On or about January 27, 2005, Plaintiff and Mr. Wilkes executed a promissory note in the amount of $459,800.00 ("Original Note"), secured by a deed of trust on the Property. (Fourth Amended Complaint, Case No. CL-85687, attached as Exhibit 3 to the Complaint [hereinafter "State Court Compl."] ¶ 24.)

2.      Plaintiff and Mr. Wilkes were able to pay off the Original Note in November of 2005 and the original deed of trust was released.  (State Court Compl. ¶ 25.)

### Mr. Wilkes' Forgery and Financial Troubles

3.      On April 25, 2008, Mr. Wilkes executed a note ("Note") and deed of trust ("Deed of Trust") (attached to the Complaint as Exhibits 1 and 2), secured by the Property, in

the amount of $368,000.00 in favor of Homecoming Financial, LLC, f/k/a Homecoming Financial Network, Inc., a GMAC company.[1]  (Compl. ¶ 16.)

4.      As later established at the conclusion of litigation in the Circuit Court for Prince William County ("State Court"), Mr. Wilkes forged Plaintiff's signature on the Note and Deed of Trust.  (Compl. ¶ 17.)

5.      Apparently due to the fact that Mr. Wilkes was using the funds from the Note to support his gambling habit, Mr. Wilkes almost immediately fell into arrears on the Note.  (State Court Compl. ¶ 41.)  By September, 2008, GMAC was reporting the account to the credit reporting agencies ("CRAs") – Trans Union, LLC ("TransUnion"), Experian Information Solutions, Inc. ("Experian"), and Equifax, Inc. ("Equifax") – as delinquent. (Transcript of Deposition of Alisha Wilkes, dated May 11, 2011 [hereinafter "Wilkes Tr."], at 118, 122, portions of which are attached as **Exhibit A**.)

6.      GMAC reports account delinquencies to the CRAs by means of a computer to computer transmission system.  (Transcript of Deposition of Oscar Marquis, dated June 8, 2011, at 30-32 [hereinafter [Marquis Tr."], relevant portions of which are attached as **Exhibit B**).

7.      All credit reporting by GMAC is transmitted via computer in a coded format that is not decipherable by a lay person until the information is de-coded and translated into English on a consumer's credit report.  (Marquis Tr., at 33.)  The computerized reporting on a particular account is known as a "tradeline." (Marquis Tr., at 57).  A credit report is not generated by the CRAs unless it is requested by a consumer or by a proposed creditor.  (Marquis Tr., at 33.)

---

[1] The Note later was transferred to Federal National Mortgage Association ("FNMA"), which was the holder of the Note at the time of the State Court Lawsuit.  (State Court Compl. ¶ 15.) At the time of the State Court Lawsuit, GMAC was the mortgage servicer.

8.      Plaintiff was unaware of the forgery or the fact that her former husband, Mr. Wilkes, had opened several credit cards in their joint names and charged excessive amounts on existing credit cards, until on or about October 14, 2008. (Wilkes Tr., at 37; Compl. ¶ 18.)

**Plaintiff Discovers the Forgery and Mr. Wilkes' Wrongdoing**

9.      On or about October 12, 2008, Plaintiff began receiving telephone calls from creditors of Mr. Wilkes about amounts past due on various credit cards, as well as a home equity loan with SunTrust Bank.  (Wilkes Tr., at 27-31.)

10.     Plaintiff immediately confronted Mr. Wilkes about the calls she had received from various creditors.  As a result of that confrontation, Mr. Wilkes left the home and Plaintiff and Mr. Wilkes formally separated.  (Wilkes Tr., at 244-45.)

11.     On or about October 14, 2008, Plaintiff obtained a copy of her credit report and discovered that, among other outstanding loans and debts incurred by her ex-husband, the CRAs were reporting that Plaintiff was responsible for a mortgage on the Property identified as GMAC Mortgage Account No. 477177 ("GMAC Account") and that the account was delinquent.  (Compl. ¶ 18; Wilkes Tr., at 35-36.)

12.     The GMAC Account was the account created by Mr. Wilkes' execution of the Note and Deed of Trust on April 25, 2008.  (Compl. ¶ 18.)

**Plaintiff Hires Legal Counsel**

13.     Plaintiff immediately employed an attorney, Scott Weible, to assist her in clearing up the financial situation in which she found herself.  (Wilkes Tr., at 53.)  On or about October 22, 2008, Mr. Weible sent a letter to GMAC advising GMAC that Plaintiff had been the victim of identity theft.  (Wilkes Tr., at 54-55.)  The letter stated that Plaintiff "did not agree to or otherwise acquiesce in any information being placed in her credit report or otherwise be reported to any credit reporting agency for any purpose connected with" the GMAC Account,

and therefore "demands" that GMAC "*remove any and all reference*" to the GMAC Account "*from each and every place where it appears in her credit history*."  (emphasis added).  The October 22, 2008 Letter is attached as **Exhibit C**.

14.    GMAC responded by letter to Mr. Weible on November 7, 2008, enclosing an ID Theft Affidavit and instructions and requesting that Plaintiff complete the ID Theft Affidavit and provide supporting documentation, including a police report.  (The November 7, 2008 Letter is attached as **Exhibit D**; Wilkes Tr., at 57-59.)

15.    The November 7, 2008 letter advised Mr. Weible, then Plaintiff's counsel, that until the required documentation was received, servicing activities, including default remedies and credit reporting would continue.  (**Exhibit D**.)

16.    Plaintiff did not respond to the November 7, 2008 letter from GMAC and did not send the ID Theft Affidavit to the address provided in the letter. (Wilkes Tr., at 58, 62-63.)

17.    On or about November 19, 2008, due to Mr. Wilkes' continued failure to make any payments on the Note, GMAC sent a letter to Mr. Weible advising him that foreclosure on the Deed of Trust had been scheduled.  (Transcript of Deposition of Amy Fleitas dated June 17, 2011, at 26-28 [hereinafter "Fleitas Tr."], portions of which are attached as **Exhibit E**.)

18.    In November, 2008, Plaintiff retained John Bazaz ("Mr. Bazaz") to assist her with clearing up her financial situation and resolving all of her issues with the GMAC Account. (Wilkes Tr., at 75.)

19.    By November of 2008, Plaintiff was aware that she had been the victim of identity theft and that GMAC was reporting to the CRAs that she was obligated on the GMAC Account.  (Wilkes Tr., at 118, 127-28.)

### The State Court Lawsuit

20.     On November 25, 2008, Plaintiff filed her first complaint in the Circuit Court for Prince William County, Case No. CL8657 ("State Court Lawsuit"), against numerous defendants, including Mr. Wilkes and GMAC.   Plaintiff sought to have the State Court declare that the Note and Deed of Trust were forged, that the Note was unenforceable against the Plaintiff, and that the Deed of Trust was not a lien on the Property.  (State Court Compl., at 12.) Plaintiff also sought compensatory and punitive damages and requested that the State Court grant such further relief it deemed proper. (State Court Compl., at 13.)

21.     The State Court Lawsuit was amended several times, with the fourth amendment filed on July 28, 2009.  The Fourth Amended Complaint is attached to the Complaint as Exhibit 3.  (Compl. ¶ 20.)

22.     In January, 2009, Plaintiff moved back to Keyser, West Virginia, her hometown. (Wilkes Tr., at 27.)

23.     During the State Court Lawsuit, GMAC filed a third party complaint against North American Closing Services, LLC ("NACS") asserting that NACS was responsible for the amounts due under the Note.  (Fleitas Tr., at 43-44.)

24.     On May 31, 2009, Plaintiff filled out an ID Theft Affidavit.  The May 31, 2009 ID Theft Affidavit is attached to the Complaint as Exhibit 5.

25.     Plaintiff does not recall who asked her to fill out the May 31, 2009 ID Theft Affidavit nor does she recall how or whether it was transmitted to GMAC or to whom it was sent.  (Wilkes Tr., at 148-52.)

26.     In June 2009, Plaintiff propounded Interrogatories to GMAC asking GMAC about its policies and procedures concerning identity theft as required by federal law.

(Defendants' Answers to Second Set of Interrogatories, relevant portions of which are attached as **Exhibit F**, Interrogatory No. 23.)

27.     On February 4, 2010, after a two day bench trial, the State Court issued its Letter Opinion finding, inter alia, that the Deed of Trust was void and that Plaintiff was not obligated on the Note.  The State Court also found that NACS was liable for the full sum transferred to NACS in funding the Note.  The State Court's Letter Opinion is attached to the Complaint as part of Exhibit 4.

28.     On February 26, 2010, the State Court entered its final Judgment Order.  (Compl. ¶ 23.)  The Judgment Order is attached to the State Court Complaint as part of Exhibit 4.

29.     GMAC's legal department received a copy of the Judgment Order in early March 2010.  (Transcript of Deposition of Peter Knapp dated April 25, 2011, at 74 [hereinafter "Knapp Tr."], portions of which are attached as **Exhibit G**; Fleitas Tr., at 35.)

30.     On March 19, 2010, the Order of Judgment became final pursuant to Rule 1:1 of the Rules of the Virginia Supreme Court.

31.     On March 28, 2010, the time to appeal the Order of Judgment expired.

**Plaintiff Sends Dispute Letters**

32.     On March 8, 2010, having obtained a copy of her credit report in mid to late February 2010, Plaintiff sent a dispute letter to Equifax, Experian and TransUnion disputing the GMAC Account.  (The March 8, 2010 Letter is attached to the Complaint as Exhibit 7.)

33.     The March 8, 2010 Letter was drafted by Plaintiff's counsel.  (Wilkes Tr., at 153-54.)  Plaintiff had no input into the content of the letter.  (*Id.*)

34.     In response to the March 8, 2010 Letter, Equifax removed the GMAC Account from Plaintiff's credit report.  (Compl. ¶ 27.)   Experian and TransUnion verified the GMAC Account and continued to report it as accurate.  (*Id.*)

35.     On or about April 22, 2010, GMAC received $360,000.00 from the First American Title policy.  As a result, GMAC marked the GMAC Account as paid and wrote off the balance of the loan. (Knapp Tr., at 65; Fleitas Tr., at 45).

36.     On or about May 12, 2010, Plaintiff sent a second dispute letter dated May 4, 2010 to Experian and TransUnion.  (Compl. ¶ 28.)  A copy of the May 4, 2010 Letter is attached to the Complaint as Exhibit 8.

37.     Once again, the May 4, 2010 Letter was drafted by Plaintiff's counsel.  She had no input into the May 4, 2010 Letter aside from signing it.  (Wilkes Tr., at 157.)

38.     In response to the May 4, 2010 Letter, Experian and TransUnion refused to reinvestigate the dispute.  (Compl. ¶ 29.)  The CRAs did not send ACDVs to GMAC or otherwise notify GMAC of the receipt of the May 4, 2010 Letter.  (Plaintiff's Answers to Interrogatories, attached hereto as **Exhibit H**; Answer to Interrogatory No. 9; Defendant's Answers to Interrogatories, relevant portions of which are attached hereto as **Exhibit I**, Answer to Interrogatory No. 2.)

39.     On June 22, 2010, Plaintiff sent a third dispute letter dated June 16, 2010 to Experian and TransUnion.  (Compl. ¶ 30.)  The June 16, 2010 Letter is attached to the Complaint as Exhibit 9.  GMAC did not receive any ACDVs as a result of the June 16, 2010 letter to Experian and TransUnion. (**Exhibit I**; Answer to Interrogatory No. 2.)

40.     Also on or about June 22, 2010, Plaintiff sent her first dispute letter dated June 16, 2010 to GMAC, which GMAC did not receive until July 13, 2010.  (Compl. ¶ 30; **Exhibit I**, Answer to Interrogatory No. 2.)  The June 16, 2010 Letter to GMAC is attached to the Complaint as Exhibit 10.

41.     Once again, the June 16, 2010 Letters were drafted by Plaintiff's counsel. Plaintiff did not have any input into the letters except to sign them and have her signature notarized.  (Wilkes Tr., at 163.)

42.     As of July 2010, TransUnion had deleted the GMAC Account and it did not appear on Plaintiff's credit report dated July 14, 2010.  (Wilkes Tr., at 195-96.)

43.     On or about August 12, 2010, in response to the June 16, 2010 Letter, GMAC sent an AUD request to the CRAs to have the tradeline concerning the GMAC Account deleted. (Fleitas Tr., at 60; **Exhibit I**, Answer to Interrogatory No. 5.)

44.     On or about September 13, 2010, Plaintiff obtained a copy of her credit report. (Wilkes Tr., at 169.)  As of that date, Plaintiff knew that the GMAC Account had been deleted and no longer appeared on any of her credit reports.  (Wilkes Tr., at 170-72.)

45.     Despite knowing this fact, Plaintiff filed her Complaint on October 14, 2010.

### The ACDVs and GMAC's Response

46.     In response to the March 8, 2010 Letter to the CRAs, GMAC received five Automated Credit Dispute Verification ("ACDV").  The first ACDV was received on or about March 15, 2010.  (**Exhibit I**; Answer to Interrogatory No. 5.)

47.      GMAC responded to the ACDVs on March 19, 2010, March 22, 2010 and March 24, 2010.  (**Exhibit I**; Answer to Interrogatory No. 5.)

48.     Allison Higgins, a credit reporter for GMAC, received one ACDV.  (Transcript of Deposition of Allison Higgins dated April 25, 2011, at 10 [hereinafter "Higgins Tr."], relevant portions of which are attached hereto as **Exhibit J**.)

49.     Lori Aguilar, a credit reporter for GMAC, received the other four ACDVs. (Transcript of Deposition of Lori Aguilar dated April 25, 2011, at 29-30, 42-43, 78-81[hereinafter "Aguilar Tr."], portions of which are attached hereto as **Exhibit K**.)

50.     Both Ms. Higgins and Ms. Aguilar testified that they followed GMAC's procedures in responding to the ACDVs generated as a result of the March 8, 2010 Letter. (Aguilar Tr., at 43, 51-54; Higgins Tr., at 9-12.)  Both Ms. Higgins and Ms. Aguilar went through each step outlined in the GMAC procedures to respond to the ACDVs.  (*Id.*)

51.     After reviewing the information available to them in GMACs computer system, which did not reflect the entry of the Judgment Order approximately two weeks prior, both Ms. Aguilar and Ms. Higgins responded to the CRAs by verifying the GMAC Account.  (**Exhibit I**, Answer to Interrogatory No. 5.)

52.     Ms. Fleitas testified that, although she believed that the matter could have been handled a bit better, GMAC employees followed GMAC's procedures in responding to the ACDVs.  (Fleitas Tr., at 10-11, 53.)

53.     Ms. Fleitas testified that there are not unreasonable "walls" preventing communication between the legal department and the credit reporting department.  (Fleitas Tr., at 40.).

54     Ultimately, at the direction of GMACs legal department, when GMAC received Plaintiff's June 22, 2010 Letter, it deleted the GMAC Account on August 12, 2010.  (Fleitas Tr., at 60.)

**Plaintiff's Efforts to Sell/Refinance the Property**

55.     After January of 2009, when Plaintiff moved back to Keyser, West Virginia, she sought to lease the Property.  On March 31, 2009, Plaintiff entered into a lease for the Property. (Transcript of Deposition of Bryan Garcia, dated June 9, 2011, at 85 [hereinafter "Garcia Tr."], pertinent portions of which are attached hereto as **Exhibit L**.)

56.     In January, 2010, Plaintiff advised her real estate agent, Bryan Garcia, that it was her plan to put the Property on the market with the hope of having the Property sold by the time

the tenant's lease expired in late March of 2010.  (Email from Alisha Wilkes to Bryan Garcia, dated January 13, 2010, attached hereto as **Exhibit M**.)

57.     By February 12, 2010, a few days after the State Court issued its Letter Opinion, Plaintiff had determined that she wished to put the Property on the market by April 2010 and communicated as much to Mr. Garcia.  (Email from Alisha Wilkes to Bryan Garcia, dated February 12, 2010, attached hereto as **Exhibit N**.)  Plaintiff told Mr. Garcia that refinancing would not be a viable option unless she could increase the rent.  (*Id.*)

58.     Plaintiff did, in fact, put the Property on the market in early April, 2010.  (Garcia Tr., at 27, 72, 75.)

59.     At no time after the house was listed for sale in April 2010 did Plaintiff discuss with Mr. Garcia any plan other than to sell the Property.  (Garcia Tr., at 27, 75-76.)

60.     By April of 2010, Plaintiff had begun dating Matthew Kingery, to whom she is now engaged to be married.  (Wilkes Tr., at 215.)  Mr. Kingery is a lawyer who lives and works in Charleston, West Virginia. (*Id.*)

61.     On April 21, 2010, Plaintiff obtained a contract to sell the Property.  (Garcia Tr., at 26; 79-81.)   However, after a home inspection, the prospective buyers decided not to purchase the Property and Plaintiff signed a release of the contract on May 6, 2010.  (*Id.*, 26, 80-81.)

62.     Mr. Garcia advised Plaintiff to wait to put the Property on the market until the tenants had moved out of the Property and removed all of their belongings and he had a chance to clean up the Property so it would show better.  (Garcia Tr., at 26)  The tenants moved out because the State Court litigation had ended and Plaintiff wanted to sell the house.  (*Id.*, at 23.)

As a result, Plaintiff took the Property off the market from early May 2010 through early June of 2010. (*Id.*, at 26)

63.     In May 2010, Plaintiff gave notice to the tenants terminating the lease and requesting that they vacate the Property by the end of May 2010. (Garcia Tr., at 70.)

64.     At some time between March and May of 2010, Plaintiff applied for a loan on the Property. (Wilkes Tr., at 202, 205.) She applied for a loan while the Property was actually under contract and before the sales contract was released on May 6, 2011. (Garcia Tr., at 79-83.) Plaintiff took this step after consulting with her attorneys. (Wilkes Tr., at 213.)

65.     Plaintiff used an internet search engine to find lenders to obtain an investment loan on the Property. (Wilkes Tr., at 205.) Based on her search results, Plaintiff applied for a loan with Precision Funding, LLC for $220,000.00. (*Id.*, at 205-06.)

66.     On the Uniform Residential Loan Application she filled out with Precision Funding, she identified the Property as an "investment." (A true copy of the loan application is attached as **Exhibit O**.)

67.     On May 4, 2010, Precision Funding notified Plaintiff that she had been denied for the Loan. (Wilkes Tr., at 207.) At this time, the Property remained under contract and, as far as her realtor knew, Plaintiff still wanted to sell the house. (Garcia Tr., at 75-76; 79-83.)

68.     Plaintiff also applied for a loan from Quicken Loans, another lender she located via an internet search. (Wilkes Tr., at 218.) On May 24, 2010, Plaintiff received a letter from Quicken Loans denying her application for a loan. (Wilkes Tr., at 219.)

69.     As of May, 2010, Plaintiff had not returned to Northern Virginia to meet with any mortgage brokers or banks about a loan, had not asked Mr. Garcia about the possibility of applying for a loan and had not looked for a job in Northern Virginia. (Wilkes Tr., at 223-24.)

70.     On June 18, 2010, Plaintiff entered into a contract for the sale of the Property. The sale closed on July 16, 2010 for the sum of $384,000.00.  (Garcia Tr., at 72.)

71.     From the proceeds of the sale of the Property, Plaintiff paid her attorneys' fees of $190,000 and kept more than $155,000 for herself. (Wilkes Tr., at 42; **Exhibit P** (GMAC/AW 3037-3040.)

### Plaintiff's Claimed Emotional Distress

72.     Plaintiff testified that, prior to October 2008, when she discovered the fraud perpetrated upon her by her ex-husband, she had taken Xanax (for anxiety) and Ambien (for sleep problems) intermittently.  (Wilkes Tr., at 13.)  Indeed, Mr. Kingery testified that Plaintiff had always suffered from sleep problems.  (Transcript of Deposition of Matthew Kingery, dated June 9, 2011, at 41; a copy of which was filed under seal as Exhibit C to Defendant's Memorandum in Opposition to Motion in Limine to Exclude Testimony of Matthew Kingery.)

73.     Plaintiff first saw a doctor in October 2008 – Dr. Hammonds – for the emotional distress caused by her husband's actions.  (Wilkes Tr., at 271.)  Dr. Hammonds prescribed medication for anxiety and to help her sleep. (*Id.*)

74.     Plaintiff also saw Dr. Price once she had moved back to West Virginia in January of 2009. (Wilkes Tr., at 182, 272.)

75.     Plaintiff took anxiety medication (Xanax and Ativan) from October of 2008 through late 2009 and intermittently in the beginning of 2010.  (Wilkes Tr., at 11-13.)  Plaintiff took sleep mediation (Ambien) for the same time period.   (Wilkes Tr., at 11-12.)  She received no new prescriptions for the drugs after 2009.  (Wilkes Tr., at 181.)

76.     In fact, Plaintiff was not under the care of any healthcare providers on a regular basis for any of the damages she claims in this case (Wilkes Tr., at 173-76.)

77.    Plaintiff testified that, although she did feel a lot of stress and anxiety after March 2010, it was "different" and she "had developed coping mechanisms at that point." (Wilkes Tr., at 176-78.)

78.    Mr. Kingery testified that Plaintiff's primary sources of stress were the financial problems Mr. Wilkes caused her, her job and her status as a single mother.  (Kingery Tr., at 48-49.)

<u>S</u>TANDARD OF <u>R</u>EVIEW

The standards courts apply in their consideration of motions for summary judgment are well-established.  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

<u>A</u>RGUMENT

## I.    Plaintiff's Claims are Barred by Res Judicata

Federal courts apply state law on *res judicata*, also known as claim preclusion, when determining the preclusive effects of a state court judgment. *Greengael, LC v. Board of Sup'rs of Culpeper Cnty.*, 313 Fed. Appx. 577, 579 (4th Cir. 2008) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 2005).  Rule 1:6 of the Rules of the Supreme Court of Virginia, promulgated in 2006, provides as follows:

> [a] party whose claim for relief arising from identified conduct, a transaction, or
> an occurrence, is decided on the merits by a final judgment, shall be forever
> barred from prosecuting any second or subsequent civil action against the same
> opposing party or parties on any claim or cause of action that arises from that
> same conduct, transaction or occurrence, *whether or not the legal theory or*
> *rights asserted in the second or subsequent action were raised in the prior*
> *lawsuit, and regardless of the legal elements or the evidence upon which any*
> *claims in the prior proceeding depended, or the particular remedies sought.*

Rule 1:6(a), Va. S. Ct. (emphasis added). Virginia's claim preclusion doctrine bars "relitigation

of the same cause of action, or any part thereof, which could have been litigated between the

same parties and their privies." *Martin-Bangura v. Va. Dep't. of Mental Health*, 640 F. Supp. 2d

729, 738 (E.D. Va. 2009) (quoting *Smith v. Ware*, 244 Va. 374, 421 (1992)). Thus, as the terms

of the Rule make clear, in Virginia, the doctrine of *res judicata* precludes claims that could have

been brought in a prior suit, even if they were not actually asserted where the claim sought to be

barred arose out of the same conduct, transaction, or occurrence as the previously litigated

claim. *Fennell v. Town of Pocahontas*, 2005 U.S. Dist. LEXIS 19007, * 8 (W.D. Va. Sept. 2,

2005) (citing *Flora, Flora & Montague, Inc. v. Saunders*, 235 Va. 306, 367 S.E.2d 493, 495

(1988). A party asserting that a claim is precluded must also "show that the previous judgment

was a valid, final judgment on the merits." *Martin-Bangura*, 640 F. Supp. 2d at 738.

A.    <u>Plaintiff's FCRA Claims are Barred by Res Judicata</u>

There is no dispute that Plaintiff and GMAC were parties to the State Court Lawsuit and

that the State Court entered a final judgment on the merits in that case. (SUF ¶¶ 20, 28.)

Accordingly, if the Plaintiff's FCRA cause of action in this case arose out of the same conduct,

transaction, or occurrence as the claims litigated in the State Court Lawsuit, Plaintiff is barred

from bringing those claims in this case.

Plaintiff's claims in this case arise out of GMAC's alleged improper reporting to the

CRAs that she was obligated on the GMAC Account and that the account was delinquent and in

foreclosure. (Compl. ¶¶ 73-76.) Without question, GMAC's reporting of the GMAC Account as one on which Plaintiff was obligated arose out of the same transaction or occurrence that gave rise to Plaintiff's claims in the State Court Lawsuit – namely, Mr. Wilkes' forgery on the Note and Deed of Trust that created the GMAC Account and his subsequent failure to make any payments on the Note. Indeed, a number of the factual allegations in the Complaint mirror those contained in the State Court Complaint, including allegations that Mr. Wilkes forged the Note and Deed of Trust and that Plaintiff discovered the derogatory GMAC Account in October of 2008. (Compl. ¶¶16-18; State Court Compl. ¶¶ 37, 39.) Plaintiff admits that she knew, by November 2008 and before she filed the State Court Lawsuit, that GMAC was reporting the delinquent GMAC Account as her obligation. (SUF ¶ 19.) Indeed, she sought to have GMAC remove the credit reporting when her attorney sent the October 22, 2008 Letter to GMAC. (SUF ¶ 13.) She also propounded interrogatories in the State Court Lawsuit specifically asking GMAC about its policies and procedures related to identify theft. (SUF ¶ 29.) There is no question that Plaintiff was aware that she had claims against GMAC related to its credit reporting.

Accordingly, Plaintiff could have included allegations against GMAC in the State Court Lawsuit related to the credit reporting and requested for example that the State Court declare that the credit reporting must stop and grant injunctive relief ordering GMAC to cease reporting the GMAC Account on the tradeline sent to the CRAs. Plaintiff amended the State Court Complaint four separate times and had ample opportunity to include claims against GMAC related to GMAC's credit reporting. Any claims that Plaintiff may have related to allegedly inaccurate credit reporting by GMAC related to the GMAC Account created by Mr. Wilkes' forgery could have been raised in the State Court Lawsuit and are now barred. *See Martin-*

*Bangura*, 640 F. Supp.2d at 741 (plaintiff's claims barred by *res judicata* when he could have raised his Title VII claim during prior state proceeding).

Moreover, to the extent that Plaintiff argues that no cause of action under the FCRA existed until she submitted a dispute letter to the CRAs who, in turn, transmitted ACDVs to GMAC, the undisputed facts show that the Judgment Order was not final when Plaintiff submitted her first dispute letter to the CRAs on March 8, 2010.  (SUF ¶¶ 30-31.)  Indeed, it appears that Plaintiff obtained a copy of her credit report between February 4, 2010, when the State Court issued its letter opinion, and March 8, 2010.  (**Exhibit A**, Wilkes Tr., at 155.)  On discovering that GMAC was continuing to report the GMAC Account, Plaintiff could have sought relief from the State Court.  *See* Va. Code Ann. § 8.01-186 (providing that further relief based on a declaratory judgment order or decree may be granted whenever necessary or proper).[2]  Moreover, GMAC responded to the ACDVs *before* the Judgment Order became final and non-appealable on March 28, 2010.  Plaintiff could, therefore, have brought her FCRA claims before the State Court in March of 2010.  Having failed to raise her claims concerning GMAC's credit reporting in the State Court, Plaintiff is barred from bringing them in this case.[3]

---

[2] Indeed, this provision would have permitted Plaintiff to request that the State Court grant her further relief at *any* time after entry of the Judgment Order.  Accordingly, had Plaintiff's main concern been her credit report, she could have requested, even after the Judgment Order became final, that the State Court order that GMAC cease reporting the GMAC Account.  This procedure would, no doubt, have resulted in a far quicker resolution of the reporting issue – although it would not have provided her attorneys with an opportunity to recover their fees.

[3] At the very least, Plaintiff is barred in this case from complaining of any action or inaction on the part of GMAC that occurred before the entry of the Judgment Order.  *Martin-Bangura*, 640 F.Supp.2d at 740 (plaintiff was barred when he could have raised claims of retaliation based on facts that occurred before a final decision was rendered in the state court).  GMAC has filed a Motion *in Limine* seeking to exclude all evidence of GMAC's actions or inactions that took place prior to the entry of the Judgment Order in the State Court Lawsuit.

B.     Plaintiff's Defamation Claims are Barred by Res Judicata.

For the same reasons, Plaintiff's defamation claims are barred by *res judicata*. Plaintiff admits that she knew, as of November 2008, that GMAC was reporting the delinquent GMAC Account on her tradeline to the CRAs. (SUF ¶ 19.) Accordingly, Plaintiff could have brought a cause of action for defamation against GMAC in the State Court Lawsuit. As with her credit reporting claims, Plaintiff's claims for defamation arise out of the same transaction or occurrence giving rise to her claims to void the Note and Deed of Trust – her ex-husband's forgery and failure to pay the GMAC Account. Having failed to raise her claims in the State Court Lawsuit, Plaintiff is barred from recovering for any action of alleged defamation that occurred prior to the date that the Judgment Order in the State Court Lawsuit became final.

## II.     Plaintiff's Defamation Claims Must be Limited to Two Publications

In her Complaint, Plaintiff asserts a defamation claim for "each date on which GMAC sent information to the credit reporting agencies" and "each date on which GMAC published the defamation through the credit reporting agencies to third parties." (Compl. ¶ 68.)[4] Virginia recognizes two general varieties of defamation: (1) words that are defamatory *per se*; and (2) all other defamatory words which, though not in themselves actionable, occasion a person special damage. *See Wells v. Liddy*, 186 F.3d 505, 522 (4th Cir. 1999), *cert. denied*, 120 S.Ct. 939 (2000). This case does not involve defamation *per se*.[5] Plaintiff must show (1) a publication about Plaintiff, (2) a false and defamatory statement, (3) requisite intent, and (4) special damages. *Verrinder v. Rite Aid Corp.*, 2007 U.S. Dist. LEXIS 90931, at *65 (W.D. Va. 2007).

---

[4] Nevertheless, Plaintiff concedes that the statue of limitations bars recovery for any allegedly defamatory publications made more than one year prior to the filing of the Complaint. (**Exhibit H**, Answer to Interrogatory No. 3.)

[5] Plaintiff does not contend that GMAC's credit reporting imputed the commission of a crime involving moral turpitude, infection of a contagious disease, unfitness to perform her employment, or in any way prejudiced her in her profession. *See Wells*, 186 F.3d at 522.

As an initial matter, Plaintiff's allegations concerning GMAC's credit reporting to the CRAs is not actionable as a matter of law. The undisputed facts demonstrate that the reporting is accomplished via a computer to computer transfer of coded data that is not decipherable by a lay person. (SUF ¶ 7.) Accordingly, GMAC's mere reporting to the CRAs cannot be considered the publication of an injurious falsehood. *See Cretella v. Kuzminski*, 640 F.Supp.2d 741, 753 (E.D. Va. 2009) (plaintiff must prove that the statement was seen or heard by someone other than the plaintiff); *c.f., Yeagle v. Collegiate Times*, 255 Va. 293, 497 S.E.2d 136 (1997) (it is for the court to determine as a matter of law whether the statement is capable of a defamatory meaning). Plaintiff cannot demonstrate that the simple communication between GMAC's computer system and the CRAs' computer system of coded information (1) was seen by someone other than the plaintiff, or (2) was capable of defamatory meaning. It is only when the information is accessed by the CRAs to create a credit report, which is then sent to a prospective lender, that publication of defamatory words to a third person can occur.[6]

Accordingly, at issue in this case is any republication of the information provided to the CRAs in the form of a credit report accessed by or sent to a third party. Plaintiff asserts that Experian and TransUnion "continued to sell credit reports that regarded the Plaintiff to potential creditors which lacked a permissible purpose for the access of the report." (Compl. ¶ 36.) However, GMAC is not liable for these alleged repetitions or republications because they were not the natural and probable consequence of GMAC's credit reporting, nor did GMAC presumptively or actually authorize or direct the republication. *Weaver v. Beneficial Fin. Co.*, 199 Va. 196, 98 S.E.2d 687, 690 (1957) (author or originator of a defamation is liable for a

---

[6] In a similar vein, Plaintiff cannot claim to have suffered any damages merely as a result of the computer to computer reporting of a string of code. It is only when that code is translated into English and transmitted to a third party that the allegedly defamatory words can cause any damage.

republication or repetition thereof by third persons only if it is the natural and probable consequence of his act, or he has presumptively or actually authorized or directed its republication). As Plaintiff alleges, Experian and TransUnion released these reports impermissibly and without Plaintiff's authorization. GMAC cannot have been expected to anticipate, nor did it authorize, the release of credit reports in violation of the FCRA. The only credit reports authorized by Plaintiff were the two reports sent to Quicken Loans and Precision Funding in April or May 2010. Thus, only these allegedly defamatory publications can be considered in determining whether Plaintiff suffered special damages. As set forth below, at Section IV, *infra*, Plaintiff cannot demonstrate that she suffered any damages as a result of these two publications and her defamation claims therefore fail.

## III.   Plaintiff's "Willfulness" Claim Fails as a Matter of Law

The FCRA imposes certain duties on GMAC as a furnisher of credit information. First, in order to trigger a duty to act, GMAC must receive notice pursuant to 15 U.S.C. §1681(i)(a)(2) of a dispute with regard to the completeness or accuracy of any information it provided to a CRA. 15 U.S.C. §1681s-2(b)(1). Notice is provided when a CRA reports that a customer has disputed an item of credit reported by GMAC. 15 U.S.C. §1681(i)(a)(2). After receiving notice, GMAC is required to "conduct an investigation with respect to the disputed information" and "review all relevant information provided" to it by the CRA. 15 U.S.C. §1681s-2(b)(1). Regardless of the results of the investigation, GMAC must report back to any

CRA that notified it of the dispute.   15 U.S.C. §1681s-2(b)(1)(C).   It is undisputed here that GMAC received five ACDVs from the CRAs, all in response to the March 8, 2010 Letter.[7]

The FCRA contains two sections that address the remedies available to consumers wronged by a furnisher's actions. *See* 15 U.S.C.A. §§ 1681n, 1681o.  If a violation is negligent, the affected consumer is entitled to actual damages. 15 U.S.C. § 1681o(a). If the violation is willful, however, the consumer may have actual damages, or statutory damages ranging from $100 to $1,000, and even punitive damages. 15 U.S.C. § 1681n(a). To show willful noncompliance, the plaintiff must prove that the defendants "knowingly and intentionally committed an act in conscious disregard for the rights of others but need not show malice or evil motive." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 226 (3d Cir. 1997) (quoting *Philbin v. Trans Union Corp.*, 101 F.3d 957, 970 (3d Cir. 1996).  In addition, reckless disregard of FCRA requirements – *i.e.*, an interpretation that is objectively unreasonable – qualifies as a willful violation of the Act. *See Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 71, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007).   Plaintiff has presented no evidence that GMAC acted knowingly or recklessly.

Plaintiff's claim that GMAC acted willfully rests on two propositions: (1) GMAC knew about the outcome of the State Court Lawsuit, which held that Plaintiff was not responsible for the Note and Deed of Trust, and failed to remove the negative reporting from her credit file, and (2) failed to correct the reporting for a period of five months after being notified in March 2010

---

[7] To prevail on a claim under section 1681s-2(b), Plaintiff must show that the credit reporting agency notified the defendant of the dispute. *See, e.g.*, *Scott v. Wells Fargo Home Mortg., Inc.*, 2004 U.S. Dist. LEXIS 28781, at *20-21 (E.D. Va. Dec. 15, 2004), aff'd in part, rev'd in part on other grounds by *Scott v. Wells Fargo  Home Mortg., Inc.*, 143 Fed. Appx. 525 (4th Cir. 2005); see also 15 U.S.C. §§ 1681s-2(b)(1), 1681n(a) and 1681o.  Here, it is undisputed that neither the May 4, 2010 letter nor the June 16 Letter to the CRAs resulted in GMAC receiving notification from a CRA.  Therefore, GMAC is – at a minimum – entitled to summary judgment with respect to any claim under §1681s-2b that it violated the FCRA with respect to these letters.

that Plaintiff was disputing the GMAC Account.   (**Exhibit G**, Answer to Interrogatory No. 9.)

Accepting these allegations as true, Plaintiff has not identified facts that support her claim that

GMAC acted willfully, as opposed to negligently, with regard to the alleged FCRA violations.

The undisputed facts in this case demonstrate that GMAC did not willfully fail to comply with

the statute.   Instead, the facts demonstrate that GMAC credit operators followed GMAC's

procedures when they received the ACDVs from the CRAs.   (SUF ¶¶ 50.).   Indeed, Plaintiff

does not contend that the credit operators failed to follow GMACs procedures, misrepresented

or concealed any fact or harbored any ill will toward Plaintiff.   The facts demonstrate that

**GMAC had received the Judgment Order only two weeks before it responded to the first**

**ACDV and during the time that it was not yet a final and non-appealable order**.   (SUF ¶¶

30-31, 46-47.)   The timing of the alleged violation defeats any willfulness claim.   The fact that

this information was not yet reflected in GMAC's computer systems does not demonstrate a

knowing or reckless violation of the FCRA.

Admittedly, GMAC did not receive another dispute letter or other contact concerning

the GMAC Account until July 13, 2010.   Although there was a delay, information was received

in mid-July 2010 – as a result of Plaintiff's June 16, 2010 Letter – indicating that the GMAC

Account should be deleted from Plaintiff's credit file.   (SUF ¶¶ 43, 54.)   Upon receiving this

information, GMAC acted promptly to remove the information from the tradeline reported to

the CRAs.   On August 12, 2010, more than two months before the Plaintiff filed her Complaint,

GMAC requested that the GMAC Account be deleted from Plaintiff's credit file.   (SUF ¶ 43.)

By September 2010, it is undisputed that the GMAC Account had been removed from

Plaintiff's credit report.   Ms. Fleitas also testified that, although things might have been handled

better, a "wall" did not exist between the legal department and the credit reporting department

that would prevent communication.  (SUF ¶ 53.)  Thus, at best, Plaintiff can demonstrate that (1) information reflected in the Judgment Order had not yet been inputted into the GMAC computer system two weeks after GMAC's legal department received the Judgment Order and (2) there was an unexplained delay of approximately five months in correcting the credit reporting.

　　These facts simply are insufficient to demonstrate that GMAC "knowingly and intentionally" failed to comply with the statute or acted with "reckless disregard" for the requirements of the FCRA.  A number of courts have held that the reappearance of erroneous material on a consumer's credit report, even after the credit bureau knows the information is erroneous, may be evidence of negligence, but does not constitute conscious disregard justifying the imposition of punitive damages.  *See County Vanlines, Inc. v. Experian Information Solutions, Inc.*, 317 F. Supp.2d 393, 394 (S.D.N.Y. 2004); *Cousin v. Trans Union Corp.*, 246 F.3d 359, 373-74 (5th Cir. 2001) (fact that Trans Union knew that account reported on plaintiff's tradeline was a result of subscription fraud and continued to report the account was insufficient to demonstrate conscious disregard of plaintiff's rights); *c.f., Ross v. Federal Deposit Ins. Co.*, 625 F.3d 808, 816 (4th Cir. 2010) (even accepting inference that WaMu continued reporting after it knew of initial error, all that would be shown is that WaMu behaved negligently with respect to its reporting).  For instance, in *Rambarran v. Bank of America*, the Court held that, despite the fact that Bank of America had knowledge that the plaintiff's account was paid in full and continued to verify the existence of the account to the CRAs, Plaintiff could not point to any facts in the record supporting his assertion that Bank of America acted willfully or recklessly, as opposed to negligently, in failing to carry out an obligation under the FCRA.  609 F. Supp.2d 1253, 1271-72 (S.D. Fla. 2009).  Accordingly, the mere fact that GMAC's legal

24

department knew – approximately two weeks before its credit department received the first ACDV – that the State Court had entered the Judgment Order voiding the Note and Deed of Trust is insufficient to demonstrate that it acted willfully – or in a manner that was "objectively unreasonable" in failing to immediately correct the reporting.

Similarly, the fact that there was a delay between GMAC's receipt of the ACDVs from the CRAs indicating that Plaintiff disputed that she was obligated on the GMAC Account and the date GMAC corrected the reporting is insufficient to demonstrate willfulness. There is no evidence whatsoever that the delay was occasioned by knowing or reckless conduct. A court cannot assume knowing or reckless conduct based solely on the fact that there was a delay. *Llewellyn v. Allstate Home Loans, Inc.*, 2001 U.S. Dist. LEXIS 63607, at *42 (D. Colo. 2011). The Plaintiff bears the burden of demonstrating that GMAC's conduct was willful. *See Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (a defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial). She cannot do so because she cannot point to any evidence whatsoever that the delay was occasioned by a knowing or reckless disregard for GMAC's statutory obligations. As the Court in *Llewellyn* observed, this lack of evidence "at most suggests negligence . . . which is insufficient to show an entitlement to statutory or punitive damages." 2011 U.S. Dist. LEXIS 63907, at *42. Accordingly, GMAC is entitled to summary judgment with respect to Plaintiff's claim under 15 U.S.C. §1681(n).

## IV.    Plaintiff Cannot Demonstrate She Has Suffered Any Damages.

A plaintiff asserting a violation of the FCRA must "provide some evidence from which a reasonable fact finder could conclude that he suffered actual damages as a result of defendant's actions in order to survive summary judgment." *McMillan v. Experian*, 170 F.Supp.2d 278, 284 (D. Conn. 2001); *see also Rambarran*, 609 F. Supp.2d at 1263 (failure of plaintiff to produce

evidence of damage resulting from an FCRA violation mandates summary judgment).   As a matter of the statutory text, Plaintiff must show *both actual damages and proximate cause in order to recover for a negligent violation of the FCRA*." *Harris v. Experian Information Solutions, Inc.*, Civ. No. 6:06cv1808, at p.13 (D.S.C. June 30, 2009) (emphasis added). Similarly, Plaintiff must demonstrate that she suffered "special damages" as a result of the alleged defamation. *Wells*, 186 F.2d at 522.

A.   Plaintiff Cannot Prove She Suffered Economic Harm

To establish compensable damages, a plaintiff may not rest on mere allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Sloane v. Equifax Info. Servs., LLC*, 510 F. 3d 495, 503 (4th Cir. 2007) (stating that a plaintiff must "reasonably and sufficiently explain the circumstances of [the] injury and not resort to mere conclusory statements.") (*quoting Price v. City of Charlotte*, 93 F. 3d 1241, 1251 (4th Cir. 1996)).   Plaintiff asserts three categories of actual damages: loss of approximately 30 to 40 hours of her time, emotional distress and damages resulting from two credit denials.   (**Exhibit A**, Wilkes Tr., at 234-37)[8]

Plaintiff claims that she suffered credit denials when she sought to refinance her home in April or early May of 2010. (SUF ¶¶ 64-68.)   As an initial matter, the FCRA applies only to consumer reports.   It does not apply to reports used for business, commercial, or professional purposes.   116 Cong. Record 36, 572 (1970) (the FCRA "does not apply to reports used for business, commercial or professional purposes.")   Necessarily, then, the FCRA does not provide

---

[8] However, Plaintiff is unable to articulate precisely what actions consumed 30 to 40 hours of her time.  Plaintiff admits that her attorneys drafted each of the letters she sent to the CRAs and to GMAC and that she merely signed the letters and had them notarized.  (SUF ¶¶ 38, 42, 46.) Plaintiff has not identified any other concrete actions she took to correct the credit reporting issue.  Accordingly, Plaintiff has offered nothing more than conclusory testimony to support this category of damages.

for damages resulting from a plaintiff's attempt to secure credit for business investment purposes. *Johnson v. Wells Fargo Home Mortg., Inc.*, 558 F. Supp.2d 1114, 1122 (D. Nev. 2008) ("[I]t is generally held that losses resulting from the use of a credit report solely for a business or commercial transaction are not recoverable under the FCRA.")  Plaintiff applied for the loan with Precision Funding for purposes of using the Property as an investment.  (SUF ¶ 66.)  Moreover, there is no evidence that Plaintiff applied for a different type of loan with Quicken Loans.  Accordingly, the loans that Plaintiff applied for in April of 2010 were to assist her in using the Property as investment property.  The FCRA does not provide for damages resulting from either of these alleged investment mortgage loans.  Accordingly, even if Plaintiff had articulated any damages resulting from her inability to obtain these loans, she cannot recover damages for any "lost opportunity" with respect to the Property.

Moreover, Plaintiff is unable to identify any economic damages that she suffered as a result of the credit denials.  Notably, Plaintiff had already put the Property on the market and obtained a contract for the sale of the house by mid-April 2010.  (SUF ¶¶ 58-61.)  Indeed, her email correspondence with Mr. Garcia evidences her intent – as early as February 2010 – to sell the Property.  (SUF ¶¶ 66-67.)  Mr. Garcia testified that, after February or March 2010, Plaintiff never discussed with him that she intended to do anything other than sell the Property.  (SUF ¶ 59.)  Her actions are consistent with this intent.  In early April 2010, she put the Property on the market.  Shortly thereafter, during the same time frame she allegedly was attempting to refinance the Property, Plaintiff entered into a contract to sell the Property.[9]  Although the contract fell through, Plaintiff gave notice to the tenants terminating their lease and promptly put the Property on the market again in May 2010.

_____

[9] It goes without saying that while the Property was under contract, Plaintiff could not have entered into an agreement to refinance the Property.

By March 2010, Plaintiff was living in Keyser, West Virginia, and dating Mr. Kingery, to whom she is now engaged. (SUF ¶ 60.)  Mr. Kingery lives in Charleston, West Virginia. (*Id.*)  Plaintiff made no visits the Northern Virginia to view the Property and made no attempt to locate a job in Northern Virginia.  (SUF ¶ 69.)  Her only efforts to refinance came after consultation with counsel and during a time when the Property was under contract for sale and/or being prepared to be once again placed on the market.  By June, the Plaintiff had obtained another contract to sell the Property.  (SUF ¶ 70.)  The sale closed in July 2010 and Plaintiff used the proceeds to pay her attorneys' fees and net $150,000.00 for herself.  (SUF ¶¶ 70-71.)  Plaintiff testified that she plans to move to Charleston, West Virginia.  (**Exhibit A**, Wilkes Tr., at 216.)   Nor has Plaintiff provided any evidence whatsoever that would demonstrate that she suffered economic harm as a result of her inability to refinance the Property, as opposed to selling it.   Thus, Plaintiff is unable to point to any economic damages suffered as a result of the two denials of credit that occurred in May 2010.

### B.    Plaintiff cannot establish that GMAC caused her any Emotional Distress Damages.

Plaintiff asserts that she suffered from emotional distress as a result of GMAC's alleged failure to correct her credit report between March and August of 2010.  (**Exhibit H**, Answer to Interrogatory No. 9.)  However, she offers nothing more than conclusory testimony that she suffered such distress during the March 2010 to August 2010 timeframe.   Such conclusory statements are not sufficient to support a damage recovery, particularly in the area of emotional distress damages.   The Fourth Circuit has recognized that "not only is emotional distress fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Price*, 93 F. 3d at 1250; *Ross v. Federal Deposit Ins. Corp.*, 625 F.3d 808, 818 (4th Cir. 2010) (presented only with Ross's conclusory assertions, no reasonable jury could find that WaMu's

debt collection practices were the proximate cause of his emotional distress).  Accordingly, the Fourth Circuit looks to the following in determining if and how much emotional distress damages are appropriate:

> [T]he factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional distress; psychiatric or psychological treatment; and the loss of income, if any.

*Id.* (*citing Knussman v. Maryland*, 272 F. 3d 625, 640 (4th Cir. 2001)); *Wantz v. Experian Info. Solutions,* 386 F.3d 829, 834 (7th Cir. 2004); *Sloane v. Equifax Info. Servs., LLC,* 510 F.3d 495, 503 (4th Cir. 2007) (holding, in a FCRA case, that plaintiffs may not rely on mere "'conclusory statements'"; rather, they must "'sufficiently articulate[ ]' true 'demonstrable emotional distress,'" including "the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such  mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any.").  Plaintiff's superficial and conclusory assertions do not hold up under such an analysis.

Notably, in this case, Plaintiff testified that she was not under the care of a physician during the period from March 2010 to August 2010, she was taking medication only intermittently for sleep issues and anxiety (which she had suffered from even prior to discovering Mr. Wilkes' forgery and financial shenanigans).  (SUF ¶¶ 72, 76.)  Plaintiff has nothing more than her conclusory testimony that she suffered from anxiety and emotional distress as a result of attempting to clear her credit report.  Moreover, Plaintiff cannot demonstrate that GMAC's delay in correcting her credit report caused her alleged emotional

distress.   Indeed, her answers to Interrogatories are telling in this regard.   In response to Interrogatory Number 13, requesting that she identify her damages with specificity, Plaintiff responded:

> Ms. Wilkes has endured substantial and ongoing emotional and mental anguish and loss of self-esteem because of this ordeal to recapture her good name and credit. . . . As a result, Ms. Wilkes suffered from a loss of appetite, noticeable weight loss, social anxiety, a constant fear or uneasiness, difficulty sleeping, unusual nightmares, trouble relating to other people, emotional blunting, feelings of unreality, the inability to concentrate at work, stress-related neck, shoulder, and back pain.  . . . Ms. Wilkes was forced to file a lawsuit in the Prince William County Circuit Court as GMAC, among others, was trying to foreclose on her home.  The Prince William County litigation took over 14 months and trial lasted two full days. The presiding judge issued a written opinion that took an additional few weeks.   All the while, Ms. Wilkes was suffering from extreme emotional distress and anxiety as she did not want to lose her home. . . . This lawsuit and the process leading up to it, has caused Ms. Wilkes additional emotional distress and anxiety.

(**Exhibit G**, Answer to Interrogatory No. 9.)   This fact is bolstered by Mr. Kingery, who testified that the primary sources of Plaintiff's emotional distress were Mr. Wilkes' actions and her status as a single mother.   (SUF ¶ 78.)   Clearly, as demonstrated by her answers to Interrogatories, as well as her deposition testimony, the damages Plaintiff attributes to GMAC -- if any such damages exist – were caused by the actions of her ex-husband, Mr. Wilkes, in forging her name on the Note and Deed of Trust, and not by any alleged credit reporting deficiencies occurring in the March to August 2010 time period.

<h2 style="text-align:center">C<small>ONCLUSION</small></h2>

For the foregoing reasons, GMAC respectfully requests that this Court grant its Motion for Summary Judgment, enter judgment against Plaintiff on all counts of the Complaint asserted against GMAC, and grant it such other relief as it may deem appropriate.

GMAC MORTGAGE, LLC

By:   \_\_/s/ John C. Lynch_____
                By Counsel

John C. Lynch (VSB No. 39267)
Ethan G. Ostroff (VSB No. 71610)
*Counsel for Defendant GMAC Mortgage LLC*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7765
Facsimile: (757) 687-1504
E-mail: john.lynch@troutmansanders.com
E-mail: ethan.ostroff@troutmansanders.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7th day of July, 2011, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following CM/ECF participants:

<u>**Counsel for Plaintiff**</u>
John C. Bazaz, Esq.
Law offices of John Bazaz, PLC
4000 Legato Rd., Suite 1100
Fairfax, VA 22033
E-mail: jbazaz@bazazlaw.com

Leonard Anthony Bennett
Consumer Litigation Assoc PC
12515 Warwick Blvd., Suite 1000
Newport News, Virginia 23606
E-mail: lenbennett@cox.net

Matthew James Erausquin
Consumer Litigation Assoc PC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
E-mail: matt@clalegal.com

<u>**Counsel for America Funding, Inc.**</u>
Brian Nelson Casey, Esq.
Taylor & Walker PC
555 Main St , PO Box 3490
Norfolk, VA 23514-3490
Email: bcasey@taylorwalkerlaw.com

    /s/ John C. Lynch
John C. Lynch (VSB No. 39267)
*Counsel for Defendant GMAC Mortgage LLC*
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: (757) 687-7765
Facsimile: (757) 687-1504
E-mail: john.lynch@troutmansanders.com