1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division


-----------------------------:
ALISHA W. WILKES,            :   Case No. 1:10-cv-01160
                             :   (CMH-TRJ)
            Plaintiff,       :
                             :
vs.                          :
                             :
EXPERIAN INFORMATION         :
SOLUTIONS, INC., et al.,     :            Volume I
                             :
            Defendants.  :       (Pages 1 - 141)
-----------------------------:

                              Fairfax, Virginia

                            Wednesday, May 11, 2011

Videotaped deposition of:


                ALISHA WILKES

called for oral examination by counsel for Defendant,

pursuant to notice, at the law offices of John Bazaz,

4000 Legato Road, Suite 1100, Fairfax, Virginia, before

LaQuicia Thomas of Capital Reporting Company, a Notary

Public in and for the Commonwealth of Virginia,

beginning at 11:06 a.m., when were present on behalf of

the respective parties:

Exhibit A

# Capital Reporting Company
## Wilkes, Alisha - Volume I 05-11-2011

2

```
 1   On behalf of the Plaintiff:

 2        JOHN C. BAZAZ, ESQUIRE
          Law Offices of John C. Bazaz, PLC
 3        4000 Legato Road, Suite 1100
          Fairfax, Virginia 22033
 4        (703) 272-8455

 5        LEONARD ANTHONY BENNETT, ESQUIRE
          Consumer Litigation Associates, P.C.
 6        12515 Warwick Boulevard, Suite 100
          Newport News, Virginia 23606
 7        (757) 930-3660
          (Appeared Telephonically)
 8

 9   On behalf of the Defendant,
     GMAC Mortgage, LLC:
10
          JOHN C. LYNCH, ESQUIRE
11        Troutman Sanders, LLP
          222 Central Park Avenue, Suite 2000
12        Virginia Beach, Virginia 23462
          (757) 687-7765
13

14   On behalf of the Defendant,
     America Funding, Inc.:
15
          BRIAN NELSON CASEY, ESQUIRE
16        Taylor & Walker, P.C.
          555 Main Street
17        P.O. Box 3490
          Norfolk, Virginia 23514-3490
18        (757) 625-7300

19
     Also present:
20
          Dylan Browne, Video Technician
21

22                      * * * * *
```

## Capital Reporting Company
### Wilkes, Alisha - Volume I 05-11-2011

                                                                11

| | | | |
|---|---|---|---|
| 1 | Q | When is the last time you've ever | 11:09:02 |
| 2 | | been on any other medications besides those? | 11:09:04 |
| 3 | A | Regularly? | 11:09:06 |
| 4 | Q | Yes. | 11:09:07 |
| 5 | A | Asthma medication up through probably | 11:09:08 |
| 6 | | this past February, regular asthma medication. | 11:09:17 |
| 7 | | How far back do you want me to go? | 11:09:24 |
| 8 | Q | Maybe three or four years -- | 11:09:27 |
| 9 | A | Okay. | 11:09:28 |
| 10 | Q | -- would be fine. | 11:09:29 |
| 11 | A | I was taking anxiety medication | 11:09:31 |
| 12 | | regularly from about October of 2008 through | 11:09:34 |
| 13 | | late 2009, and then intermittently the | 11:09:40 |
| 14 | | beginning of 2010.  I still take it | 11:09:48 |
| 15 | | occasionally.  I was also taking sleep | 11:09:52 |
| 16 | | medication for the same period of time.  I | 11:09:58 |
| 17 | | don't take that intermittently anymore, | 11:10:02 |
| 18 | | though. | 11:10:06 |
| 19 | Q | Okay.  During the October 2008, late | 11:10:06 |
| 20 | | 2009 time frame, you were regularly taking | 11:10:09 |
| 21 | | anxiety medication? | 11:10:13 |
| 22 | A | Yes. | 11:10:14 |

12

| | | | |
|---|---|---|---|
| 1 | Q | And you were regularly taking | 11:10:14 |
| 2 | sleep-aid medication? | | 11:10:18 |
| 3 | A | Yes. | 11:10:19 |
| 4 | Q | And then after 2009, is it fair to | 11:10:19 |
| 5 | say during 2010, you took both those | | 11:10:23 |
| 6 | medications intermittently? | | 11:10:31 |
| 7 | A | Yes. | 11:10:31 |
| 8 | Q | And then starting in the end of 2010, | 11:10:31 |
| 9 | you haven't been taking those medications? | | 11:10:32 |
| 10 | A | I haven't -- I've taken it maybe just | 11:10:35 |
| 11 | a little bit every now and then.  Not the | | 11:10:38 |
| 12 | sleep medication, but the anxiety medication | | 11:10:41 |
| 13 | every now and then. | | 11:10:44 |
| 14 | Q | And tell me what type of anxiety | 11:10:46 |
| 15 | medication you were taking. | | 11:10:49 |
| 16 | A | Xanax was the one I was taking. | 11:10:50 |
| 17 | Q | Any others? | 11:10:54 |
| 18 | A | I took Ativan briefly. | 11:10:55 |
| 19 | Q | And how about the sleep-aid | 11:11:00 |
| 20 | medication? | | 11:11:02 |
| 21 | A | Ambien. | 11:11:02 |
| 22 | Q | How about prior to October 2008?  Had | 11:11:05 |

13

| | |
|---|---|
| 1   you taken any of these anxiety medications | 11:11:16 |
| 2   before? | 11:11:20 |
| 3      A     Intermittently, I had taken -- I had | 11:11:20 |
| 4   a prescription for Xanax at one point, I | 11:11:25 |
| 5   believe, but I took it just intermittently. | 11:11:29 |
| 6      Q     When was the first time you can | 11:11:31 |
| 7   recall ever taking an anxiety medication? | 11:11:34 |
| 8      A     Probably, maybe mid 2007, somewhere | 11:11:36 |
| 9   in that time frame. | 11:11:39 |
| 10      Q     And how about the sleep-aid | 11:11:40 |
| 11   medication?   When was the first time you think | 11:11:43 |
| 12   you -- | 11:11:46 |
| 13      A     It would have been probably around | 11:11:47 |
| 14   that same time frame. | 11:11:48 |
| 15      Q     And it's my understanding, in 2007 | 11:11:50 |
| 16   through 2010, you were going through a | 11:11:56 |
| 17   divorce? | 11:11:59 |
| 18      A     The end of 2008 -- | 11:11:59 |
| 19      Q     Okay. | 11:12:03 |
| 20      A     -- until early 2010. | 11:12:04 |
| 21      Q     Your divorce became final in early | 11:12:07 |
| 22   2010? | 11:12:16 |

## Capital Reporting Company
### Wilkes, Alisha - Volume I 05-11-2011

27

| | | |
|---|---|---|
| 1 | hometown, but I moved back in January 2009. | **11:24:53** |
| 2 | Q    Okay.  So you got separated in | **11:24:59** |
| 3 | October 2008, and moved home in January 2009? | **11:25:02** |
| 4 | A    Yes. | **11:25:07** |
| 5 | Q    Is it fair to say by January 2009, | **11:25:07** |
| 6 | you were pretty confident the marriage needed | **11:25:11** |
| 7 | to end? | **11:25:14** |
| 8 | A    Yes. | **11:25:15** |
| 9 | Q    Okay.  Tell me about the receiving | **11:25:15** |
| 10 | the calls from the creditors.  Who were these | **11:25:21** |
| 11 | creditors? | **11:25:23** |
| 12 | A    I believe the first one was SunTrust. | **11:25:23** |
| 13 | Q    What was that about? | **11:25:28** |
| 14 | A    It was about a line of credit that | **11:25:30** |
| 15 | was taken out against our home. | **11:25:35** |
| 16 | Q    Did you ever speak with anybody at | **11:25:36** |
| 17 | SunTrust? | **11:25:40** |
| 18 | A    I did.  One phone call. | **11:25:41** |
| 19 | Q    What did they say to you? | **11:25:43** |
| 20 | A    They said they wanted to speak to | **11:25:45** |
| 21 | Daniel Wilkes about his line of credit against | **11:25:48** |
| 22 | our home -- his home -- his home equity line | **11:25:52** |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

28

| | | |
|---|---|---|
| 1 | of credit. | 11:25:56 |
| 2 | Q    Did you eventually find out that | 11:25:57 |
| 3 | there was a home equity line of credit on the | 11:25:59 |
| 4 | home? | 11:26:02 |
| 5 | A    Yes. | 11:26:02 |
| 6 | Q    And how much was it for? | 11:26:02 |
| 7 | A    That one I don't know.  There was | 11:26:04 |
| 8 | more than one.  I don't know how much that one | 11:26:04 |
| 9 | was for.  I don't remember now. | 11:26:06 |
| 10 | Q    Okay.  What other lines of credit | 11:26:06 |
| 11 | besides this SunTrust one? | 11:26:07 |
| 12 | A    If I -- there were, I believe, three | 11:26:09 |
| 13 | lines of credit. | 11:26:17 |
| 14 | Q    Do you remember the names of the | 11:26:18 |
| 15 | other companies? | 11:26:23 |
| 16 | A    Two of them were SunTrust.  The other | 11:26:25 |
| 17 | one I don't remember who it belonged to. | 11:26:27 |
| 18 | Q    Did you have any idea about how much | 11:26:29 |
| 19 | was owed on any of these lines of credit? | 11:26:32 |
| 20 | A    I don't remember now. | 11:26:36 |
| 21 | Q    Okay.  Who else besides SunTrust was | 11:26:37 |
| 22 | calling you at the house? | 11:26:42 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

29

| | | |
|---|---|---|
| 1 | A    SunTrust was the first one.  The | 11:26:44 |
| 2 | second one I talked to was someone from Bank | 11:26:46 |
| 3 | of America. | 11:26:50 |
| 4 | Q    And what did you learn from Bank of | 11:26:50 |
| 5 | America? | 11:26:54 |
| 6 | A    That there was a credit card that had | 11:26:54 |
| 7 | a very high balance that was not being paid. | 11:26:56 |
| 8 | Q    Approximately, how much was that | 11:27:00 |
| 9 | balance? | 11:27:02 |
| 10 | A    I don't recall now.  In the tens of | 11:27:03 |
| 11 | thousands of dollars. | 11:27:10 |
| 12 | Q    Like 10 or 20,000 or more? | 11:27:12 |
| 13 | A    More, more. | 11:27:18 |
| 14 | Q    Okay.  So far, we have SunTrust, the | 11:27:19 |
| 15 | line of credit; Bank of America, the credit | 11:27:23 |
| 16 | card.  Any other calls from creditors that you | 11:27:25 |
| 17 | recall? | 11:27:27 |
| 18 | A    Those were the only two I spoke with. | 11:27:28 |
| 19 | Q    Okay.  Did you have any | 11:27:30 |
| 20 | understanding, after talking to SunTrust or | 11:27:31 |
| 21 | Bank of America, about whether you were on | 11:27:33 |
| 22 | these obligations personally or not? | 11:27:36 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

30

| | | |
|---|---|---|
| 1 | A    My understanding, based on what Bank | 11:27:38 |
| 2 | of America was telling me, was that I was | 11:27:42 |
| 3 | obligated also. | 11:27:45 |
| 4 | Q    Have you come to learn from any | 11:27:46 |
| 5 | source about whether you actually are | 11:27:48 |
| 6 | personally obligated on the SunTrust or the | 11:27:52 |
| 7 | Bank of America obligations? | 11:27:55 |
| 8 | A    The SunTrust, I am not.  The Bank of | 11:27:59 |
| 9 | America, I'm still not sure. | 11:28:00 |
| 10 | Q    Okay.  Any other obligations that | 11:28:03 |
| 11 | your husband incurred that you have learned | 11:28:07 |
| 12 | that you're personally obligated on, or may be | 11:28:12 |
| 13 | personally obligated? | 11:28:16 |
| 14 | A    There were two more credit cards that | 11:28:17 |
| 15 | I may be obligated on. | 11:28:21 |
| 16 | Q    Okay.  And what companies are they | 11:28:24 |
| 17 | with? | 11:28:25 |
| 18 | A    They were both with American Express. | 11:28:25 |
| 19 | Q    And what were the balances on those, | 11:28:27 |
| 20 | approximately? | 11:28:29 |
| 21 | A    One was in excess of $100,000.  And | 11:28:30 |
| 22 | the other was a lesser amount, in the | 11:28:37 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

31

| | | |
|---|---|---|
| 1 | neighborhood of $15,000, but I'm not certain | 11:28:40 |
| 2 | exactly anymore. | 11:28:44 |
| 3 | Q    When did you learn about those | 11:28:45 |
| 4 | American Express accounts? | 11:28:47 |
| 5 | A    In October 2008. | 11:28:49 |
| 6 | Q    So it's fair to say, generally, in | 11:28:52 |
| 7 | October 2008, you found out about all of these | 11:28:55 |
| 8 | obligations and -- | 11:28:59 |
| 9 | A    Correct. | 11:28:59 |
| 10 | Q    -- it obviously proceeded from there | 11:29:00 |
| 11 | for you obviously wanting a separation? | 11:29:03 |
| 12 | A    Correct.  The one -- the one American | 11:29:05 |
| 13 | Express card I did know existed, I didn't -- I | 11:29:06 |
| 14 | was not aware of the extraordinary balance on | 11:29:07 |
| 15 | it. | 11:29:09 |
| 16 | Q    Did your husband ever tell you about | 11:29:10 |
| 17 | how he incurred this debt? | 11:29:12 |
| 18 | A    He had -- he did have some | 11:29:14 |
| 19 | explanations for how he incurred the debt. | 11:29:18 |
| 20 | Q    What were they? | 11:29:21 |
| 21 | A    Gambling in Las Vegas, mostly. | 11:29:22 |
| 22 | Q    Did he ever acknowledge signing your | 11:29:36 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

35

| 1 | Q    Did you have any understanding about | 11:32:49 |
|---|---|---|

1      Q    Did you have any understanding about          11:32:49

2  what the agreement was with your husband in         11:32:51

3  this agreement about your personal residence?       11:32:53

4      A    That it would be titled into my name,       11:32:59

5  that I would become the sole owner of the           11:33:02

6  house.                                              11:33:05

7      Q    Okay.  At this time, in November of         11:33:06

8  2008, did you have any knowledge of GMAC being      11:33:16

9  involved in your life?                              11:33:21

10     A    Yes.                                        11:33:23

11     Q    Okay.  Tell me how that first came          11:33:23

12 about and how you first learned that GMAC was       11:33:26

13 involved in your life.                              11:33:31

14     A    I pulled my credit report --               11:33:32

15     Q    Okay.                                       11:33:32

16     A    -- on October 14, 2008, and I saw           11:33:34

17 that there was a mortgage on it, GMAC's             11:33:38

18 mortgage, in my name.                               11:33:41

19     Q    And did you have any understanding          11:33:42

20 about when that mortgage was entered into?          11:33:48

21     A    No.  At that point, I didn't know          11:33:51

22 anything about it.                                  11:33:53

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

36

| | | |
|---|---|---|
| 1 | Q    Okay.  And how about at any | 11:33:54 |
| 2 | subsequent point; did you learn when your | 11:33:55 |
| 3 | husband forged your name and when that was | 11:33:58 |
| 4 | supposedly entered into? | 11:34:01 |
| 5 | A    I believe it was in April of 2008. | 11:34:07 |
| 6 | Q    Okay.  And do you know how much that | 11:34:10 |
| 7 | mortgage was for? | 11:34:12 |
| 8 | A    I believe it was $380,000. | 11:34:12 |
| 9 | Q    Okay.  And did you understand that | 11:34:16 |
| 10 | that was -- I know you didn't know anything | 11:34:26 |
| 11 | about it in April of 2008, but subsequent to | 11:34:28 |
| 12 | that, did you learn that that was a refinance | 11:34:31 |
| 13 | of your prior mortgage? | 11:34:34 |
| 14 | A    No.  I don't remember learning that. | 11:34:37 |
| 15 | Q    Was the GMAC mortgage a second | 11:34:39 |
| 16 | mortgage, or was that a first mortgage? | 11:34:43 |
| 17 | A    The -- I don't know.  It wasn't -- | 11:34:47 |
| 18 | there was -- there was another mortgage that | 11:34:54 |
| 19 | had been taken out on the house before the | 11:34:57 |
| 20 | GMAC mortgage.  So it would have, technically, | 11:34:59 |
| 21 | been a -- I guess, a third mortgage. | 11:35:02 |
| 22 | Q    Did you have any understanding about | 11:35:06 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

37

| | | |
|---|---|---|
| 1 | whether the GMAC mortgage paid off any of the | 11:35:08 |
| 2 | other -- or the earlier mortgages? | 11:35:11 |
| 3 | A    No.  I don't believe it did. | 11:35:14 |
| 4 | Q    Okay.  Let me ask you this:  You | 11:35:16 |
| 5 | didn't recall the bank that you got the | 11:35:19 |
| 6 | original mortgage from in January of 2005, | 11:35:22 |
| 7 | correct? | 11:35:26 |
| 8 | A    Right. | 11:35:27 |
| 9 | Q    Do you remember or were you -- did | 11:35:27 |
| 10 | you have any knowledge of any subsequent | 11:35:29 |
| 11 | refinancing that occurred on your house? | 11:35:32 |
| 12 | A    I don't believe there was any | 11:35:34 |
| 13 | refinancing on the house. | 11:35:38 |
| 14 | Q    Were -- did you have any knowledge, | 11:35:39 |
| 15 | anytime between 2005 and October 2008, of any | 11:35:40 |
| 16 | new loans being taken out on your house? | 11:35:46 |
| 17 | A    Did I know in between that -- | 11:35:48 |
| 18 | Q    Yes. | 11:35:48 |
| 19 | A    -- time period that any were being | 11:35:50 |
| 20 | taken out?  No. | 11:35:51 |
| 21 | Q    Okay.  So your knowledge was, before | 11:35:53 |
| 22 | this all came to a head in October and | 11:35:55 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

42

| | | | |
|---|---|---|---|
| 1 | A | Yes. | 11:39:43 |
| 2 | Q | And when was that house sold? | 11:39:43 |
| 3 | A | July 2010. | 11:39:45 |
| 4 | Q | And how much did you sell the house | 11:39:50 |
| 5 | | for? | 11:39:58 |
| 6 | A | I believe I sold it for somewhere | 11:39:58 |
| 7 | | around $375,000, I believe. | 11:40:03 |
| 8 | Q | How much of that money did you get -- | 11:40:07 |
| 9 | A | I think -- | 11:40:07 |
| 10 | Q | -- after the closing occurred? | 11:40:13 |
| 11 | A | I think a little over 150,000 is what | 11:40:15 |
| 12 | | I was able to keep. | 11:40:23 |
| 13 | Q | Well, let me make sure I understand | 11:40:25 |
| 14 | | you.  Is that after paying the 190,000 for the | 11:40:28 |
| 15 | | attorneys' fees? | 11:40:35 |
| 16 | A | Correct. | 11:40:36 |
| 17 | Q | Okay.  So out of the proceeds from | 11:40:36 |
| 18 | | the sale of the house in Gainesville, you were | 11:40:38 |
| 19 | | able to pay your attorneys and you received | 11:40:41 |
| 20 | | $150,000? | 11:40:44 |
| 21 | A | Right.  Yes. | 11:40:45 |
| 22 | Q | My rough math is that -- comes up to | 11:40:46 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

53

| | | |
|---|---|---|
| 1 | that you retained Mr. Weible to conduct? | 11:51:08 |
| 2 | A    Initially, just for advice on what | 11:51:11 |
| 3 | course of action to take to clear up the | 11:51:15 |
| 4 | financial mess I found myself in. | 11:51:18 |
| 5 | Q    Do you know, generally, when you | 11:51:20 |
| 6 | first consulted and hired him? | 11:51:23 |
| 7 | A    October 14th or 15th would have been | 11:51:25 |
| 8 | when I first spoke with him.  It was | 11:51:28 |
| 9 | immediately. | 11:51:31 |
| 10 | Q    And how long did you retain | 11:51:32 |
| 11 | Mr. Weible? | 11:51:42 |
| 12 | A    I believe only two to three weeks. | 11:51:43 |
| 13 | MR. LYNCH:  I'd like to have this | 11:52:34 |
| 14 | marked as Exhibit 2. | 11:52:35 |
| 15 | (Wilkes Exhibit No. 2 was marked for | 11:52:35 |
| 16 | identification.) | 11:52:52 |
| 17 | MR. LYNCH:  (Tenders document.) | 11:52:52 |
| 18 | MR. BAZAZ:  Thank you.  Do you have | 11:52:54 |
| 19 | one for Brian? | 11:52:56 |
| 20 | MR. LYNCH:  Yeah, I do. | 11:52:57 |
| 21 | (Tenders document.) | 11:53:00 |
| 22 | MR. CASEY:  I got it. | 11:53:00 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

54

| | | |
|---|---|---|
| 1 | BY MR. LYNCH: | 11:53:02 |
| 2 | Q    Ms. Wilkes, I put a document in front | 11:53:03 |
| 3 | of you, which has been marked as Exhibit 2. | 11:53:05 |
| 4 | A    Uh-huh. | 11:53:05 |
| 5 | Q    And if you could take as much time as | 11:53:08 |
| 6 | you need to review it, and then let me know | 11:53:11 |
| 7 | when you're ready to field some questions. | 11:53:13 |
| 8 | A    Okay.  Okay. | 11:53:37 |
| 9 | Q    Do you recognize that letter? | 11:53:38 |
| 10 | A    Yes. | 11:53:40 |
| 11 | Q    What is it? | 11:53:41 |
| 12 | A    It's the letter that Mr. Weible sent | 11:53:42 |
| 13 | to GMAC. | 11:53:44 |
| 14 | Q    Did you have an understanding that | 11:53:46 |
| 15 | this letter had been sent? | 11:53:48 |
| 16 | A    I knew that Mr. Weible was acting on | 11:53:49 |
| 17 | my behalf to try to clear up the financial | 11:53:52 |
| 18 | problems on my credit report.  I don't know | 11:53:57 |
| 19 | that I was aware, specifically, that this | 11:54:00 |
| 20 | letter was sent. | 11:54:03 |
| 21 | Q    Do you remember seeing a copy of this | 11:54:05 |
| 22 | letter either when it was sent or shortly | 11:54:07 |

55

| | | |
|---|---|---|
| 1 | thereafter? | 11:54:10 |
| 2 | A    I don't remember. | 11:54:11 |
| 3 | Q    Do you remember receiving anything in | 11:54:12 |
| 4 | the mail from Mr. Weible during the time | 11:54:15 |
| 5 | period he represented you? | 11:54:19 |
| 6 | A    I don't remember. | 11:54:21 |
| 7 | Q    But it's fair to say you understood | 11:54:27 |
| 8 | that he was contacting GMAC on your behalf? | 11:54:33 |
| 9 | A    Yes.  That's fair to say. | 11:54:33 |
| 10 | Q    Did you ever learn about how GMAC | 11:54:35 |
| 11 | responded to Mr. Weible's inquiry about the | 11:54:51 |
| 12 | loan? | 11:54:56 |
| 13 | A    I don't recall. | 11:54:59 |
| 14 | Q    Okay. | 11:55:02 |
| 15 | MR. LYNCH:  Let's make this | 11:55:03 |
| 16 | Exhibit 3. | 11:55:05 |
| 17 | (Tenders document.) | 11:55:05 |
| 18 | MR. BAZAZ:  Thank you. | 11:55:05 |
| 19 | (Wilkes Exhibit No. 3 was marked for | 11:55:05 |
| 20 | identification.) | 11:55:26 |
| 21 | BY MR. LYNCH: | 11:55:26 |
| 22 | Q    And Ms. Wilkes, just like any of the | 11:55:29 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

57

1   GMAC's response to him?                               11:56:59

2       A    I don't recall having a discussion          11:57:01

3   with him about GMAC's response.                       11:57:03

4       Q    Okay.                                        11:57:06

5            MR. LYNCH:  We will make this Exhibit

6   4.

7            (Tenders document.)

8            MR. BAZAZ:  Thank you.

9            (Wilkes Exhibit No. 4 was marked for

10  identification.)                                      11:58:37

11  BY MR. LYNCH:                                         11:58:37

12      Q    Ms. Wilkes, are you ready to field          11:58:38

13  some questions?                                       11:58:40

14      A    Yes.                                         11:58:41

15      Q    Have you ever seen the document that        11:58:41

16  has been marked as Exhibit 4?                         11:58:43

17      A    The letter on the front, no, does not       11:58:46

18  look familiar to me.  The forms I have seen           11:58:50

19  because I had to fill out a number of ID theft        11:58:54

20  affidavits.  So I have seen forms like that.          11:58:58

21      Q    Okay.  Do you remember Mr. Weible            11:59:02

22  giving you forms from GMAC to be completed?           11:59:04

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

58

| | | |
|---|---|---|
| 1 | A    I do not remember that. | 11:59:08 |
| 2 | Q    Okay.  And you understand, from this | 11:59:10 |
| 3 | cover letter, that GMAC was asking for an | 11:59:15 |
| 4 | affidavit to be completed by you and a copy of | 11:59:20 |
| 5 | the police report? | 11:59:24 |
| 6 | A    I see where it's asking for the | 11:59:25 |
| 7 | affidavit.  If you could maybe direct me to | 11:59:31 |
| 8 | see if it's -- | 11:59:37 |
| 9 | Q    Yeah.  It's in the first -- I guess | 11:59:37 |
| 10 | it's the second large paragraph. | 11:59:40 |
| 11 | A    Okay.  Copy of the police report. | 11:59:42 |
| 12 | Okay.  Yes.  I see that now. | 11:59:49 |
| 13 | Q    Do you remember at all during the | 11:59:51 |
| 14 | course of your representation by Mr. Weible | 11:59:52 |
| 15 | ever being asked to fill out an affidavit for | 11:59:55 |
| 16 | the identity theft? | 12:00:00 |
| 17 | A    I don't recall. | 12:00:02 |
| 18 | Q    Okay.  And do you ever remember being | 12:00:03 |
| 19 | asked, while you were being represented by | 12:00:08 |
| 20 | Mr. Weible, to get a police report? | 12:00:10 |
| 21 | A    I don't remember being asked to do | 12:00:14 |
| 22 | that. | 12:00:16 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

59

| | | | |
|---|---|---|---|
| 1 | Q | Okay. | 12:00:16 |
| 2 | A | I don't remember it happening. | 12:00:17 |
| 3 | Q | Okay.  And I believe you testified | 12:00:20 |
| 4 | earlier you did not make a report to the | | 12:00:21 |
| 5 | police until sometime in 2009? | | 12:00:25 |
| 6 | A | 2009 was when I talked with Detective | 12:00:28 |
| 7 | Downham, but there was another incident where | | 12:00:37 |
| 8 | I talked with the Prince William County Police | | 12:00:39 |
| 9 | about my identity being stolen. | | 12:00:42 |
| 10 | Q | When was that? | 12:00:44 |
| 11 | A | That was also in 2009, but I don't | 12:00:45 |
| 12 | recall -- it would have been in the spring of | | 12:00:49 |
| 13 | 2009.  I don't remember the month. | | 12:00:53 |
| 14 | Q | Did you talk to the Fairfax -- | 12:00:54 |
| 15 | Fairfax detective before you talked to someone | | 12:00:56 |
| 16 | in Prince William County? | | 12:00:58 |
| 17 | A | I believe Prince William County was | 12:01:00 |
| 18 | first and Fairfax was second. | | 12:01:03 |
| 19 | Q | And your recollection is you talked | 12:01:04 |
| 20 | to someone in Prince William sometime in the | | 12:01:08 |
| 21 | spring of 2009? | | 12:01:11 |
| 22 | A | I believe. | 12:01:12 |

## Capital Reporting Company
### Wilkes, Alisha - Volume I 05-11-2011

62

| | | |
|---|---|---|
| 1 | William County Police and told them that? | 12:03:08 |
| 2 | A   Correct. | 12:03:09 |
| 3 | Q   Did you -- was any type of report | 12:03:10 |
| 4 | filled out at that time? | 12:03:18 |
| 5 | A   I believe so. | 12:03:18 |
| 6 | Q   Was that something you just did over | 12:03:18 |
| 7 | the telephone? | 12:03:18 |
| 8 | A   Correct. | 12:03:18 |
| 9 | Q   Okay.  And was that something you did | 12:03:19 |
| 10 | on your own accord, or was that done on the | 12:03:22 |
| 11 | advice of counsel? | 12:03:26 |
| 12 | A   It was something I did on my own. | 12:03:27 |
| 13 | Q   Okay.  To be as straightforward as | 12:03:31 |
| 14 | possible, what I want to ask you is, do you | 12:03:35 |
| 15 | have any understanding why the affidavit that | 12:03:38 |
| 16 | GMAC was requesting in that letter and the | 12:03:42 |
| 17 | police report were not sent back to GMAC in | 12:03:45 |
| 18 | 2008? | 12:03:49 |
| 19 | A   I don't know. | 12:03:50 |
| 20 | Q   What -- I mean, can you give me any | 12:03:51 |
| 21 | further explanation for that?  Was it | 12:03:56 |
| 22 | something you had in your possession that you | 12:03:58 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

63

1 didn't do, or you just didn't know about it?        12:04:00

2      A    I don't recall knowing about it.  I        12:04:03

3 believe if I had been advised to do it that I        12:04:08

4 would have done it, but I don't know.  I don't       12:04:10

5 recall having it.                                    12:04:12

6      Q    And you would agree with me, going         12:04:14

7 back to that time period, there would not have       12:04:16

8 been -- you wouldn't have had any objection to       12:04:18

9 filling out an affidavit and sending it to           12:04:21

10 GMAC in October or November of 2008?                12:04:24

11     A    I don't know.  I would have probably       12:04:29

12 consulted with my attorney and just done            12:04:31

13 whatever was advised.                               12:04:34

14     Q    Do you recall any decision ever being      12:04:37

15 made by you, in October or November of 2008,        12:04:40

16 not to send an affidavit or a police report to      12:04:43

17 GMAC?                                               12:04:51

18     A    I don't recall.                            12:04:53

19     Q    And you don't remember the discussion      12:04:54

20 coming up, or it being in your mind that I'm        12:04:57

21 not going to respond to GMAC on this request?       12:05:00

22     A    I don't recall having any discussion       12:05:03

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

75

| | | |
|---|---|---|
| 1 | behalf. | 12:15:29 |
| 2 | Q    Okay.  Is there anything in this | 12:15:29 |
| 3 | letter that you disagree with him saying to | 12:15:31 |
| 4 | GMAC? | 12:15:34 |
| 5 | A    I don't know.  It's a lot of | 12:15:35 |
| 6 | language.  I don't know.  I don't see anything | 12:15:39 |
| 7 | that I would disagree with, but there is a lot | 12:16:33 |
| 8 | of legalese in it that if it were explained to | 12:16:37 |
| 9 | me word for word, I may or may not agree with. | 12:16:42 |
| 10 | I don't know.  But this -- it looks okay.  It | 12:16:46 |
| 11 | looks okay. | 12:16:49 |
| 12 | Q    Why did you not continue to retain | 12:16:49 |
| 13 | Mr. Weible? | 12:16:52 |
| 14 | A    I decided to go ahead and file for | 12:16:54 |
| 15 | divorce.  And at that point, that was when I | 12:16:58 |
| 16 | met Mr. Bazaz, and I decided to just do the | 12:17:01 |
| 17 | divorce and the state action all through | 12:17:04 |
| 18 | Mr. Bazaz rather than having two separate | 12:17:07 |
| 19 | attorneys and taking two separate courses of | 12:17:10 |
| 20 | action. | 12:17:14 |
| 21 | Q    Was there any gap of time between the | 12:17:14 |
| 22 | representation that you had from Mr. Weible to | 12:17:23 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

118

1   situation.                                            13:09:34

2       Q    And you understand that this case            13:09:35

3   where you sued GMAC, in part, pertains to some        13:09:42

4   credit reporting that was done in March of            13:09:48

5   2010?                                                 13:09:51

6       A    Yes.                                          13:09:53

7       Q    You would agree with me, back in             13:09:54

8   October and November of 2008, that you knew           13:09:57

9   about the incorrect credit reporting done by          13:10:02

10  GMAC?                                                 13:10:04

11      A    I did, but there had not yet been the        13:10:09

12  lawsuit --                                            13:10:12

13      Q    I understand.                                13:10:13

14      A    -- that required GMAC to remove the          13:10:14

15  lien from the house --                                13:10:19

16      Q    Okay.                                        13:10:19

17      A    -- at that point.                            13:10:20

18      Q    I understand.  My question is,               13:10:21

19  though, back in October and November of 2008,         13:10:24

20  your position was that there were incorrect           13:10:27

21  entries on your credit report by GMAC; isn't          13:10:31

22  that true?                                            13:10:35

122

1      Q    Did you give this Experian letter to          13:13:28

2  your attorney?                                          13:13:31

3      A    I don't know.  If Experian sent me            13:13:34

4  the letter, then I would have probably                  13:13:39

5  forwarded it to my attorney.                            13:13:41

6      Q    Okay.  The state court litigation             13:13:43

7  that we've, you know, talked about today                13:14:00

8  somewhat, was your understanding of that that           13:14:03

9  you were attempting to get the deed of trust            13:14:06

10  and promissory note and validate it?                   13:14:10

11      A    Yes.  The lien's removed from my              13:14:14

12  house.                                                 13:14:19

13      Q    Okay.  And going into that also,             13:14:19

14  which we can tell from the documents we've             13:14:21

15  gone through today, you knew that the GMAC was         13:14:23

16  reporting on your credit report in 2008?               13:14:29

17      A    Yes, I did.                                   13:14:34

18      Q    Okay.  Do you have any understanding         13:14:35

19  about why this credit reporting issue was not          13:14:37

20  raised in the state court litigation and you           13:14:40

21  didn't ask for that relief?                            13:14:43

22      A    I was very focused on what I saw to          13:14:45

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

127

| | | | |
|---|---|---|---|
| 1 | | pursuant to at least two credit reports that | 13:18:35 |
| 2 | | we've -- you've reviewed today? | 13:18:37 |
| 3 | A | Pursuant to? | 13:18:39 |
| 4 | Q | The two credit reports that you | 13:18:40 |
| 5 | | obtained in October and -- | 13:18:42 |
| 6 | A | No -- | 13:18:42 |
| 7 | Q | -- November. | 13:18:44 |
| 8 | A | -- I'm asking can you rephrase the | 13:18:44 |
| 9 | | way you're saying it. | 13:18:46 |
| 10 | Q | Oh.  The first time -- the first | 13:18:48 |
| 11 | | notice you ever received about the GMAC lien | 13:18:49 |
| 12 | | was by a credit report? | 13:18:53 |
| 13 | A | That's correct. | 13:18:55 |
| 14 | Q | Okay.  So you knew then that GMAC was | 13:18:55 |
| 15 | | reporting on your credit? | 13:18:59 |
| 16 | A | Correct. | 13:19:00 |
| 17 | Q | And due to learning of that issue, | 13:19:01 |
| 18 | | you went to attorneys to get assistance with | 13:19:04 |
| 19 | | that? | 13:19:07 |
| 20 | A | Correct. | 13:19:07 |
| 21 | Q | And you wanted that off your credit | 13:19:08 |
| 22 | | report in 2008; isn't that true? | 13:19:10 |

```
                                                        128
 1      A    I was much more concerned with the       13:19:14

 2  actual debt and the lien against my house in      13:19:16

 3  2008.                                             13:19:19

 4      Q    Okay.  But you were also concerned       13:19:21

 5  that it was on your credit report, weren't        13:19:24

 6  you?                                              13:19:27

 7      A    I don't -- it's -- to me, it's all --    13:19:27

 8  it was all one giant problem.  If I clear         13:19:33

 9  up -- in my mind, if I cleared up the lien        13:19:36

10  against the house, that took care of the          13:19:39

11  credit report.  I didn't see that as being a      13:19:42

12  primary issue.  I saw the lien as the issue.      13:19:45

13  And I thought if I took care of getting the       13:19:48

14  lien off of the house, the credit report would    13:19:50

15  no longer be an issue.                            13:19:53

16      Q    If you can go back to the letter from    13:19:57

17  Mr. Weible.  I'm not sure which exhibit that      13:20:10

18  was.                                              13:20:13

19          MR. BAZAZ:  Exhibit 2.                    13:20:19

20          MR. LYNCH:  Exhibit 2.                    13:20:21

21      A    (Complies with request.)                 13:20:33

22  BY MR. LYNCH:                                     13:20:33
```

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

148

| | | | |
|---|---|---|---|
| 1 | A | It's an ID theft affidavit. | **13:38:46** |
| 2 | Q | And what is it dated? | **13:38:51** |
| 3 | A | May 31, 2009. | **13:38:53** |
| 4 | Q | Do you know where you got this form | **13:39:07** |
| 5 | affidavit from? | | **13:39:10** |
| 6 | A | I don't remember. | **13:39:10** |
| 7 | Q | Do you know where you completed it? | **13:39:11** |
| 8 | Were you at home, were you at a law firm, or | | **13:39:20** |
| 9 | do you know? | | **13:39:23** |
| 10 | A | I don't believe I was at a law firm, | **13:39:24** |
| 11 | but I may have been home or in my office. | | **13:39:27** |
| 12 | Q | Do you know what the purpose was of | **13:39:31** |
| 13 | completing this affidavit? | | **13:39:33** |
| 14 | A | It has the GMAC mortgage listed on | **13:39:35** |
| 15 | it. So it appears that it was to let GMAC | | **13:39:44** |
| 16 | know about the identity theft. | | **13:39:48** |
| 17 | Q | And just so we're clear, what page | **13:39:51** |
| 18 | are you looking at to see the reference of | | **13:39:54** |
| 19 | GMAC? | | **13:39:56** |
| 20 | A | I'm looking at 400026 at the bottom, | **13:39:57** |
| 21 | or page 5 of the affidavit. | | **13:40:02** |
| 22 | Q | And that -- GMAC is listed in your | **13:40:05** |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

149

1  handwriting?                                    13:40:08

2     A    Yes.                                     13:40:09

3     Q    Who requested that you fill out this     13:40:09

4  affidavit?                                       13:40:12

5        MR. BAZAZ:  Objection to the extent        13:40:12

6  it seeks to violate the attorney/client         13:40:14

7  privilege.                                       13:40:22

8        THE WITNESS:  Do I answer it?              13:40:22

9        MR. BAZAZ:  Well, I instruct you not       13:40:23

10  to answer it if it was one of your attorneys    13:40:26

11  that told you to fill it out.  If it was        13:40:28

12  somebody else, you can answer.                  13:40:30

13  BY MR. LYNCH:                                   13:40:31

14     Q    Yeah.  Was it anybody else, other       13:40:31

15  than your attorneys, that instructed you to     13:40:33

16  complete this affidavit?                        13:40:35

17     A    Not that I recall.  I don't recall.     13:40:37

18     Q    Okay.  And I'm just going to give you   13:40:40

19  an example.  Did anyone at the police           13:40:43

20  department give you this affidavit to be        13:40:46

21  completed?                                      13:40:48

22     A    I don't believe so.                     13:40:49

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

150

1    Q    Okay.  So you don't know of anyone,          13:40:50

2  other than attorneys, that may have asked you       13:40:52

3  to complete this?                                    13:40:54

4    A    I don't -- I just -- I don't remember         13:40:56

5  exactly.                                             13:40:57

6    Q    Do you know if this -- or after you           13:40:58

7  completed this affidavit, where the affidavit        13:41:04

8  was sent?                                            13:41:05

9    A    I do not know where it was sent.  I           13:41:06

10  don't know where it was sent.                        13:41:16

11    Q    Do you have any knowledge about              13:41:18

12  whether it was sent to GMAC or not?                  13:41:20

13    A    I don't know.                                 13:41:24

14    Q    After you completed the affidavit,           13:41:25

15  who did you give it to?                              13:41:29

16    A    I don't remember.                             13:41:31

17         MR. LYNCH:  We'll make this                   13:42:34

18  Exhibit 9.                                           13:42:36

19         (Wilkes Exhibit No. 9 was marked for         13:42:38

20  identification.)                                     13:42:39

21  BY MR. LYNCH:                                        13:42:39

22    Q    Ms. Wilkes, that is a copy of the            13:42:39

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

151

| 1 | complaint in this case.  If you can go to | 13:42:42 |
| 2 | paragraph 24 of the complaint and read that | 13:43:17 |
| 3 | paragraph, and let me know when you're ready | 13:43:28 |
| 4 | to field some questions. | 13:43:31 |
| 5 | A    Okay.  Okay. | 13:43:33 |
| 6 | Q    And do you see there where it says | 13:43:42 |
| 7 | there that on May 31, 2009, plaintiff sent an | 13:43:45 |
| 8 | ID theft affidavit to GMAC concerning the GMAC | 13:43:52 |
| 9 | account; plaintiff never received a direct | 13:43:54 |
| 10 | response from GMAC concerning the ID theft | 13:43:57 |
| 11 | affidavit? | 13:43:58 |
| 12 | A    Yes. | 13:43:58 |
| 13 | Q    Do you understand that to be a true | 13:43:59 |
| 14 | statement? | 13:44:01 |
| 15 | A    To the best of my knowledge. | 13:44:02 |
| 16 | Q    Do you know or were you the person | 13:44:05 |
| 17 | that sent this ID theft affidavit to GMAC? | 13:44:08 |
| 18 | A    Did I, personally, send it to them? | 13:44:12 |
| 19 | Q    Yes. | 13:44:15 |
| 20 | A    I actually don't know. | 13:44:16 |
| 21 | Q    Do you know who sent it? | 13:44:18 |
| 22 | A    I don't -- it would have been me or | 13:44:20 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

152

| | | | |
|---|---|---|---|
| 1 | | one of my attorneys. | 13:44:22 |
| 2 | Q | If you can go to Exhibit 5 of the | 13:44:24 |
| 3 | | complaint. | 13:44:28 |
| 4 | A | (Complies with request.) | 13:44:28 |
| 5 | Q | It appears to me Exhibit 5 of the | 13:44:55 |
| 6 | | complaint is the same as the ID theft | 13:44:58 |
| 7 | | affidavit that is the previous exhibit. | 13:45:01 |
| 8 | A | Yes. | 13:45:05 |
| 9 | Q | Okay.  Have you ever seen any | 13:45:06 |
| 10 | | documents showing how this ID theft was sent | 13:45:08 |
| 11 | | to GMAC? | 13:45:12 |
| 12 | A | I don't remember seeing any. | 13:45:14 |
| 13 | Q | And sitting here today, you don't | 13:45:16 |
| 14 | | know? | 13:45:19 |
| 15 | A | I don't know what? | 13:45:19 |
| 16 | Q | How it was sent or if there's any | 13:45:21 |
| 17 | | documents that prove it was sent to GMAC. | 13:45:24 |
| 18 | A | I don't know. | 13:45:28 |
| 19 | Q | Okay. | 13:45:28 |
| 20 | | MR. LYNCH:  Exhibit 10? | 13:46:24 |
| 21 | | MR. BAZAZ:  I think that's correct. | 13:46:25 |
| 22 | | BY MR. LYNCH: | 13:46:31 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

153

| | | | |
|---|---|---|---|
| 1 | Q | Ms. Wilkes, just like the other | 13:46:32 |
| 2 | documents, take as much time as you need with | | 13:46:35 |
| 3 | Exhibit 10, and let me know when you're ready | | 13:46:40 |
| 4 | to field some questions. | | 13:46:43 |
| 5 | A | Okay. | 13:47:47 |
| 6 | Q | Okay.  Have you seen this letter | 13:47:48 |
| 7 | before? | | 13:47:50 |
| 8 | A | Yes. | 13:47:50 |
| 9 | Q | And it's addressed from you to the | 13:47:51 |
| 10 | three credit reporting agencies? | | 13:47:55 |
| 11 | A | Yes. | 13:47:58 |
| 12 | Q | And you were living in Keyser, West | 13:47:59 |
| 13 | Virginia at the time? | | 13:48:02 |
| 14 | A | Yes. | 13:48:02 |
| 15 | Q | And the first statement says, My | 13:48:03 |
| 16 | attorney provided me this letter? | | 13:48:05 |
| 17 | A | Yes. | 13:48:12 |
| 18 | Q | Do you see this? | 13:48:12 |
| 19 | A | Yes. | 13:48:12 |
| 20 | Q | Did your attorney draft the letter or | 13:48:12 |
| 21 | did you? | | 13:48:12 |
| 22 | A | My attorney drafted this letter. | 13:48:12 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

154

| | | | |
|---|---|---|---|
| 1 | Q | And you signed the letter? | **13:48:13** |
| 2 | A | Yes. | **13:48:16** |
| 3 | Q | And you had it notarized? | **13:48:18** |
| 4 | A | Yes. | **13:48:21** |
| 5 | Q | With someone -- it appears to me that | **13:48:22** |
| 6 | | someone in Keyser notarized it. | **13:48:25** |
| 7 | A | Yes. | **13:48:27** |
| 8 | Q | Do you know why this letter wasn't | **13:48:27** |
| 9 | | sent to GMAC? | **13:48:31** |
| 10 | A | Because it was being sent to the | **13:48:33** |
| 11 | | credit bureaus for the credit reporting | **13:48:37** |
| 12 | | agencies. | **13:48:40** |
| 13 | Q | Okay.  Do you know why it was being | **13:48:40** |
| 14 | | sent to the credit reporting agencies and not | **13:48:42** |
| 15 | | GMAC? | **13:48:46** |
| 16 | A | I don't. | **13:48:47** |
| 17 | Q | Is there anything in this letter, | **13:48:48** |
| 18 | | other than your signature, that you personally | **13:48:56** |
| 19 | | typed or worked on? | **13:48:59** |
| 20 | A | No.  Only my signature. | **13:49:05** |
| 21 | Q | Prior to this letter being sent, | **13:49:07** |
| 22 | | which is Exhibit 10, had you pulled your | **13:49:45** |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

157

| | | |
|---|---|---|
| 1 | A    I'm not sure.  I don't -- I may have | **13:52:23** |
| 2 | been at the time, but I don't remember now. | **13:52:26** |
| 3 | MR. LYNCH:  We'll make this | **13:52:32** |
| 4 | Exhibit 11. | **13:52:34** |
| 5 | (Tender document.) | **13:52:34** |
| 6 | MR. BAZAZ:  Thank you. | **13:53:17** |
| 7 | BY MR. LYNCH: | **13:53:17** |
| 8 | Q    Do you remember signing Exhibit 11, | **13:53:18** |
| 9 | Ms. Wilkes? | **13:53:22** |
| 10 | A    I don't remember doing it, but it is | **13:53:23** |
| 11 | my signature.  So I did it. | **13:53:26** |
| 12 | Q    Would you agree with me that your | **13:53:28** |
| 13 | attorney prepared this letter as well? | **13:53:30** |
| 14 | A    Yes. | **13:53:33** |
| 15 | Q    And you simply signed it? | **13:53:33** |
| 16 | A    I read it and signed it. | **13:53:35** |
| 17 | Q    Would you -- would it be fair to say | **13:53:37** |
| 18 | that the only thing that had your personal | **13:53:39** |
| 19 | involvement in this letter was your | **13:53:41** |
| 20 | signature -- signatures? | **13:53:45** |
| 21 | A    As far as creating it, that's the | **13:53:46** |
| 22 | only thing that I put on it. | **13:53:48** |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

163

| | | | |
|---|---|---|---|
| 1 | | dated June 16, 2010? | **13:59:50** |
| 2 | A | Yes. | **13:59:52** |
| 3 | Q | And that's your signature? | **13:59:53** |
| 4 | A | Yes. | **13:59:54** |
| 5 | Q | And you would agree with me that this | **13:59:55** |
| 6 | | was a letter that was like the other letters | **13:59:57** |
| 7 | | drafted by your attorneys? | **14:00:01** |
| 8 | A | Yes. | **14:00:02** |
| 9 | Q | And this letter -- you didn't have | **14:00:03** |
| 10 | | any input in this letter at all except to sign | **14:00:05** |
| 11 | | your name and have it notarized? | **14:00:08** |
| 12 | A | I would have read it and approved it. | **14:00:11** |
| 13 | Q | Right.  But you didn't write any of | **14:00:15** |
| 14 | | the letter? | **14:00:18** |
| 15 | A | No.  I didn't write any of it. | **14:00:18** |
| 16 | Q | Do you know why you sent a letter to | **14:00:20** |
| 17 | | GMAC on June 16, 2010, but GMAC wasn't | **14:00:24** |
| 18 | | included on the May or the March 2010 letters? | **14:00:30** |
| 19 | A | Well, what I had done up to that | **14:00:34** |
| 20 | | point hadn't been working.  So it makes sense | **14:00:44** |
| 21 | | to try something different. | **14:00:48** |
| 22 | Q | Was this your decision to send a | **14:00:49** |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

169

```
 1  2009.                                          14:20:14

 2      Q    And is it fair to say, in 2009 and    14:20:14

 3  2010, you were regularly checking your credit  14:20:18

 4  report?                                         14:20:22

 5      A    Yes.  Pretty regularly.               14:20:22

 6      Q    Like how often can you recall?        14:20:25

 7      A    Oh, probably once every other month.  14:20:28

 8      Q    Okay.  That's all I've got with that. 14:20:31

 9           MR. LYNCH:  Make this Exhibit 15.     14:20:36

10  BY MR. LYNCH:                                   14:21:47

11      Q    Can you identify this document,       14:21:47

12  Ms. Wilkes?                                     14:21:50

13      A    Yes.  It's another credit report.     14:21:50

14      Q    What's the date of it?                14:21:52

15      A    September 13, 2010.                    14:21:54

16      Q    Would you agree with me that by this  14:21:56

17  time, the GMAC Mortgage account that was        14:22:09

18  incurred as a result of your husband's          14:22:17

19  identity theft had been deleted from your       14:22:22

20  credit report?                                  14:22:26

21      A    No.  It's not been deleted.  It's      14:22:26

22  still on there.                                 14:22:29
```

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

170

| 1 | Q | Tell me what page you're looking at. | 14:22:30 |

1    Q    Tell me what page you're looking at.         14:22:30

2    A    Page 2.  Am I misunderstanding?              14:22:33

3    Q    Do you know if that -- which GMAC            14:22:43

4    account that is, if that was your original       14:22:53

5    GMAC account or if it's the one that was --       14:22:57

6    A    Well, it says account ████    I'm not       14:22:59

7    sure which one that is.                          14:23:03

8    Q    Let's see.  If you want to look back         14:23:09

9    at a previous credit report to compare the       14:23:41

10   account numbers, I think that will help you      14:23:47

11   answer the question.                             14:23:51

12   A    It looks like that might be the             14:24:14

13   original one, the first one.                     14:24:16

14   Q    That's our understanding.                    14:24:17

15   A    Okay, okay.  It looks like it might         14:24:20

16   be the original one then.                        14:24:22

17   Q    I just wanted to ask you if you had         14:24:22

18   any understanding that the GMAC account that     14:24:25

19   had been fraudulently opened by your husband,    14:24:28

20   that by September of 2010, if not earlier,       14:24:32

21   that had been deleted from your credit report?   14:24:33

22   A    Yes.  It appears it was deleted by          14:24:36

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

171

1  then.                                                    14:24:39

2      Q    And you and I can agree that based             14:24:40

3  on -- looking at -- at September 2010 credit             14:24:43

4  report, that your initial mortgage with GMAC             14:24:46

5  that was entered into in 2005 is still on your           14:24:51

6  credit report showing a zero balance?                    14:24:52

7      A    Correct.                                         14:24:54

8      Q    Okay.  Did you have that                         14:24:55

9  understanding back in September of 2010?                  14:24:56

10     A    I believe I did know by then.                    14:24:59

11     Q    That you knew the fraudulent GMAC               14:25:02

12  account had been deleted?                                14:25:06

13     A    It had been -- it -- I knew it had              14:25:09

14  been deleted at that pull.  Each time I would           14:25:11

15  pull the credit report, yes, I knew it had              14:25:16

16  been deleted at each specific pull of the               14:25:20

17  credit report.                                           14:25:25

18     Q    So after you received this particular          14:25:25

19  report in September 2010, you knew that GMAC            14:25:28

20  was no longer reporting the second account?             14:25:32

21     A    I don't remember specifically looking          14:25:34

22  at it, but if I would have pulled this and              14:25:37

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

172

| | | | |
|---|---|---|---|
| 1 | looked at it, then, yes, I would have had that | | 14:25:42 |
| 2 | understanding that GMAC was not reporting in | | 14:25:43 |
| 3 | September of 2009. | | 14:25:47 |
| 4 | Q | '10. | 14:25:48 |
| 5 | A | '10.  I'm sorry. | 14:25:48 |
| 6 | Q | Okay. | 14:25:48 |
| 7 | A | September of 2010.  Yes. | 14:25:49 |
| 8 | Q | So you would agree with me that the | 14:25:49 |
| 9 | time period that we're dealing with, in this | | 14:25:51 |
| 10 | case, is after you had the state court trial, | | 14:25:53 |
| 11 | GMAC continued to report the | | 14:25:56 |
| 12 | fraudulently-opened account from March to | | 14:25:59 |
| 13 | either August or September of 2010? | | 14:26:01 |
| 14 | A | Yes. | 14:26:04 |
| 15 | Q | And it's fair to say that -- | 14:26:06 |
| 16 | what's -- well, let me ask you, what's the | | 14:26:15 |
| 17 | date of that credit report in September of | | 14:26:18 |
| 18 | 2010? | | 14:26:22 |
| 19 | A | September 13 -- | 14:26:22 |
| 20 | Q | Okay. | 14:26:22 |
| 21 | A | -- 2010. | 14:26:24 |
| 22 | Q | It's fair to say you don't know the | 14:26:24 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

173

| | | |
|---|---|---|
| 1 | specific date prior to September 13, 2010, | 14:26:27 |
| 2 | when GMAC deleted that account from your | 14:26:30 |
| 3 | credit report? | 14:26:33 |
| 4 | A    I don't. | 14:26:34 |
| 5 | Q    So in generalities, we're talking | 14:26:35 |
| 6 | about a six-month period following the trial | 14:26:53 |
| 7 | where you're contending GMAC continued to | 14:26:57 |
| 8 | report the fraudulently-opened account on your | 14:27:01 |
| 9 | credit report? | 14:27:06 |
| 10 | A    March, April, May, June, July, | 14:27:06 |
| 11 | August, September.  So about seven months. | 14:27:07 |
| 12 | Q    But it could be six, based on the | 14:27:08 |
| 13 | fact you don't know exactly when it was | 14:27:10 |
| 14 | deleted? | 14:27:13 |
| 15 | A    Yes.  I don't know if there is a | 14:27:14 |
| 16 | credit report close to September or not that I | 14:27:16 |
| 17 | could look at, but by September, it was gone, | 14:27:18 |
| 18 | according to this. | 14:27:22 |
| 19 | Q    From the -- March 2010 through | 14:27:24 |
| 20 | September 2010, would you agree with me that | 14:27:30 |
| 21 | you were not under the care of any healthcare | 14:27:36 |
| 22 | providers on a regular basis? | 14:27:41 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

174

| | | |
|---|---|---|
| 1 | A    I did have a regular doctor. | **14:27:44** |
| 2 | Q    It was like your family practice | **14:27:46** |
| 3 | doctor? | **14:27:49** |
| 4 | A    Yes. | **14:27:49** |
| 5 | Q    In Keyser? | **14:27:50** |
| 6 | A    Yes. | **14:27:51** |
| 7 | Q    What was he treating you for during | **14:27:51** |
| 8 | those six or seven months, if anything? | **14:27:55** |
| 9 | A    I would have -- I don't know.  I have | **14:27:57** |
| 10 | ongoing issues with asthma.  I don't know that | **14:28:12** |
| 11 | I would have been treated specifically for | **14:28:17** |
| 12 | stress. | **14:28:21** |
| 13 | MR. BAZAZ:  Let me -- let me | **14:28:21** |
| 14 | interject.  I apologize for interrupting, but | **14:28:22** |
| 15 | we have an agreement that, in discovery, we | **14:28:26** |
| 16 | were just going to go into issues of emotional | **14:28:29** |
| 17 | distress and things that would affect her | **14:28:31** |
| 18 | well-being. | **14:28:34** |
| 19 | For this purpose of the deposition, | **14:28:35** |
| 20 | I'm assuming that she's not going to have to | **14:28:37** |
| 21 | go into a bunch of sprained ankles and so on | **14:28:39** |
| 22 | and so forth? | **14:28:45** |

## Capital Reporting Company
### Wilkes, Alisha - Volume I 05-11-2011

175

| | | |
|---|---|---|
| 1 | MR. LYNCH:  Yeah.  I mean, if there's | 14:28:47 |
| 2 | something that is confidential that you're not | 14:28:48 |
| 3 | claiming is an issue in this case like a | 14:28:50 |
| 4 | sprained ankle, I mean, sure. | 14:28:54 |
| 5 | MR. BAZAZ:  Okay.  I just -- | 14:28:58 |
| 6 | MR. LYNCH:  If it's a sensitive spot, | 14:28:58 |
| 7 | we can talk quickly off the record.  I'm not | 14:28:58 |
| 8 | trying to -- | 14:28:58 |
| 9 | MR. BAZAZ:  No.  I just -- the | 14:28:59 |
| 10 | question was open-ended, and I know my client | 14:28:59 |
| 11 | is going to give you the best, honest answer | 14:29:01 |
| 12 | she can.  And I was -- I was thinking that she | 14:29:01 |
| 13 | might go into times that she sprained a knee | 14:29:06 |
| 14 | and ankle, so on and so forth, and we'd be | 14:29:06 |
| 15 | here for two hours. | 14:29:09 |
| 16 | BY MR. LYNCH: | 14:29:11 |
| 17 | Q    Yeah.  Once you get into your knee, | 14:29:11 |
| 18 | I'm going to quit asking the questions. | 14:29:13 |
| 19 | A    Okay. | 14:29:13 |
| 20 | Q    Okay? | 14:29:15 |
| 21 | A    All right.  Other than routine, you | 14:29:15 |
| 22 | know, sinus -- sinus infection, that sort of | 14:29:18 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

176

1   thing, I don't know that I was treated for                    **14:29:20**

2   anything specific by that point.                               **14:29:22**

3       Q    Would you agree with me --                            **14:29:26**

4       A    I was --                                              **14:29:29**

5       Q    Okay.  All right.  Go.                                **14:29:29**

6       A    I do believe I was still taking                       **14:29:31**

7   anxiety medication intermittently, but I don't                 **14:29:37**

8   know that I needed any new prescriptions in                    **14:29:38**

9   that time frame.  So I don't know that I was                   **14:29:40**

10  going to see her, but I would have possibly                    **14:29:44**

11  still been using prescriptions she prescribed                  **14:29:47**

12  before that point.                                             **14:29:49**

13      Q    Would you agree with me that your                     **14:29:50**

14  stress and anxiety were much worse in 2008 and                 **14:29:53**

15  2009 than during this period in 2010?                          **14:29:56**

16      A    I don't know that worse would be the                  **14:30:00**

17  right word.  I was different by then.                          **14:30:04**

18      Q    You were in a better condition by                     **14:30:10**

19  then; isn't that a fair statement?                             **14:30:12**

20      A    I was in a different condition.  I                    **14:30:14**

21  was in much -- I was in a different condition                  **14:30:18**

22  by then.  I still did feel a lot of stress and                 **14:30:19**

177

1   anxiety, but I developed coping mechanisms at        **14:30:23**

2   that point.                                          **14:30:28**

3       Q    Well, by January 2010, your divorce         **14:30:29**

4   had become final; isn't that true?                  **14:30:33**

5       A    Yes.                                        **14:30:35**

6       Q    And was that a stress reliever in           **14:30:36**

7   your life?                                           **14:30:38**

8       A    The divorce -- you know, the point at       **14:30:39**

9   which Daniel and I separated, to me, that's          **14:30:42**

10  when we were finished.  So the divorce itself        **14:30:45**

11  becoming final, you know, it was a good thing,       **14:30:48**

12  but it didn't -- it didn't leave a huge mark         **14:30:52**

13  one way or the other as far as I was                 **14:30:57**

14  concerned.                                           **14:30:59**

15      Q    And by the early part of 2010, you          **14:30:59**

16  were done with the state court trial with            **14:31:04**

17  GMAC; isn't that true?                               **14:31:08**

18      A    Yes.  That ended in --                      **14:31:10**

19      Q    And wasn't that a stress reliever for       **14:31:11**

20  you that that trial was over?                        **14:31:14**

21      A    Briefly, briefly.                           **14:31:16**

22      Q    Was your stress worse from March 2010       **14:31:17**

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

178

| | | |
|---|---|---|
| 1 | to September 2010 than it was in October and | 14:31:21 |
| 2 | November of 2008? | 14:31:26 |
| 3 | A    It was -- it was a different kind -- | 14:31:28 |
| 4 | different kind of stress.  I don't know how | 14:31:31 |
| 5 | else to describe it really.  It was just a | 14:31:33 |
| 6 | different kind of stress.  It wasn't the same | 14:31:35 |
| 7 | acute, you know, punched-in-the-gut sort of | 14:31:39 |
| 8 | anxiety of pulling that initial credit report, | 14:31:43 |
| 9 | but it was definitely a different kind of | 14:31:46 |
| 10 | stress, sense of -- just the total | 14:31:50 |
| 11 | helplessness, inability to -- to make things | 14:31:56 |
| 12 | right. | 14:31:56 |
| 13 |         When things were not made right with | 14:31:59 |
| 14 | the state suit when I, you know -- when the | 14:32:02 |
| 15 | lien -- when the lien was to be removed, the | 14:32:06 |
| 16 | house was supposed to be mine again.  I felt | 14:32:09 |
| 17 | better for a little while, and then I realized | 14:32:15 |
| 18 | things were still not right.  I still -- I | 14:32:18 |
| 19 | still did not make things right. | 14:32:21 |
| 20 | Q    You sold the house, though, right? | 14:32:24 |
| 21 | A    I had to sell the house, yes. | 14:32:26 |
| 22 | Q    And you sold the house and got all | 14:32:27 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

181

1  earlier that you were under the regular, or          14:34:06

2  you were regularly taking anxiety medicine.          14:34:09

3       A    Yes.                                        14:34:14

4       Q    How often were you taking it?              14:34:15

5       A    Usually once at night and then during     14:34:17

6  the day if I needed it.                              14:34:20

7       Q    For a year, year and a half, or           14:34:22

8  longer?                                              14:34:24

9       A    Over a year.  Yeah.  I probably took       14:34:25

10  it daily for about a year.  And then less           14:34:34

11  frequently.  And then more frequently leading       14:34:38

12  up to the trial.  And then a little less            14:34:44

13  frequently again.                                   14:34:48

14      Q    From March 2010 through                    14:34:49

15  September 2010, do you recall whether you            14:34:52

16  received any prescriptions for antianxiety           14:34:55

17  medicines?                                           14:35:05

18      A    I don't -- I don't believe I received      14:35:05

19  any new prescriptions, but there may have           14:35:07

20  still been an older one that I was able to           14:35:09

21  keep getting filled.  I'm not -- I'm not sure.       14:35:13

22      Q    And if a doctor would have prescribed      14:35:15

182

| | | | |
|---|---|---|---|
| 1 | | you any anxiety medicine from March 2010 | 14:35:19 |
| 2 | | through September 2010, which doctor would | 14:35:24 |
| 3 | | that have been? | 14:35:25 |
| 4 | A | Dr. Price. | 14:35:26 |
| 5 | Q | Okay.  Any other doctors? | 14:35:28 |
| 6 | A | No.  I don't believe so. | 14:35:29 |
| 7 | Q | If the -- and you described the | 14:35:39 |
| 8 | | stress as being different.  If that different | 14:35:44 |
| 9 | | type of stress that you encountered between | 14:35:47 |
| 10 | | March and September of 2010 was occurring, can | 14:35:53 |
| 11 | | you tell me why the decision was made to wait | 14:35:56 |
| 12 | | until June of 2010 to send a letter to GMAC? | 14:35:59 |
| 13 | A | I don't know why. | 14:36:05 |
| 14 | Q | Okay.  Were you involved in the | 14:36:06 |
| 15 | | decision in any way to send that letter in | 14:36:13 |
| 16 | | June of 2010 to GMAC? | 14:36:13 |
| 17 | A | I would have reviewed the letter. | 14:36:16 |
| 18 | Q | And after September 2010, you're not | 14:36:19 |
| 19 | | blaming anything that -- on GMAC that's | 14:36:38 |
| 20 | | occurred after that time period? | 14:36:41 |
| 21 | A | After September 2010? | 14:36:44 |
| 22 | Q | Yeah. | 14:36:48 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

195

1  exhibit.  Number 20?                                    14:50:43

2            THE COURT REPORTER:  19 --

3            MR. LYNCH:  19?

4            THE COURT REPORTER:  -- I believe.

5            MR. BAZAZ:  I think it's 20.

6            THE COURT REPORTER:  Oh, it is 20.

7            MR. LYNCH:  Okay.

8  BY MR. LYNCH:                                           14:50:55

9       Q    Ms. Wilkes, if you could look at           14:50:55

10  Exhibit 20, and let me know when you're ready        14:50:59

11  to field some questions.                             14:51:03

12      A    (Complies with request.)                    14:51:04

13      Q    Would you agree with me that               14:51:23

14  Exhibit 20 is your credit report from                14:51:26

15  TransUnion dated July 14, 2010?                      14:51:30

16      A    Yes, along with a letter.                   14:51:34

17      Q    And would you agree with me that the       14:51:37

18  GMAC account that was fraudulently opened by         14:51:45

19  your husband is not listed on this credit            14:51:51

20  report from July of 2010?                            14:51:54

21      A    Correct.                                    14:51:56

22      Q    And you would agree with me your           14:51:58

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

196

| | | |
|---|---|---|
| 1 | original GMAC account from 2005 that was | **14:52:00** |
| 2 | opened properly with your husband is listed, | **14:52:00** |
| 3 | but it has a zero balance? | **14:52:06** |
| 4 | A    Yes. | **14:52:08** |
| 5 | Q    So you would agree with me that as of | **14:52:09** |
| 6 | July 14, 2010, with respect to TransUnion, | **14:52:15** |
| 7 | your credit report was correct as it pertains | **14:52:19** |
| 8 | to GMAC? | **14:52:23** |
| 9 | A    On TransUnion, yes.  In July, this -- | **14:52:25** |
| 10 | this report is correct. | **14:52:28** |
| 11 | Q    Okay.  In 2008, did you know what | **14:52:31** |
| 12 | your credit score was? | **14:52:38** |
| 13 | A    No.  I don't know. | **14:52:40** |
| 14 | Q    Do you know what your -- did you know | **14:52:41** |
| 15 | what your credit score was in 2009? | **14:52:43** |
| 16 | A    2009?  No. | **14:52:47** |
| 17 | Q    Do you know what your credit score | **14:52:49** |
| 18 | was in 2010? | **14:52:52** |
| 19 | A    Yes.  I don't know exactly, but it | **14:52:53** |
| 20 | was in the low sixes -- low 600, low 600. | **14:52:59** |
| 21 | Q    Do you know, generally, what time | **14:53:03** |
| 22 | period in 2010 you checked your credit score? | **14:53:05** |

202

```
 1  we discussed, right?                        14:57:56

 2      A    Correct.  But that wasn't what you  14:57:57

 3  asked me.                                    14:58:00

 4      Q    No, no.  I understand.              14:58:01

 5           You talked about attempt -- you     14:58:19

 6  attempted to refinance your house.           14:58:21

 7      A    Yes.                                14:58:24

 8      Q    Tell me when you first decided to do 14:58:25

 9  that.                                        14:58:27

10      A    I believe that was around March of  14:58:28

11  2010, somewhere around there.                14:58:37

12      Q    Okay.  And you were living in Keyser, 14:58:39

13  West Virginia?                               14:58:42

14      A    Yes.                                14:58:42

15      Q    And how often were you coming back to 14:58:43

16  Northern Virginia?                           14:58:45

17      A    Rarely.                             14:58:47

18      Q    You came back for the trial?        14:58:47

19      A    Right.                              14:58:50

20      Q    And before the trial, when was the  14:58:51

21  last time you'd been back to Northern        14:58:52

22  Virginia?                                    14:58:55
```

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

205

| 1 | Q | And you eventually sold it for 375? | 15:00:32 |
| 2 | A | Right. | 15:00:36 |
| 3 | Q | And when was that again? | 15:00:36 |
| 4 | A | When I sold it was July 2010. | 15:00:37 |
| 5 | Q | '10? | 15:00:41 |
| 6 | A | Yes. | 15:00:42 |

7    Q    And you attempted to refinance it in          15:00:43

8 March of 2010?                                        15:00:46

9    A    I believe.  February or March,                15:00:48

10 somewhere around there.                              15:00:50

11    Q    Okay.  And who did you attempt to            15:00:52

12 refinance it with?                                    15:00:54

13    A    Precision Funding, I believe, was one        15:00:55

14 of them, and I can't remember the name of the        15:01:05

15 other company.                                        15:01:06

16    Q    And was that after the state court           15:01:07

17 trial was over?                                        15:01:09

18    A    Yes.                                          15:01:10

19    Q    Do you know why you applied for              15:01:11

20 credit with Precision Funding?                        15:01:17

21    A    I just used a search engine to find          15:01:26

22 lenders.                                               15:01:27

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

206

| | | | |
|---|---|---|---|
| 1 | Q | How did you get introduced to | 15:01:27 |
| 2 | | Precision Funding? | 15:01:30 |
| 3 | A | They contacted me. | 15:01:31 |
| 4 | Q | After you made an inquiry on the | 15:01:33 |
| 5 | | internet? | 15:01:35 |
| 6 | A | Yes. | 15:01:36 |
| 7 | Q | Okay.  How much of a refinance were | 15:01:37 |
| 8 | | you seeking from Precision Funding? | 15:01:47 |
| 9 | A | I can't remember.  I believe around | 15:01:51 |
| 10 | | $250,000, I believe. | 15:01:57 |
| 11 | Q | I'm going to show you the next | 15:01:59 |
| 12 | | document. | 15:01:59 |
| 13 | | MR. LYNCH:  We'll mark it as 21. | 15:02:01 |
| 14 | | (Tenders document.) | 15:02:01 |
| 15 | | MR. BAZAZ:  Thank you. | 15:02:01 |
| 16 | BY MR. LYNCH: | | 15:02:01 |
| 17 | Q | It appears to me -- and tell me if | 15:02:18 |
| 18 | | you agree or not, Ms. Wilkes -- that you were | 15:02:19 |
| 19 | | seeking a loan in the amount of 220,000. | 15:02:23 |
| 20 | A | Okay.  Yes. | 15:02:28 |
| 21 | Q | Does that sound accurate? | 15:02:29 |
| 22 | A | Yes. | 15:02:30 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

207

| | | | |
|---|---|---|---|
| 1 | Q | And you would agree with me that you | 15:02:31 |
| 2 | were denied for that loan? | | 15:02:33 |
| 3 | A | Yes. | 15:02:35 |
| 4 | Q | And you would agree with me the | 15:02:36 |
| 5 | reason given was just based on information | | 15:02:37 |
| 6 | received in your credit report? | | 15:02:42 |
| 7 | A | Yes. | 15:02:43 |
| 8 | Q | And it's fair to say you don't know | 15:02:44 |
| 9 | specifically what was in your credit report | | 15:02:46 |
| 10 | that caused the denial? | | 15:02:47 |
| 11 | A | Well, one of the boxes that's marked | 15:02:49 |
| 12 | is garnishment, attachment, and foreclosure. | | 15:02:54 |
| 13 | So I would say that had a big impact. | | 15:02:57 |
| 14 | Unacceptable payment record on a previous | | 15:03:02 |
| 15 | mortgage is also checked. | | 15:03:05 |
| 16 | Q | Okay.  Do you see under other? | 15:03:06 |
| 17 | A | Do not grant credit to any applicant | 15:03:16 |
| 18 | on the terms and conditions you have | | 15:03:21 |
| 19 | requested. | | 15:03:24 |
| 20 | Q | Do you know what that means? | 15:03:24 |
| 21 | A | I don't. | 15:03:28 |
| 22 | Q | And under garnishment, attachment, | 15:03:29 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

213

| | | |
|---|---|---|
| 1 | A   -- others. | 15:08:07 |
| 2 | Q   And who are the others? | 15:08:08 |
| 3 | MR. BAZAZ:  To the extent you're | 15:08:09 |
| 4 | asking her if her lawyers told her to -- | 15:08:11 |
| 5 | MR. LYNCH:  No, no, no.  I'm not. | 15:08:14 |
| 6 | But what I am asking is -- | 15:08:15 |
| 7 | MR. BAZAZ:  Well, let me try it this | 15:08:19 |
| 8 | way.  If you're asking if she consulted with | 15:08:22 |
| 9 | lawyers, she can answer that.  If you're | 15:08:26 |
| 10 | asking what her lawyers told her or didn't | 15:08:28 |
| 11 | tell her, then I'm going to instruct her not | 15:08:30 |
| 12 | to answer. | 15:08:33 |
| 13 | BY MR. LYNCH: | 15:08:42 |
| 14 | Q   I'm not going to ask you about the | 15:08:49 |
| 15 | substance of the communications, but is it | 15:08:49 |
| 16 | fair to say that you consulted with lawyers | 15:08:49 |
| 17 | about the issue of refinancing? | 15:08:51 |
| 18 | A   I consulted.  Yes.  It's fair to say | 15:08:53 |
| 19 | that I did. | 15:09:03 |
| 20 | Q   Okay.  Had you applied for any jobs | 15:09:04 |
| 21 | in the Northern Virginia area? | 15:09:07 |
| 22 | A   In what time period? | 15:09:10 |

215

| | | | |
|---|---|---|---|
| 1 | A | Yeah.  When I was in high school.  I | 15:10:20 |
| 2 | met him when I was in high school. | | 15:10:22 |
| 3 | Q | Okay.  And did you all date in high | 15:10:22 |
| 4 | school? | | 15:10:24 |
| 5 | A | No. | 15:10:24 |
| 6 | Q | And when you came back to Keyser | 15:10:24 |
| 7 | after the separation from your husband, | | 15:10:26 |
| 8 | when -- how -- when was the first time you saw | | 15:10:28 |
| 9 | him? | | 15:10:30 |
| 10 | A | The first time I saw him? | 15:10:30 |
| 11 | Q | Yeah. | 15:10:32 |
| 12 | A | January 2010. | 15:10:33 |
| 13 | Q | Okay.  In Keyser or in -- | 15:10:41 |
| 14 | A | In Keyser, yes. | 15:10:44 |
| 15 | Q | And he lives in Keyser now or in | 15:10:47 |
| 16 | Charleston? | | 15:10:51 |
| 17 | A | He lives in Charleston. | 15:10:51 |
| 18 | Q | Okay.  When did you start dating? | 15:10:53 |
| 19 | A | Around March of 2010. | 15:10:56 |
| 20 | Q | Okay.  Keyser is about how far from | 15:11:01 |
| 21 | Charleston?  Three hours, four? | | 15:11:07 |
| 22 | A | About four. | 15:11:10 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

218

1    Q    -- at all?  Where did you want to                15:13:11

2  live?                                                   15:13:13

3    A    I don't know.  I don't know.  I don't            15:13:13

4  think I even thought about what I wanted.               15:13:20

5    Q    Where do you want to live now?                   15:13:24

6    A    I think I want to live in Charleston             15:13:28

7  because that's where my fiance is.                      15:13:31

8    Q    Okay.                                            15:13:34

9         MR. BAZAZ:  How is everybody doing?              15:13:35

10  Does anybody need a break?                             15:13:37

11        You need a break?                                15:13:37

12        THE WITNESS:  I'm okay.                          15:13:37

13        MR. BAZAZ:  Okay.                                15:13:39

14  BY MR. LYNCH:                                          15:13:44

15    Q    Do you know how you came in contact            15:13:45

16  with Quicken Loans?                                    15:13:47

17    A    They contacted me the same way               15:13:48

18  Precision did.                                         15:13:52

19    Q    Do you know of anybody else you               15:13:54

20  attempted to refinance with other than Quicken         15:13:59

21  and Precision?                                         15:14:02

22    A    I don't believe there was anyone             15:14:03

## Capital Reporting Company
### Wilkes, Alisha - Volume I 05-11-2011

219

| | | |
|---|---|---|
| 1 | else. | 15:14:05 |
| 2 | MR. LYNCH:  I'd ask -- this will be | 15:14:07 |
| 3 | the next exhibit, 20 -- | 15:14:07 |
| 4 | MR. BAZAZ:  2. | 15:14:07 |
| 5 | MR. LYNCH:  22. | 15:14:07 |
| 6 | BY MR. LYNCH: | 15:14:25 |
| 7 | Q    And how quickly, both with Quicken | 15:14:25 |
| 8 | and Precision, did you get these denial | 15:14:29 |
| 9 | letters after you applied for the loan?  Was | 15:14:30 |
| 10 | it usually a week or two? | 15:14:34 |
| 11 | A    I don't remember.  I'm not sure how | 15:14:36 |
| 12 | quickly they came. | 15:14:38 |
| 13 | Q    May 24, 2010, is Exhibit 22, the | 15:14:42 |
| 14 | letter from Quicken? | 15:14:48 |
| 15 | A    Yes. | 15:14:51 |
| 16 | Q    And it appears that the loan was not | 15:14:51 |
| 17 | approved? | 15:14:59 |
| 18 | A    Correct. | 15:15:00 |
| 19 | Q    And it appears the reasons were | 15:15:01 |
| 20 | credit history, current/previous slow | 15:15:04 |
| 21 | payments, judgments, liens, or bankruptcy? | 15:15:07 |
| 22 | A    Yes. | 15:15:13 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

223

| | | |
|---|---|---|
| 1 | A    I can't remember at that point what | 15:17:52 |
| 2 | the situation was with the other credit cards. | 15:17:55 |
| 3 | I would have to look at the time line to see | 15:17:59 |
| 4 | when the other credit cards had been settled. | 15:18:01 |
| 5 | But there would have -- you know, there would | 15:18:04 |
| 6 | have been the issue of just needing income for | 15:18:09 |
| 7 | living expenses.  But I don't believe I had | 15:18:13 |
| 8 | any other outstanding obligations. | 15:18:18 |
| 9 | Q    Did you talk with Bryan Garcia during | 15:18:21 |
| 10 | this time period about getting introduced to a | 15:18:24 |
| 11 | mortgage broker to try to find a loan on your | 15:18:28 |
| 12 | house? | 15:18:31 |
| 13 | A    No.  I don't believe I ever talked to | 15:18:31 |
| 14 | Bryan about that. | 15:18:32 |
| 15 | Q    Did you talk to any mortgage brokers | 15:18:32 |
| 16 | or any banks at all in Northern Virginia about | 15:18:35 |
| 17 | the issue? | 15:18:37 |
| 18 | A    No.  I don't think so. | 15:18:39 |
| 19 | Q    Did you talk to any banks in West | 15:18:39 |
| 20 | Virginia about refinancing the house in | 15:18:42 |
| 21 | Northern Virginia? | 15:18:44 |
| 22 | A    There was a person that I called who | 15:18:45 |

224

| | | |
|---|---|---|
| 1 | was a friend of the family, and I can't even | 15:18:49 |
| 2 | remember what his name is now.  But his advice | 15:18:52 |
| 3 | was just basically that he couldn't help me | 15:18:58 |
| 4 | because he was in West Virginia, but he was | 15:19:00 |
| 5 | the only person. | 15:19:03 |
| 6 |     Q    If you were really intent on | 15:19:04 |
| 7 | refinancing the house, can you tell me why you | 15:19:08 |
| 8 | didn't go to anyone else other than Quicken | 15:19:12 |
| 9 | Loans and Precision Funding? | 15:19:15 |
| 10 |     A    After being denied twice, I thought | 15:19:17 |
| 11 | it was a pretty clear message that it wasn't | 15:19:22 |
| 12 | going to happen. | 15:19:24 |
| 13 |     Q    And you didn't go to any traditional | 15:19:26 |
| 14 | large bank type of companies to seek | 15:19:29 |
| 15 | refinancing? | 15:19:33 |
| 16 |     A    No.  I don't believe so. | 15:19:33 |
| 17 |     Q    You didn't consult Bank of America? | 15:19:38 |
| 18 |     A    No. | 15:19:41 |
| 19 |     Q    BB&T? | 15:19:42 |
| 20 |     A    No. | 15:19:44 |
| 21 |     Q    SunTrust? | 15:19:44 |
| 22 |     A    No. | 15:19:45 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

244

| | | | |
|---|---|---|---|
| 1 | Q | Would you look in the -- on the first | 15:48:07 |
| 2 | page in the third paragraph that begins, | | 15:48:09 |
| 3 | Whereas.  Do you see that? | | 15:48:12 |
| 4 | A | Uh-huh. | 15:48:12 |
| 5 | Q | It says, On -- Whereas, on | 15:48:12 |
| 6 | October 12, 2008, certain irreconcilable | | 15:48:14 |
| 7 | differences arose between the parties, as a | | 15:48:17 |
| 8 | result of which they separated and intended | | 15:48:21 |
| 9 | to, thereafter, live separate and apart from | | 15:48:22 |
| 10 | each other permanently. | | 15:48:26 |
| 11 | | Do you see that paragraph? | 15:48:28 |
| 12 | A | Yes. | 15:48:28 |
| 13 | Q | Was October 12, 2008, the date that | 15:48:28 |
| 14 | you all separated? | | 15:48:32 |
| 15 | A | Yes. | 15:48:33 |
| 16 | Q | And did he move out of the home on | 15:48:34 |
| 17 | that day? | | 15:48:35 |
| 18 | A | He left on that day and didn't stay | 15:48:36 |
| 19 | there after that. | | 15:48:38 |
| 20 | Q | All right.  What happened on that | 15:48:41 |
| 21 | particular date that caused him to leave? | | 15:48:43 |
| 22 | A | That was the day that I talked with | 15:48:46 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

245

| | | |
|---|---|---|
| 1 | someone from, I believe, Bank of America about | 15:48:50 |
| 2 | that credit card.  And based on what that | 15:48:54 |
| 3 | person told me, it was clear that it was his | 15:48:57 |
| 4 | debt.  And when I confronted him about it, he | 15:49:00 |
| 5 | lied and continued to lie.  And so I told him | 15:49:03 |
| 6 | to leave and to come back when he was ready to | 15:49:07 |
| 7 | tell me what was going on. | 15:49:10 |
| 8 | Q    That all occurred on October 12th? | 15:49:11 |
| 9 | A    Yes. | 15:49:15 |
| 10 | Q    Okay.  Anything else occur on that | 15:49:16 |
| 11 | date, other than that, that caused him to | 15:49:17 |
| 12 | leave? | 15:49:20 |
| 13 | A    No.  I don't think there was anything | 15:49:21 |
| 14 | else.  I think that was the main event. | 15:49:25 |
| 15 | Q    Okay.  You also mentioned that at | 15:49:27 |
| 16 | some point, you suspected that he had been | 15:49:29 |
| 17 | unfaithful.  When did you begin to suspect | 15:49:33 |
| 18 | that? | 15:49:36 |
| 19 | A    That was -- it would have been | 15:49:36 |
| 20 | towards late October. | 15:49:42 |
| 21 | Q    And what caused you to have those | 15:49:43 |
| 22 | suspicions? | 15:49:45 |

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

271

```
 1      A     Correct.                              16:16:27

 2      Q     When did you first seek medical       16:16:28

 3   attention as a result of emotional distress?   16:16:31

 4      A     I believe late October of 2008 or     16:16:33

 5   maybe early November of 2008.                  16:16:39

 6      Q     And who did you seek medical          16:16:41

 7   attention from?                               16:16:44

 8      A     Dr. Hammonds.                         16:16:44

 9      Q     And what treatment did you receive?   16:16:46

10      A     Anxiety medication and sleep          16:16:48

11   medication.                                   16:16:50

12      Q     And how often -- how many times did   16:16:51

13   you see Dr. Hammonds for emotional distress?   16:16:53

14      A     I think I only went to her twice.     16:16:56

15      Q     When was the second time?             16:16:58

16      A     Probably January -- around            16:17:00

17   January 2009, because I was just using the     16:17:06

18   prescriptions she had given me in the initial  16:17:09

19   visit.  So I didn't go back until they were    16:17:13

20   running out.                                   16:17:16

21      Q     Did you tell Dr. Hammonds about your  16:17:17

22   husband forging your signature on the loan     16:17:21
```

Capital Reporting Company
Wilkes, Alisha - Volume I 05-11-2011

272

1    documents for the GMAC loan?                      16:17:25

2        A    I don't believe I got into those kind    16:17:30

3    of details with her.                              16:17:33

4        Q    Did you tell her that your husband       16:17:34

5    had given your permission to America Funding      16:17:38

6    to access your credit report?                     16:17:42

7        A    I didn't talk with her about those       16:17:44

8    kinds of things.                                  16:17:47

9        Q    Did you talk to her about your           16:17:49

10   derogatory reports on your credit report?         16:17:57

11       A    I did not talk to her about that.        16:18:05

12       Q    Did you talk to her about the liens      16:18:06

13   on your house from the GMAC mortgage?             16:18:17

14       A    I may have mentioned that there were     16:18:22

15   financial problems.  I don't -- but I'm sure I    16:18:25

16   didn't give her any details about the            16:18:28

17   situation.                                        16:18:32

18       Q    Did you see Dr. Price for emotional      16:18:33

19   distress as well?                                 16:18:42

20       A    Yes.                                     16:18:43

21       Q    Did you tell Dr. Price any of that       16:18:44

22   information I just talked about?                  16:18:46