```
 1    IN THE UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF VIRGINIA
 2    ALEXANDRIA DIVISION
 3
             ALISHA W. WILKES,                  )
 4                                              )
                        Plaintiff,              )
 5                                              ) Civil Action No.
                   v.                           ) 1:10-CV-01160
 6                                              ) (CMH-TRJ)
             EXPERIAN INFORMATION SOLUTIONS,    )
 7                                Et al.
                        Defendants.
 8
 9        VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
                        Of AMY FLEITAS
10           TAKEN ON BEHALF OF THE PLAINTIFF
                   Virginia Beach, Virginia
11                      June 17th, 2011
12                 11:09 a.m. - 12:44 p.m.
13   Appearances:
14                CONSUMER LITIGATION ASSOCIATES, P.C.
                  By:  LEONARD A. BENNETT, ESQUIRE
15                     Counsel for the Plaintiff
                       12515 Warwick Boulevard, Suite 100
16                     Newport News, VA 23606
17                TROUTMAN SANDERS, LLP
                  By:  JOHN C. LYNCH, ESQUIRE
18                     Counsel for the Defendant
                       222 Central Park Avenue, Suite 2000
19                     Virginia Beach, VA 23462
20
     Also Present:
21
22   Gary Payne, Jr.
     Videographer
23
24   Georgeanne Curtis
     Court Reporter
25
                                                        Page 1
```

Maxene Weinberg Agency
(800) 640-1949

Exhibit E

```
 1           MR. LYNCH:  I'm going to object to form.  I think
 2   that's outside the topics.  Just generally asking her what
 3   mistakes were made in the file.  I'm not instructing you not to
 4   answer, but I do believe it's beyond the topics.
 5   BY MR. BENNETT:
 6       Q.   Ma'am, what mistakes, now that you've reviewed the
 7   history of this case and you're being called by GMAC Mortgage to
 8   inform us as to the knowledge and understanding of what
 9   occurred, what mistakes do you believe were made by GMAC as to
10   how it handled my client's credit reporting?
11       A.   I don't believe there were any actual mistakes in the
12   way the credit reporting was corrected given the sequence of
13   events, what I reviewed in regard to the state court action and
14   the timing of the disputes that came in the actions that were
15   taken by GMAC Mortgage.  We're kind of looking at two different
16   things.  When we were looking at the state court action we were
17   wondering whether we were dealing with actions to avoid a
18   mortgage.  It's my understanding a specific credit dispute was
19   not raised in that action.  Now that we have the specific credit
20   dispute, I think maybe things could have been done a little bit
21   better.  We could have looked at things in a different way, but
22   I don't believe what we did was a mistake.
23       Q.   Was there any way that our client's credit reporting
24   disputes were handled that GMAC believes were other than
25   intentional.  All that occurred with respect to the credit
```

Page 10

```
 1    reporting process for Miss Wilkes, do you believe or does GMAC
 2    believe followed its ordinary procedure, correct?
 3         A.    That is my understanding, yes.
 4         Q.    There were not errors or failure to follow the
 5    intended procedures of which you are aware?
 6         A.    In the --
 7         Q.    In the way it processed or handled my client's credit
 8    disputes.
 9         A.    No.  That is my understanding.  The standard
10    procedures were followed.
11         Q.    And to your knowledge those procedures remain the same
12    today?  Those credit reporting dispute procedures?
13         A.    As they were in --
14         Q.    In 2010?
15         A.    Yes.
16         Q.    Now, we have asked questions regarding some of the
17    topics you have been profer red by GMAC to respond to about the
18    manner in which GMAC informed itself of its obligations under
19    the sections that govern its credit reporting in disputes.  You
20    are prepared to speak for or as GMAC in that regard today?
21         A.    Yes.
22         Q.    How does GMAC make sure it's informed of the law that
23    governs its disputes and how it handles consumer credit
24    reporting disputes?
25         A.    GMAC Mortgage would primarily rely on the
```

Page 11

```
 1    I believe it was Exhibit One.
 2         Q.   Let me make sure I understand.  Mr. Weible, the
 3    lawyer, sends you a letter informing you his client has been the
 4    victim of fraud.  She did not sign your loan?
 5         A.   Yes, he sent the initial complaint.
 6         Q.   GMAC uses his contact information to update its file
 7    for the address and then on November 19th sends him a letter
 8    telling our client the foreclosure sale date has now been sent?
 9         A.   Yes.  And that was because Mr. Weible did direct us
10    to direct any further communications to him and advised us that
11    Miss Wilkes was represented by counsel and we may not contact
12    her for any reason whatsoever in his letter.
13         Q.   So then, by the way, have you ever and I'm okay if
14    this is so private, have you ever been the subject the
15    foreclosure within the last five years?
16         A.   Personally?
17         Q.   Personally.
18         A.   No, I have not.
19         Q.   Any close friends or family members who have lost
20    their home?
21         A.   No.
22         Q.   Any co-workers at GMAC that have lost their homes?
23         A.   I may be aware of pending actions but it's nothing I
24    have personally discussed.
25         Q.   It's nothing you've ever felt?
```

Page 26

```
 1      A.   No.
 2      Q.   Our client finds in mid to late October there's a loan
 3 on her home.  And you know she has a young child, right?
 4      A.   I believe I was aware there was a child.
 5      Q.   It goes to a lawyer who writes to GMAC.
 6      A.   Yes.
 7      Q.   And says his client is a victim of fraud?
 8      A.   Right.
 9      Q.   The same day that GMAC responds, November 7th, 2008
10 telling our client they need to fill out some forms and provide
11 information before you'll start your investigation.  That's what
12 the letter said, right?
13      A.   Yes.
14      Q.   By the way, if she had filled out those forms that's
15 still not a guarantee of any outcome one way or the other.  That
16 just means you'll start the investigation?
17      A.   It means that further investigation can be completed,
18 correct.
19      Q.   So, November 7th, she gets that response or her lawyer
20 does?
21      A.   Yes.
22      Q.   And she gets letters from GMAC and its foreclosure
23 firm telling her a sale date has been set to sell her house, the
24 house that she and her baby are living in, right?
25      A.   Yes, she received notice of the initiation or the
```

Page 27

```
 1     referral to foreclosure counsel.
 2          Q.   That is the procedure that GMAC intended in this case
 3     or do you believe it was a mistake?
 4          A.   I don't believe it was a mistake.  I don't think there
 5     was any intention to send those two letters out concurrently as
 6     part of our procedure.  That was the timing that occurred in
 7     this particular issue when it was addressed with us coincided
 8     with the referral but that is not a timeline that we dictate.
 9     It was not a mistake nor was it an intentional action; it
10     happened to be the timing in the matter.
11          Q.   Take a look at Exhibit 8.
12          A.   I'm sorry.  I apologize.  Yes.
13          Q.   This the state court lawsuit, right?
14          A.   Yes.
15          Q.   We agreed it was filed November 25th, 2008.  GMAC
16     agrees?
17          A.   Yes.
18          Q.   Take a look at the last page of the document.
19          A.   Yes.
20          Q.   It indicates GMAC received a copy of this on
21     December 3rd, 2008.  Look at line number seven, the last page.
22          A.   Yes.
23          Q.   Now, I recognize you've never yourself received
24     letters or threatening foreclosure but between the time she gets
25     November 7th, she gets letters telling her a foreclosure has
```

```
 1    in cases who were unsupervised in how they were litigated.  In
 2    the state court matter, GMAC's legal department supervised and
 3    oversaw the state court proceedings?
 4         A.   Correct.
 5         Q.   And would have received copies of documents that were
 6    provided to the state court GMAC lawyers?
 7         A.   That would be my understanding, yes.
 8         Q.   Now take a look at Exhibit Nine.
 9         A.   Yes.
10         Q.   GMAC Mortgage, LLC would have received a copy of this
11    state court judgement and opinion letter within days of when it
12    was issued, correct?
13         A.   I don't know.  I can't say for sure on time frames but
14    that would be reasonable.
15         Q.   Take a look at Exhibit Ten.
16         A.   Yes.
17         Q.   This is the amended complaint, the first amended
18    complaint in the state action, correct?
19         A.   Yes.
20         Q.   And GMAC would have received this or shortly after its
21    lawyers received a copy, right?
22         A.   Yes.
23         Q.   You can put that whole book aside.  We're done with
24    that.  There's a second book that starts with Exhibit Eleven.
25    Exhibit Eleven is the second amended complaint in the state
```

Page 35

```
 1    if all of the components of the company know how their work fits
 2    together.
 3         Q.   Do you think structurally that's applicable to GMAC?
 4         A.   In my opinion?
 5              MR. LYNCH:  I object.  You're giving facts.
 6    BY MR. BENNETT:
 7         Q.   In your experience as a GMAC employee?
 8         A.   In my experience we do have the infrastructure in
 9    place so that we are able effectively communicate cost
10    departments with the our servicing systems and support systems
11    and we use.
12         Q.   And in your regular day to day jobs there are times
13    where the legal department has to inform you about details of
14    cases that are in litigation, right?
15         A.   In certain circumstances details might be provided
16    that is much less common because the need to protect privilege
17    most often we are given direction as to how to handle a specific
18    file.
19         Q.   But there's not this visible wall that exists between
20    the legal department and the loan servicing or even the credit
21    reporting?
22         A.   No, there is not.  There is no wall.
23         Q.   Take a look at Exhibit Sixteen.  This is the state
24    court action.  Look at page nine, the ninth page of
25    Exhibit Sixteen.  This is a response to GMAC and Homecomings
```

Page 40

```
 1        A.    Yes.
 2        Q.    Exhibit Nineteen, have you ever reviewed this document
 3   before?
 4        A.    Yes, I have.
 5        Q.    What is this document?
 6        A.    This would represent the action that GMAC brought as a
 7   third party Plaintiff in the matter against, I believe, the
 8   settlement company, whoever is listed here.  It looks like the
 9   settlement company, the notary and the former spouse.
10             MR. BENNETT:  Mr. Lynch, you said you would get me a
11   demand letter sent by GMAC to the title company.
12             MR. LYNCH:  Our understanding is Donna Hall at Sam
13   White's firm sent that letter and that letter triggered
14   representation by Mr. Nolan.  They are searching through their
15   files.  They may have to pull it from storage.  As she gets it,
16   we'll provide it.
17   BY MR. BENNET:
18        Q.    GMAC actually sued the title company alleging that Mr.
19   Wilkes had forged the GMAC note, correct?  Take a look at
20   Exhibit Nineteen, paragraph five.  Can you read paragraph five?
21        A.    "Forged plaintiff's signature on loan documents and
22   the deed of trust and obtained the loan proceeds and then
23   conveyed the property to plaintiff."  Yes, it is my
24   understanding that GMAC did raise a third party complaint in an
25   effort to avoid loss from the voiding of the mortgage or
```

Page 43

 1   potential voiding the mortgage at this point this time.

 2      Q.   Take a look at the last page of this.  This was signed
 3   June 5th, 2009.

 4      A.   Correct.

 5      Q.   Served on that day.  As of June 5th, 2009 it was
 6   GMAC's position that Mr. Wilkes had forged Alisha Wilkes'
 7   signature on its loan documents?

 8           MR. LYNCH:  I object.  I think that calls for a legal
 9   conclusion and to the extent it doesn't you can answer?
10   BY MR. BENNETT:
11      A.   My understanding is GMAC was raising this third party
12   complaint in an action to void the deed of trust and was not
13   making those assertions outside but I'm not sure how that all
14   fits together so I don't want to --

15      Q.   GMAC in this Exhibit Nineteen, going back to the
16   questions I asked before, GMAC's state court lawyer would not
17   have filed this third party complaint without approval from the
18   legal department at GMAC?

19      A.   That would be my understanding, yes.

20      Q.   The legal department would have had to approve the
21   allegation GMAC making the public statement that Mr. Wilkes
22   forged the plaintiff's signature on the GMAC loan documents,
23   right?

24      A.   I would assume they reviewed it previously.  Yes, I
25   would say they had seen this, correct.

Page 44

```
 1        Q.   After the state court order came out, the judge found
 2   that Miss Wilkes was not responsible for the GMAC loan.  GMAC
 3   received payment from the title company, correct?
 4        A.   Yes.
 5        Q.   How much money was paid by the title company?
 6        A.   I don't have the specific recollection and what that
 7   number was.
 8        Q.   Approximately how much was it?
 9        A.   The number $368 thousand is sticking but I have to
10   review the documents.
11        Q.   The loan amount was approximately $368 thousand.  Did
12   GMAC receive payment for the full loan?
13        A.   I believe the amount received was short of the amount
14   required to completely satisfy the debt.
15        Q.   By how much?
16        A.   That I could not say without reviewing the documents.
17        Q.   What documents do you need to review?
18        A.   I need to take a look at the servicing history, the
19   financial history.
20        Q.   I don't have that.  You didn't tell me the amount in
21   there.  You maybe either redacted that or you didn't give it to
22   me.
23        A.   The payment history?
24        Q.   The amount of money GMAC received from the title
25   company is not in any of my documents.
```

Page 45

```
 1        Q.   And you understood that Miss Wilkes in March, 2010
 2   made a dispute?  You are aware she disputed the credit
 3   reporting?
 4        A.   Yes.
 5        Q.   Her dispute was made under the Fair Credit Reporting
 6   Act?
 7        A.   Yes.
 8        Q.   GMAC did not report the account as disputed?
 9        A.   No.  At the time when the account was reviewed.  The
10   account was reviewed and based on the information available
11   within our system at that time the servicing records at that
12   time the loan was reported back as based on that information.
13        Q.   Let me step back to the structure of this deposition.
14   In the beginning I asked you if you understand the distinction
15   between your personal knowledge versus what we'll call your
16   prepared 30B6 knowledge?
17        A.   Yes.
18             MR. LYNCH:  I object to that but you can answer.
19   BY MR. BENNETT:
20        Q.   Knowledge that is given to you, properly given to you
21   so you can answer questions that are otherwise outside your
22   field, right?
23        A.   Yes.
24        Q.   And you today have been able to so testify about
25   certain areas that are not based on your personal knowledge?
```

Page 53

```
 1    would mean those deletions would take place by an AUD process
 2    where we were initiating the communication rather than
 3    responding to one from the bureaus.
 4        Q.   And in this case, Miss Wilkes' case you ultimately
 5    actually deleted the account?
 6        A.   Correct.
 7        Q.   And why did GMAC delete the account?
 8        A.   Ultimately at the direction of our legal department
 9    when we received confirmation or we received some
10    additional documentation, a letter that was dated June, 2010, a
11    letter was forwarded to our offices, forwarded to our legal
12    department and we were advised by our case manager to delete the
13    file.
14        Q.   Was that the same case manager the one that had been
15    the case manager that handled the state court action?
16        A.   No.
17        Q.   Did he work in the same department?
18        A.   They were both part of the legal department.
19        Q.   And you're aware that even under the circumstances of
20    this case using an AUD, as you referred, GMAC still did not
21    delete due to fraud?
22        A.   I'm not aware of the reason that the AUD that was
23    sent.  Do you have a document?  I could look at that and see
24    because they would help me.
25        Q.   I don't have it. Your AUD did not delete due to fraud.
```

Page 60