IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| ALISHA W. WILKES, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 1:10-cv-00160 |
| | ) | (CMH-TRJ) |
| -vs- | ) | |
| | ) | |
| GMAC MORTGAGE, LLC, et al., | ) | |
| | ) | DEPOSITION OF |
| Defendants. | ) | LORI AGUIAR |

The deposition of MS. LORI AGUIAR called as a witness by the plaintiff in the above-entitled action, pursuant to notice and taken before Brenda L. Bodensteiner Klenk, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public, at GMAC Mortgage, LLC, 3451 Hammond Avenue, Waterloo, Iowa, on April 25, 2011, at 12:10 p.m.

APPEARANCES:

CONSUMER LITIGATION ASSOCIATES, PC
By ATTORNEY LEONARD A. BENNETT
12515 Warwick Boulevard, Suite 1000
Newport News, Virginia 23606
Lenbennett@cox.net

and

LAW OFFICES OF JOHN BAZAZ, PLC
By ATTORNEY JOHN BAZAZ
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
Jbazaz@bazazlaw.com
appeared telephonically on behalf of the plaintiff;



Exhibit K

APPEARANCES (Continued):

TROUTMAN SANDERS LLP
By ATTORNEY JOHN C. LYNCH
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
757.687.7765
John.lynch@troutmansanders.com
appeared on behalf of GMAC Mortgage, LLC, defendant;

TAYLOR & WALKER, PC
By ATTORNEY BRIAN NELSON CASEY
555 Main Street
P.O. Box 3490
Norfolk, Virginia 23514-3490
757.625.7300
Bcasey@taylorwalkerlaw.com
appeared telephonically on behalf of America Funding, Inc., defendant;

GLASSER & GLASSER, PLC
By ATTORNEY JASON HAMLIN
580 East Main Street, Suite 600
Norfolk, Virginia 23510-3490
Jhamlin@glasserlaw.com.com
appeared telephonically on behalf of Nationstar Mortgage, LLC, defendant;

MORRIS & MORRIS, PC
By ATTORNEY GRANT EDWARD KRONENBERG
700 East Main Street, Suite 1100
P.O. Box 30
Richmond, Virginia 23218-3490
Gkronenberg@morrismorris.com.com
appeared telephonically on behalf of Trans Union, LLC, defendant.

VIDEOGRAPHER:
David Seuferer, Video Specialists LLC

(meets" --

Q. And of course, you did not use that code for any of the Wilkes' ACDVs; correct?

A. Correct.

Q. How often, if at all, do you use that code?

MR. LYNCH: I'm going to object to form.

A. We no longer use that code.

BY MR. BENNETT:

Q. Do you know when you stopped using that code?

A. No.

Q. Would that have been about the same time that you stopped noting accounts as disputed?

A. Yes.

Q. Well, let's -- let's walk through -- since we have the ACDVs and we have your manual out, can you walk me through the Wilkes investigation or dispute process that you would have followed.

A. Okay.

Q. Let's start with the first ACDV says Response Date with March 19, 2010. That is the top left. That is the date that you would have sent this -- GMAC would have sent this back to credit reporting agencies; correct?

A. Correct.

Q. And I know that this first ACDV is from Experian. Is there any way that you're able to tell that by looking at

your copy of the ACDV?

A. The subscriber code. I do not have the subscriber codes with me.

Q. So do you know whether or not this -- other than my representation, whether or not this came from Experian?

A. No.

Q. By the way, are you the person that would have accessed and pulled these ACDVs out for the lawyers in this case?

A. No, I did not.

Q. You were not that person?

A. No.

Q. Do you know who did that?

A. No. I do not know for sure.

Q. Who do you believe did it?

A. I cannot say for sure.

Q. Okay. Who -- recognizing your uncertainty, who do you think is the most likely person to have done it?

MR. LYNCH: Objection, form.

You can answer.

A. Our supervisor, Lynn Manning.

BY MR. BENNETT:

Q. And why would you guesstimate that she was the one that did that?

MR. LYNCH: Objection, form.

A. Yes. And AUD would be -- we would send that if we wanted to send an update to the credit bureaus on an account.

Q. Do the ACDVs appear in a particular order? Or do you shop through them and choose the ACDV to work on?

A. We just pick ACDVs at random.

Q. And so let's walk through these ACDVs that are in Exhibit 2.

A. Okay.

Q. When you received the ACDV -- well, let me step back.

Earlier you testified that you reviewed the Fiserv notes for this account. Do you recall that testimony?

A. Yes.

Q. You don't recall what you were wearing on March 19, 2010, do you?

A. No.

Q. And you don't recall -- I think you said you didn't even recall how many coworkers you had at that time?

A. Correct.

Q. You didn't recall even a tight range of how many ACDVs you would have done that day; right?

MR. LYNCH: Objection to form.

You can answer.

A. Correct.

BY MR. BENNETT:

Q. Is that correct?

A. Yes.

Q. So how do you recall -- under oath how do you recall the specific actions or notes that you took on a particular ACDV over a year ago?

A. I would have followed our normal procedures in responding to an ACDV.

Q. So when you say you would have looked at the notes, you're not actually testifying that you recall looking at the notes?

A. Yes. I always look at the notes.

Q. I understand. That's a different testimony.

But in your mind you don't have a specific recollection sitting here today of looking at the Wilkes' notes?

A. No, not that specific day; no.

Q. All right. Your testimony is because you're confident that you follow GMAC's uniform procedures?

A. Yes.

Q. What happens to you if you don't follow GMAC's credit reporting investigation procedures?

MR. LYNCH: I'm going to object to form.

You can answer.

A. I guess I really wouldn't know how to answer that.

A. Yes.

Q. And what is your per hour wage?

A. Just under $16.

Q. And do you know what your wage was in 2010?

A. No, I do not recall.

Q. Do you know if it was more or less?

A. Less.

Q. And how is your hourly wage determined?

A. I don't know the procedures on that.

Q. Does your performance review impact it?

A. Yes.

Q. That determination?

A. Yes.

Q. Now, if you'll take a look at Exhibit 2. And you can put Exhibit 1 right next to it for me.

A. Okay.

Q. When you received -- you open up your e-OSCAR and you receive an ACDV that's randomly assigned. Let's assume then that that's what happens for this first Wilkes ACDV, Exhibit 2, Pages 1 and 2 --

A. Okay.

Q. -- of the exhibit.

Help me understand what procedures you would have followed using Exhibit 1.

A. Okay. I first would have gone to our Fiserv

system, verified the name, Social Security number, and mailing address.

Q. All right. Let's -- because the jury might not have this background, looking at Exhibit 2, the ACDV . . .

A. Yes.

Q. Where it says Consumer Information, do you see that third section down?

A. Yes.

Q. When the ACDV comes in, what parts of this are filled in from the credit reporting agency before GMAC's done anything?

A. The dispute information. Well -- and then the -- under Request Data under Consumer Information.

Q. Well, under the Consumer Information you'll see this ACDV has two sections that are white and two that are gray?

A. Correct.

Q. All right. The two columns that are white, those are the ones that were already on the ACDV when it came in from Experian; correct?

A. Correct.

Q. And the two shades -- the two shaded or gray columns, those are the ones that GMAC would have added?

A. Correct.

Q. And so when you say that you verified the name and

address and Social Security number, what you're meaning is the work that you did with this section of the ACDV; is that right?

A. Right.

Q. So you would have opened up the Fiserv system, and there's a screen that would have included this customer information data, the name, address, Social, et cetera; correct?

A. Correct.

Q. What is that screen?

A. Cus Loan?

Q. I'm sorry?

A. Cus Loan, c-u-s l-o-a-n.

Q. Okay. And what does that screen have on it?

A. The customer's name, property and mailing address, most of the account, you know, information like principal balance, payment amount, payment type, loan type.

Q. So then looking at this ACDV, you would have looked at the Fiserv screen. And on the right where it says Same, you would have concluded that your computer had the same information that the credit reporting agency computer had; correct?

A. Correct.

Q. And where it says Unknown, for example, date of birth, you would have concluded that you did not know --

your computer system did not tell you what Ms. Wilkes' date of birth was?

A. Correct.

Q. And then where it says Different under current address, you had a different address than what the credit reporting agency was listing as Ms. Wilkes' current address; correct?

A. Correct.

Q. So after looking at the Fiserv system -- and I guess that's your first major step is determining what matches in this consumer information section; right?

A. Right.

Q. And what's the next step that you would have followed in handling Ms. Wilkes' ACDV?

A. Then I would have gone to our ISS application.

Q. What is the ISS application?

A. That houses our copies of our original documents for each account.

Q. When do you use the ISS system for an ACDV?

A. We use that to also verify the name and Social Security number.

Q. Would that be true -- if you look at the top, do you see where it says FCRA Relevant Information?

A. Yes.

Q. You would have understood -- you would have read

A. To determine --

Q. But the GMAC procedures for handling these credit reporting disputes do not put -- do not inform or involve the identity theft until after the ACDV has already verified the account as owing?

MR. LYNCH: I'm going to object to form.

But you can answer.

A. Correct.

BY MR. BENNETT:

Q. Does GMAC use any automated systems that -- that don't involve a human being reading the ACDV?

A. No.

Q. I'm sorry. Did you answer, or are you thinking?

MR. LYNCH: She answered.

BY MR. BENNETT:

Q. I'm sorry. What was your answer?

A. I said no.

Q. Have you had an opportunity to determine if there were any other ACDVs received on this account besides those in March 2010?

A. No, I have not.

Q. Looking at the ACDVs that follow in Exhibit 2, the first at the top is dated March 19, 2010. That's the one we've just described; correct?

A. Correct.

Q. The second, which is the third page of this exhibit -- third and fourth page, this is an ACDV that you also worked on dated March 24, 2010; correct?

A. Correct.

Q. And would you have put two and two together to connect these? I mean, your recollection of one dispute versus another?

MR. LYNCH: I'm going to object to form.

You can answer.

A. Well, I would have read in the notes that I had previously responded to an ACDV on March 19th. But I would still use the same procedures that we follow and verify, you know, the name and Social Security on Fiserv and the original documents.

BY MR. BENNETT:

Q. Do you see the second page of that second ACDV which is -- at the bottom it says 260.

A. Yes.

Q. At the top it says SCC. What does that mean?

A. I believe that would be the Special Comment Code.

Q. And this was also true -- this code, the SCC, was also reported for the first ACDV that we discussed; right?

A. Correct.

Q. So even though you changed the account status from foreclosure proceedings started to 180 days past due, GMAC

also still reported that the consumer was subject to a foreclosure; correct?

A. Right. That foreclosure proceedings had started.

Q. The third ACDV starts on Page 5 of the exhibit, 5 and 6. The Bates number is 261 and 262.

A. Yes.

Q. And this you would have processed -- this ACDV you would have processed in the same way as the previous two or the other two; correct?

A. Correct.

Q. Now, the next ACDV, Page 7 of the exhibit or Bates No. 263, this is an ACDV that was performed by Allison Higgins. Do you see that?

A. Yes.

Q. Is she the other credit reporter? You said you had two?

A. Yes.

Q. And is her job the same basic position as you hold?

A. Yes.

Q. Do you know how long Allison has been with GMAC?

A. She just had her five-year anniversary.

Q. But her position is the same as yours functionally; right?

A. Yes.

Q. Do you have anybody that reports to you?

A. No.

Q. The very last ACDV -- maybe I can't tell, but it seems to be a duplicate. Well, no. It's not a duplicate. But it's another one that came in March 19th that you handled; correct?

A. Correct.

Q. But you would have handled this one exactly the same way?

A. Yes.

MR. LYNCH: All right. Let's go off the record for a minute. I'm going to call my co-counsel.

THE VIDEOGRAPHER: We're off the record at 2:39 p.m.

(Brief recess taken.)

THE VIDEOGRAPHER: We're on the record at 2:41 p.m.

BY MR. BENNETT:

Q. Ma'am, we've talked about the procedures that GMAC has you follow. I don't -- I don't note anywhere in here where it permits you to actually have direct contact with the consumer. Is that part of your ACDV dispute process for any particular disputes?

A. No.

Q. Do you know why that's the case, why you're not permitted to --

A. No.