IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Virginia

```
----------------------------------------:
ALISHA W. WILKES,                       :
                                        :
                  Plaintiff,            :
vs.                                     :Case No.
                                        :
EXPERIAN INFORMATION                    :1:10cv1160
SOLUTIONS, INC, et al.,                 :
                                        :
                  Defendants.           :
----------------------------------------:
```

McLean, Virginia
Thursday, June 9, 2011

Deposition of:

BRYAN GARCIA

called for oral examination by counsel for Defendant GMAC Mortgage, pursuant to notice, at the office of Troutman Sanders, L.L.P., 150 West Main Street, Suite 1600, McLean, Virginia, before Amber L. Dill, of Capital Reporting Company, a Notary Public in and for the Commonwealth of Virginia, beginning at 10:17 a.m., when were present on behalf of the respective parties:

Exhibit L

A P P E A R A N C E S

On behalf of Plaintiff:

SUSAN M. ROTKIS, ESQUIRE (Via Telephone)
GARY ABBOTT, ESQUIRE (Via Telephone)
LEONARD A. BENNETT (Via Telephone)
Consumer Litigation Associates, P.C.
12515 Warwick Boulevard
Suite 110
Newport News, Virginia 23606
(757) 930-3660

On behalf of Defendant GMAC MORTGAGE:

ETHAN G. OSTROFF, ESQUIRE (Via Telephone)
Troutman Sanders, L.L.P.
222 Central Park Avenue
Suite 2000
Virginia Beach, Virginia 23462
(757) 687-7500

On behalf of Defendant AMERICAN FUNDING:

DANIELLE HALL-MCIVOR, ESQUIRE (Via Telephone)
Taylor & Walker, P.C.
555 Main Street
P.O. Box 3490
Norfolk, Virginia 23514
(757) 625-7300

© 2011

Q And do you recall why that tenant moved out in the spring of 2010?

A Because the court case was settled and she was prepared to sell the house.

Q And did Ms. Wilkes ask the tenant to leave the property?

A The lease was up and she wasn't going to renew it, no. And they didn't want to buy the house so they didn't -- they couldn't stay.

Q Okay. Did that lease have an option to allow the renters to stay month to month?

A I believe so, yeah.

Q And did Ms. Wilkes give them a notice to vacate the house?

A Not until we had it on the market because they -- they had -- Ms. Wilkes wanted to hopefully sell it before they actually physically moved out, but they weren't so kind on the house and it was -- they had -- they just had a bunch of stuff in there and it was making it hard to market the property. So she did give them notice. And I think that was sometime the end of May that they were to be out.

in early April of 2010, did it stay on the market until it was sold?

A It was on the market through April. I think we got a contract sometime in April. Pretty quickly we got a contract. The buyer did their home inspection and then they decided not to go through with the sale. They just felt there was too much that needed to be done to the house. Like I mentioned, the current tenants were not real kind on the house, and they had tons of stuff there. So that buyer backed out.

And then I suggested to Ms. Wilkes that she wait until the tenants were out and had an opportunity to get anything done to the house that needed to be done through the tenant moving out and their security deposit and all that.

And so we took it off the market, I think early May through maybe early June time frame. And then it came back on the market in early June, once everything was cleared out of the property and it showed a little bit better without all their stuff in there. And then we got a contract.

Q Okay. Once the house was listed the market for sale, did the plaintiff ever discuss with you anything other than selling the house at that point?

A No. I mean, I know her main goal was she needed to do something in order to take care of her attorney's fees and, as far as I knew, I don't think she at that point had entertained anything else but she may have. I don't know.

Q And your understanding was that she was looking to sell the house by putting it on the market, right?

A Yeah, as far as I know.

Q Do you know when the last time the plaintiff was physically at the house?

A I mean, I don't know if she came by at all during the time that the tenants were there. I mean, I didn't physically see her at the house any time after that. And I don't recollect if she even was able to make it by the house with me prior to it going on the market or while it was on the market or anything. I know she wanted to try to get by. Now, she may have come by on her own. I don't know.

A I think I told you earlier. I think the inspection -- after the inspection, the buyers decided not to go forward and they voided the contract.

Q All right. Can you take a look at 2785, please.

A Okay.

Q Okay. The bottom of that page an e-mail from Ms. Wilkes and its dated May 21,2010.

A Uh-huh.

Q When it refers to the "Mormann," M-o-r-m-a-n-n --

A Uh-huh.

Q -- that's the people who were renting the house?

A Correct.

Q And did they -- did they vacate the house at the end of May?

A Yes.

Q All right. Sir, let's -- you have another stack that includes documents from Exhibit 4 in front of you that are Bates stamped 2908 to 3344, right?

A Correct.

Q Is that, to your recollection, when the closing was?
A I believe so. It would state on the HUD-1 specifically.
Q Do me a favor and turn to 2912 and 2913.
A Okay.
Q Am I correct that each of these documents is a list of the Realtors who came to look at the house?
A Correct.
Q So on 2913 am I correct that the -- at the top of the page there are entries on top -- three entries that are dated 4/10?
A Correct.
Q Is that, to the best of your recollection, the first time someone came to look at the house?
A To the best of my recollection, yep.
Q And would these documents typically list everyone or -- strike that.
Would these documents typically list every agent that has come to look the house with a potential buyer?
A Generally. Unless somebody got missed on

Q Now, am I correct that once this document was signed, that Ms. Wilkes could not decide to take the house off the market?

A No. A seller can decide to take the house off the market and ask for a withdrawal of the listing agreement.

Q Okay. Can you take a look at 2932, please.

A Okay.

Q Can you see a paragraph that starts with number -- number 9? It's called "broker duties" and then, under subparagraph D, the sentence that begins, "Upon full ratification of this agreement, broker shall enter listing information into the MLS database" --

A Uh-huh.

Q -- "on or before April 12th, 2010"?

A Uh-huh.

Q Do you recall whether or not it was listed by that date?

A I don't remember the specific date that she chose to do it, but it was before April 12th, 2010.

Q Okay. And once it was actually entered into

the MLS database, am I correct that your understanding was that plaintiff desired to sell the house?

A Yeah.

Q And that she never discussed anything with you other than selling the house?

A I don't recollect any discussions about anything other than selling the house.

Q Okay. Can you take a look at 2935, please.

A Okay.

Q Under paragraph 20, subparagraph A.

A Uh-huh.

Q Do you recall whether or not the lien in the name of Surovell, Markle, Isaacs & Levy PLC, in the amount $210,000 was ever reduced?

A Do I recall if it was ever reduced? I believe so. I think the HUD-1 showed $190,000, if I remember correctly.

Q Do you know why it was reduced?

MR. ABBOTT: Object as to form.

BY MR. OSTROFF:

Q Do you know why the lien in the amount of $210,000 that's shown on document no. 2935 was reduced

Ms. Wilkes received after the sale of the home?

A That would be my assumption, yes.

Q Okay. Take a look at 3081.

A Okay.

Q And it's a document that titled "regional sales contract," and am I correct that it goes through page 3096?

A The contract itself goes to 3090. Then there's the Virginia jurisdictional after that, which is a part of it. And it you want to be real technical, 3097, the home inspection, is a part of it. 3098, FHA financing addendum, is a part of it. 3101 is a part of it. 3102 is a part of it.

So if you want to add on all addendums, of course, the last one you just looked at was the contract itself.

Q Right. And on 3081, it's dated April 21st, 2010?

A Yes, sir.

Q Is that the first contract that Ms. Wilkes entered into to sell this property?

A Yes, I believe so.

Q And that sales price of $365,000?
A Uh-huh.
Q That obviously was less than what she ultimately sold the home for, right?
A Correct.
Q Do you know why she accepted this lower amount in April?
A As I mentioned before, the tenant were in the house still. They had tons of clutter. The house was in rough shape. So I looked at it as an opportunity just to go ahead and move on and move forward with it.
Q And am I correct that it was the purchasers that are identified in this regional sales contract who terminated this regional sales contract?
A Yes, sir.
Q And do you recall when that was?
A Shortly after their home inspection.
Q If you could take a look at 3108, please.
A Okay.
Q Actually, before we talk about that, let's talk about 3110, and it's titled "release of sales

contract and deposit."

A What number?

Q I'm sorry. 3110.

A 3110, yep.

Q And it that what you were just referring to when we discussed what happened with the sales contract --

A Correct.

Q -- that was entered into on April 21st, 2010?

A Correct.

Q So that contract was -- strike that.

So am I correct that, on May 5th, 2010, the persons who were contemplating purchasing the home decided that they wanted to terminate the sales contract?

A Correct.

Q And am I correct that Ms. Wilkes did not find out about this until the date of her signature, which is May 6th, 2010?

A That's the date that this release was signed. I'm not sure the specific date that they

actually gave notice that they were voiding the contract.

Q Do you have any recollection of them giving notice that they wanted to release the sales contract?

A I mean, yeah, I'm sure they gave notice.

Q Okay. Do you have any recollection of when that was?

A Not specifically.

Q Do you have any recollection of speaking with Ms. Wilkes about these persons' desire to release the sales contract?

A Oh, yeah. We had the discussion about them voiding the contract due to the home inspection.

Q Do you recall what Mr. Wilkes said to you when you told her that these people wanted to release the sales contract?

A No, I don't recall what her specific response was.

Q Do you recall generally what her response was?

A I think she was bummed that we were going to have to start all over.

Q Okay. And am I correct that she still wanted to sell the house?

A As far as I knew.

Q All right. Can you take a look now at 3108 and 3109.

A Okay.

Q And am I correct that the document on 3109 entitled "acknowledgement of receipt of notice" -- was that never signed by this person that's identified as Aaron, A-a-r-o-n, Mormann, M-o-r-m-a-n-n?

A The notice itself?

Q Yes.

A No. The notice was signed by Ms. Wilkes because -- because she's given notice. Notice is unilaterally done. And then I made a copy of the receipt, his receipt of that notice.

Q And that's what the document that's labeled 3108 is for?

A Yeah.

Q So am I correct that after this sales contract dated April 21st, 2010 was signed, that Ms. Wilkes then gave notice to her tenant to vacate

A Correct.

Q And that this was the date at which time the house was being offered to rent; is that right?

A Correct.

Q And could you take a look, please, at 3223?

A Okay.

Q And that's the deed of lease with a gentleman named Aaron Mormann, correct?

A Correct.

Q And could you look through and tell me if I'm correct that this document goes through page 3232; is that right?

A Yes. Yes.

Q And on the first page of 3223 --

A Uh-huh.

Q -- under section 2, the lease term originally ended on March 31st, 2010?

A Correct.

Q And so this lease was extended for 30 days -- well, strike that. So under paragraph 2, this lease term was extended beyond March 31st, 2010, right?